**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------
**UNITED STATES OF AMERICA** *ex rel.*
**Rodney J. Repko, Relator,**

                  **Plaintiffs,**

**vs.**

**GUTHRIE HEALTHCARE SYSTEM,**
**GUTHRIE CLINIC, LTD.**
**(aka GUTHRIE MEDICAL GROUP, P.C.),**
**GUTHRIE HEALTH (aka "The Guthrie Clinic"),**
**ROBERT PACKER HOSPITAL,**
**CORNING HOSPITAL,**
**PRICEWATERHOUSECOOPERS LLP, MARK**
**MARK STENSAGER, TERENCE DEVINE, M.D.,**
**THE GUTHRIE CLINIC, JOHN DOE, M.D.**
                  **Defendants.**

**Case No.:_____**

**AMENDED COMPLAINT**

**FILED IN CAMERA AND**
**UNDER SEAL PURSUANT**
**TO 31 U.S.C. § 3730**

**JURY TRIAL DEMANDED**

       Plaintiff-Relator Rodney J. Repko, by and through his attorneys William H. Fuller and Michael Guy Holton of Fuller, Taylor & Holton, P.C., and Ronald V. Santora, Bresset & Santora, LLP, 1188 Wyoming Avenue, Forty Fort, PA on behalf of the United States of America, alleges, based on his personal knowledge, documentary evidence, and information and belief, as follows:

**<u>Summary of Action</u>**

       1.      Mr. Repko brings this action pursuant to the Federal False Claims Act to recover damages arising from more than $900 million in false and fraudulent claims submitted to Medicare and Medicaid as a result of the conduct of the defendants.  Guthrie Healthcare System ("GHS") agreed with Guthrie Clinic, Ltd. (the "Clinic") to pay kickbacks and other unlawful remuneration to more than 260 physicians employed by the Clinic.  GHS and the Clinic created a shell "joint venture" company, Guthrie Health, and used it to transfer as much as $26 million per year from GHS to the Clinic in return for referrals and ancillary

services provided by the Clinic's physicians to hospitals, outpatient surgical facilities, durable medical equipment companies, and home health companies owned by GHS.  GHS was the parent of several hospitals, along with an Ambulatory Surgery Center, DME supplier, and home health companies; the term "Hospital Group" will be used to refer to those entities collectively, or to the corporate parent of those entities at any given time herein.  This is a textbook example of an illegal kickback scheme.  The parties formed the corporate intent and state of mind to enter into a "joint venture" called Guthrie Health, and documents demonstrate that they knew in advance that it implicated, very specifically, the Anti-Kickback Statute and the Stark law. The intentional and wrongful conduct involving hundreds of millions of dollars to the Medicare/Medicaid programs, and more than $100 million in known kickbacks over the past 4 years alone, rises to a level of both civil *and* potential criminal violations of the Anti-Kickback and other potentially related criminal statutes, and the scheme continues.  Throughout, referring physicians at the Clinic sat on the "joint venture" board with lay members from the GHS, and jointly agreed on budgets calling for and anticipating specific volumes of admissions and ancillary services at each of the GHS subsidiaries, including Robert Packer ("RPH") and Corning ("Corning") hospitals, all or virtually all of which were known to be provided by Clinic physicians, and which volumes of referrals and admissions the Clinic leadership had the power to influence.  At the very same time, the same budgets called for the Clinic to receive cash "gifts" or "equity transfers" to cover its "budgeted losses".  Since FY 2001 when this arrangement through the "joint venture" was formalized, the *Clinic* has incurred losses of more than $269.9 million and for all intents and purposes is insolvent, and has been for years.  By significant contrast, GHS and its subsidiaries (hereinafter the "Hospital Group"), on the other hand have flourished as a

result of the cash-for-referrals arrangement.  The profits at RPH alone have grown from a 3.7% margin in 2004, with a profit of $4 million, to a margin of 13.8% by 2014, with profits of more than $61.2 million in FY 2015.  The United States and New York are paying at least $100 million in false claims each year to GHS and the Clinic.  As of September 30, 2017, this system comprised of a total of 379 licensed beds spread among 4 hospitals, with the largest being the flagship 238-bed RPH, yet has amassed "*unrestricted cash and investments*" of more than *$685 million*.

2.    The conduct alleged herein represents violations of a number of federal criminal and civil statutes designed to protect programs of the Department of Health and Human Services from fraudulent and abusive claims, including but not limited to the federal **Anti-Kickback Statute, 42 U.S.C. § 1320a-7b**, and its implementing Safe Harbor regulations at 42 CFR §1001.952(a)-(u);  the federal **Stark Law, 42 U.S.C. §1395nn**,  and implementing regulations at 42 CFR §411.355 regarding general exceptions, and 42 CFR §411.357, addressing exceptions related to compensation arrangements; and the federal **False Claims Act, as amended in 2010, 31 U.S.C. § 3729-3733**.  Applicable criminal statutes of limitation are tolled pursuant to the Wartime Suspension of Limitations Act.  See *U.S. ex rel Carter v Halliburton, et al*, 710 F.3d 171, 179  (4th Cir. 2013).

3.    "**We have established admission *targets* by practice. . . .  Each physician should be aware of their targets and fully engaged in achieving the targets**" , these are the words of John Nespoli, COO of GHS and the Hospital Group, to a management "Team" in FY 2008, which team included the President of the Clinic, the COO of the Clinic, the chief of cardiology of the Clinic, and members of the Clinic business office and mid-level managers and Clinic physicians, urging them to "**track actual admissions to *target***". GD

50549   In that same fiscal year, the Hospital Group benefitting from those admissions transferred millions of dollars in "Gifts" or "equity transfers" to the Clinic.

4.      Nespoli's directive was part of an email thread from his boss, GHS CEO Mark Stensager, who inquired about "targeted admissions".

5.      Since 2001, Clinic physicians sitting in leadership positions on the respective boards of the Clinic, GHS, RPH, Corning and Guthrie Health regularly reviewed and voted to approve budgets calling for or based upon targeted volumes of admissions, ancillary services, and orders for other services, products or medical equipment reimbursable by Medicare and Medicaid, knowing that Clinic was responsible for virtually all such admissions and referrals at RPH and for the majority at Corning, and at the same time voted to approve "budgeted losses" at the Clinic that would be reimbursed by "gifts", "grants" or "equity transfers" from the Hospital Group.

6.      The parties,  including defendant Devine,  have admitted that, with respect to cash transfers identical to those described herein as "gifts", such cash transfers were necessary to cover the Clinic's operating expenses, which significantly included physician salaries and benefits.

7.      As described herein, the Clinic commenced a practice that on information and belief continues to the present, of submitting requests for cash transfers to very specifically cover "physician payroll".

8.      A hospital budget includes projections, or targets, for hospital volume for the forthcoming period, including the volume of inpatient admissions, outpatient volume, surgical procedures, cardiac procedures, including catheterizations and other diagnostic and therapeutic procedures, radiology procedures, pathology and laboratory procedures, and

including all other services within the definition of "designated health services" under the

Stark law.

9.      A budget is a plan reflecting targets for the intended volume of activity within

a business for the budget period in question.

10.     A vote by a member of a board of directors to approve a hospital reflects that

individual's agreement on the volume and targets included within, and forming the basis of,

the hospital's budget.

11.     The Clinic physicians who participated in, and voted to approve such budgets

incorporating volumes or targets for hospital admissions along with providing for Clinic

losses to be covered by such cash transfers, and the compensation they personally received

that was paid in whole or in part by such cash from the Hospital Group, include:


**Clinic Physicians Sitting on Boards of Directors and Approving Budgets**


| Name | Position | Compensation / Contribution to Benefits |
|------|----------|------------------------------------------|
| Terence Devine, M.D. | Board, Vice-Chairman (GH)<br><br>Board Chairman (GC) | 2008: $771,451 / $62,811<br>2009: $830,406 / $41,271<br>2010: $886,783 / $43,062<br>2011: $871,047 / $$43,752<br>2012: $914,072 / $44,293<br>2013: $911,305 / $45,270<br>2014: $931,425 / $46,080<br>2015: $948,247 / $45,446 |
|  |  |  |
| Joseph Scopelliti, M.D. | Board, CEO (GC)<br>Board (GHS)<br>Board, CEO (GH) | 2010: $ $540,222 / $43,062<br>2011: $580,818 ($444,822 Salary + $135,996 bonus) + $32,862 Benefits<br>2012: $601,261 / $40,468<br>2013: $742,755 / $41,079<br>2014: $722,533 / $41,496 |

| | | 2015: $739,365 / $41,459 |
|---|---|---|
| | | |
| Edward Jones, M.D. | Board Secretary (GC) Board, Treasurer (GH) Board (GHS) | 2008: $275,817 / $47,249<br>2009: $288,696 / $37,025<br>2010: $315,733 / $38,770<br>2011: $314,122 / $39,612<br>2012: $327,082 / $40,458<br>2013: $340,537 / $41,079<br>2014: $329,060 / $41,496 |
| | | |
| Francis Belardi | Board, Officer (GC) Board (GHS) | 2008:  $304,590 / $48,750<br>2009:  $291,488 / $37,025<br>2010: $352,641 / $38,739<br>2012: $355,795 / $40,468<br>2013: $425,738 / $41,079<br>2014: $417,208 / $41,496 |
| | | |
| Robert Cohen, M.D. | Board, Chairman (GC) Board (GH) | 2008:  $485,105 / $56,368<br>2009:  $531,368 / 41,271<br>2010: $549,688 / $43,062<br>2011: $379,600 / $39,612 |
| | | |
| Ferrol Lee, M.D. | Board, Treasurer (GC) Board (GH) | 2008: $267,424 / $47,249<br>2009: $271,486 / $37,025<br>2010: $273,104 / $38,770<br>2011: $268,808 / $39,612 |
| | | |
| Burdett Porter, M.D. | Board Board (RPH) | 2008: $343,347 / $53,178<br>2009: $357,312 / $41,271<br>2010: $382,903 / $43,062<br>2011: $358,590 / $43,752 |
| | | |
| J. Michael Scalzone, M.D. | Board | 2008: $307,272 / $52,522<br>2011: $303,518 / $44,293<br>2012: $331,220 / $45,270 |
| | | |
| David Pfisterer, M.D. | Board (GC) (Chairman – 2011) Board (GH) | 2008: $175,328 / $42,977<br>2009: $199,810 / $36,097<br>2010: $265,718 / $38,739<br>2011: $235,067 /  $43,752<br>2012: $269,599 / $44,293<br>2013: $282,116 / $45,270 |

|  |  | 2014: $412,189 / $46,080<br>2015: $334,237 / $45,446 |
|  |  |  |
| Daniel Sporn, M.D. | Board<br>Board (RPH) | 2008: $676,450 / $60,673<br>2009: $502,313 / $41,271<br>2010: $731,102 / $43,062<br>2011: $562,670 / $43,752<br>2012: $487,844 / $44,293<br>2013: $549,520 / $45,270<br>2014: $ 568,499 / $46,080<br>2015: $562,606 / $45,446 |
|  |  |  |
| Thomas Yaeger, M.D. | Board | 2008: $199,202 / $47,129<br>2009: $206,471 / $37,535<br>2010: $227,176 / $35,902<br>2011: $225,585 / $38,963<br>2012: $231,923 / $39,014<br>2013: $237,601 / $38,591<br>2014: $240,833 / $39,638 |
|  |  |  |
| Kevin Carey, M.D. | Board (GC)<br>Board (GH)<br>Co-CEO (GH)<br>Board (GHS) | 2008: $297,212 / $52,140<br>2009: $309,132 / $41,271 |
|  |  |  |
| James Freige, M.D. | Board | 2008: $406,718 / $54,604<br>2009: $410,932 / $41,271<br>2010: $215,452 / $33,963 |
|  |  |  |
| David Talenti, M.D. | Board | 2008: $408,441 / $54,643<br>2009: $453,993 / $41,271<br>2011: $480,386 / $43,752<br>2012: $475,042 / $44,293 |
|  |  |  |
| Mark Mauer, M.D. | Board | 2008: $303,239 / $52,431<br>2009: $370,884 / $41,271<br>2010: $375,113 / $43,062<br>2011: $358,068 / $39,612<br>2012: $347,423 / $44,293 |
|  |  |  |
| Hal Sussman, D.O. | Board (GC)<br>Board (Corning) | 2008: $409,084 / $54,813<br>2009: $469,804 / $41,271<br>2010: $495,569 / $43,062<br>2011: $497,955 / $43,750 |

|  |  | 2013: $480,891 / $46,080 |
|---|---|---|
|  |  |  |
| Douglas Trostle, M.D. | Board (GC)<br>Board (GH) | 2009: $494,932 / $23,271<br>2010: $524,957 / $43,062<br>2011: $531,729 / $43,572<br>2012: $484,657 / $44,293<br>2014: $589,274 / $46,080<br>2015: $571,724 / $41,459 |
|  |  |  |
| Daniel Brown, M.D. | Board (GC)<br>Board (RPH) | 2008: $386,707 / $54,154<br>2009: $397,912 / $41,271<br>2011: $452,152 / $43,752<br>2012: $427,027 / $45,270<br>2014: $427,922 / $46,080<br>2015: $441,156 / $44,635 |
| Kyra Bannister, M.D. | Board (GH) | 2013: $331,949 / $45,270<br>2014: $333,169 /  $42,145 |
|  |  |  |
| Surya Narayanan, M.D. | Board (RPH) | 2011: $319,268 / $39,612<br>2012: $303,776 / $39,140 |
|  |  |  |
| Felice Reitknecht,  M.D. | Board (GC) | 2008: $411,530 / $54,154<br>2009: $445,532 / $41,271<br>2010: $443,757 / $43,062 |
|  |  |  |
| Vance Good, M.D. | Board (GC) | 2008: $187,539 / $45,826<br>2009: $198,437 / $38,646<br>2010: $214,544 / $38,068 |
|  |  |  |
| Thomas McDonald, M.D. | Board (GC) 2009<br>Officer (GC) 2009 | 2008: $464,453 / $55,903<br>2009: $515,682 / $41,271<br>2010: $566,308 / $43,062<br>2011: $566,120 / $43,752<br>2013: $564,296 / $45,270 |
|  |  |  |
| Kishore Harjai, M.D. | Dir. Card. Cath Lab | 2009: $467,265 / $41,271<br>2012: $523,485 / $44,293 |
|  |  |  |
| Dermot Reynolds, M.D. |  | 2009: $767,034 / $41,092<br>2010: $918,233 / $43,062<br>2011: $1,123,463 / $43,752 |
|  |  |  |
| Thomas Vandermeer, | Board (GC) | 2010: $375,957 / $43,062 |

| M.D. | Board (RPH) | 2011: $375,470 / $43,572<br>2012: $461,003 / $44,293<br>2013: $451,561 / $45,270<br>2014: $447,897 / $46,080<br>2015: $454,699 / $45,446 |
|---|---|---|
| | | |
| Rodrigo Samodal, M.D. | Board (GC) | 2011: $212,876 / $40,990<br>2012: $228,700 / $38,980<br>2013: $245,153 / $43,686<br>2014: $265,165 / $46,080 |
| | | |
| Matthew Estill, M.D. | Board (GC)a | 2012: $227,937 / $41,169<br>2013: $226,835 / $42,393<br>2014; 4265,703 / $43,443 |
| | | |
| Robert Larson, M.D. | Board (GC) | 2013: $326,561 / $45,270<br>2014: $337,789 / $46,080 |
| | | |
| Frederick Bloom, M.D. | Board (GC) | 2015: $266,140 / $18,264 |
| | | |
| Russ Woglom, M.D. | Board (Corning) | 2014: $306,162 / $45,446<br>2011: $289,261 / $44,293<br>2012: $338,839 / $45,270<br>2013: $316,993 / $46,080 |
| | | |
| Louis Dubois, M.D. | Board (Corning) | 2014: $428,011 / $45,446<br>2011: $364,161 / $44,293<br>2012: $381,058 / $45,270<br>2013: $399,631 / $46,080 |
| | | |
| Venogopal Thirumuri, M.D. | Board (Corning) | 2013: $390,620 / $46,080 |
| | | |
| David Austin, M.D. | Board (Corning) | 2012: $345,520 / $45,270 |
| | | |

On information and belief, none of the individuals set forth above voted "No" on any budget voted upon during their respective tenure on any of the corporate boards of directors herein.

12.     A number of physicians sitting on boards and voting to approve budgets were

compensated at the 60th percentile when compared to physicians of similar specialties nationally, including Drs. Sussman, Scalzone, Sharma, and Stapleton, notwithstanding that the Clinic had insufficient funds to cover its operating expenses, including requiring transfers from the Hospital Group to cover "physician payroll" in many months.

13.    A number of physicians sitting on boards and voting to approve budgets were compensated at the 70th percentile when compared to physicians of similar specialties nationally, including Drs. Mauer, Carey (former CEO of the Clinic and original architect of the practices herein), notwithstanding that the Clinic had insufficient funds to cover its operating expenses, including requiring transfers from the Hospital Group to cover "physician payroll" in many months.

14.    A number of  physicians sitting on boards and voting to approve budgets were compensated at the 80th percentile when compared to physicians of similar specialties nationally, including Drs. Porter, Pfisterer, and McDonald, notwithstanding that the Clinic had insufficient funds to cover its operating expenses, including requiring transfers from the Hospital Group to cover "physician payroll" in many months.

15.    Several physicians sitting as officers and members of boards voting to approve budgets were compensated at or above the 90th percentile when compared to physicians of similar specialties nationally, including Drs. Devine, Scopelliti, Jones, Lee, Woglom, notwithstanding that the Clinic had insufficient funds to cover its operating expenses, including requiring transfers from the Hospital Group to cover "physician payroll" in many months.

16.    The subsidiaries of GHS, including defendants RPH and Corning, regularly submit claims to the Department of Health and Human Services ("HHS") Medicare and

Medicaid program for services generated by referrals from the Clinic's physicians.  The subsidiary hospitals then funnel a substantial part of the payments that they receive from Medicare and Medicaid *up* to their parent, GHS, knowing that the funds will be paid to the Clinic as "gifts" to cover "budgeted losses", and normal operative expenses, including physician compensation.  Regarding prior "equity transfers" to the Clinic identical to the "gifts" that are the subject of the claims herein, the Defendants, including GHS, Guthrie Health, the Clinic and Terrence Devine, have admitted that the Clinic "*did not provide fair market value consideration to GHS in exchange for these transactions."*  Defendants' documents refer to the cash transfers herein as "gifts" which, by definition, are also accompanied by no "fair market consideration" in return.

17.   The volume of cash "gifts" from the Hospital Group to the Clinic within the statutory period herein is set forth below:

**TABLE OF CASH "GIFTS" FROM THE HOSPITAL GROUP TO THE CLINIC**

| Cash "Gifts" 2010-2015 | | "Gift" Amount |
|---|---|---|
| **2016** | | $25,183,905 |
| **2015** | | $26,292,772 |
| **2014** | | $12,758,770 |
| **2013** | | $24,263,286 |
| **2012** | | $25,001,899 |
| **2011** | | $25,827,004 |
| **2010** | | $16,701,663 |
| **TOTAL** | | **$156,029,299** |

11

18.    As set forth in Exhibit A, attached hereto and incorporated herein by reference, over that same period, RPH received payments from Medicare and Medicaid, as follows:

| FY | | RPH Medicare & Medicaid Payments |
|---|---|---|
| **2016** | | $146,871,050 |
| **2015** | | $146,139,380 |
| **2014** | | $135,651,755 |
| **2013** | | $125,735,341 |
| **2012** | | $121,197,485 |
| **2011** | | $123,224,410 |
| **2010** | | $112,173,437 |
| **TOTAL** | | **$910,992,858** |

19.    Over that same period, Corning received payments from Medicare alone, as follows:

| FY | | Corning Medicare Payments |
|---|---|---|
| **2015 - Estimate** | | $28,777,445 |
| **2014** | | $28,777,445 |
| **2013** | | $28,250,714 |
| **2012** | | $26,058,111 |
| **2011** | | $27,002,412 |
| **2010 - Estimate** | | $25,000,000 |
| **TOTAL** | | **$163,866,227** |

20.     On information and belief, Corning received additional payments from Medicare of $28,777,445 in FY 2016.

21.     In addition, Corning received payments from the Medicaid program for services rendered by Clinic physicians, a significant portion of which payments were made with federal funds.

22.     Over that same period, from the beginning of FY 2010 to 2017, the Hospital Group increased its unrestricted cash and investments by nearly $300 million, from $388 million on July 1, 2009 to $685 million on September 30, 2017.

23.     The aforesaid "gifts" or "equity transfers" from the Hospital Group to the Clinic are separate and distinguishable from payments made to the Clinic by hospitals within the Hospital Group for services actually provided, such as providing physicians to service as department chairmen, providing physicians in support of RPH's three residency programs, and assisting in medical education and research.  Payment for services actually rendered "by" the Clinic are reported by the hospitals each year as separate line items, with separate designations indicating the funds are paid for services actually rendered "by" the Clinic, with corresponding line items reported by the Clinic showing matching amounts for services it renders "to" the individual hospitals.  By contrast, the "gifts" in question are reported by GHS, as parent of the hospitals, and are assigned the designation of "gift" or "grant" to the Clinic.

24.     In their cash-for-referrals scheme, defendants provide compensation to the Clinic's physicians while "taking into account the volume or value of the referrals and other business" generated by or resulting from the admissions, referrals and orders of those

13

physicians.  As such, the defendants' compensation arrangements, profit-sharing incentives, kickbacks and other financial arrangements are prohibited by state and federal law.  By knowingly submitting claims for reimbursement based on referrals generated by physicians who received remuneration under these arrangements, on and after July 1, 2007, Defendants violated – and continue to violate – the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and the New York False Claims Act, N.Y. Finance §§ 187 *et seq*.

25.     The Guthrie defendants, including the defendant Devine, have previously judicially *admitted* that earlier "equity transfers" of cash, identical to those described in the present action as "gifts", were transferred to the Clinic, and that the Clinic paid "no fair market consideration" in return.

26.      In submitting and processing claims and cost reports to HHS, the defendants transmit claims, cost reports and related and supporting information through the U.S. mail, private or commercial interstate carriers, along with regular transmission of communications and information by electronic means, including email and wire or similar electronic modes of transmission.

27.     At all times, defendant PriceWaterhouseCoopers LLP ("PWC") knowingly participated in defendants' misconduct by, among other things, preparing false and misleading financial statements and tax returns to disguise the payments from GHS to the Clinic and to mischaracterize GHS and the Clinic as subsidiaries of Guthrie Health.  PWC knew that the payments made the Medicare and Medicaid claims illegal and that the Clinic would be insolvent but for the millions of dollars received from GHS, but PWC concealed these facts from government regulators, bond investors, and from the public.

28.     PWC failed to disclose, or agreed to withhold or omit from financial

statements, any amounts due or owed to the United States by reason of such liability, and knew that the financial statements it prepared were required to be attached, and were attached, to the hospitals' cost reports each year hereunder.

29.     With PWC's complicity, the defendants also violated the securities laws.  The Guthrie defendants successfully raised $500 million from the public in three municipal bond offerings, most recently in July 2011.  The offering materials include material false information about their corporate organization, their financial condition, and the illegal payments from GHS to the Clinic. By assisting the defendants in preparing and issuing "consolidated" financial statements for the defendants, wherein the "Principal of Consolidation" was the fictional parent-subsidiary relationship between the "joint venture" company "Guthrie Health" and the Clinic and GHS, PWC hid the chronic and substantial losses of the Clinic within the overall highly profitable finances of the Hospital Group.  PWC also hid that fact that the Clinic's finances were substantially facilitated by the cash-for-referrals scheme in question.  As a result, potential bond buys, bond holders, and the bond rating agencies were never fully informed that the Clinic, as one of the two operating entities responsible for servicing bond-related debt, was insolvent, and losing tens of millions of dollars each year, or that it required cash "gifts" from the Hospital Group in order to cover its expenses, including physician salaries and benefits.

30.     On July 1, 2001 the Clinic had a negative net worth or "fund balance" of ($37,748,698).

31.     From July 1, 2001 through June 30, 2015, the Clinic has incurred additional losses of more than ($269.9 million) and its net fund balance through FY 2015 should therefore be ($37,748,698) plus the ($269.9 million) in additional losses, or approximately

negative ($307 million) through FY 2015.

32.     Instead, PWC has prepared and issued tax returns for the Clinic off-setting the Clinic's true negative net worth by the value of the cash "gifts" or "equity transfers" from the Hospital Group.

33.     In addition, the Clinic's New York offices have been operating in violation of the law and without the necessary license for more than 10 years.  In the same agreement that formalized the cash-for-referrals scheme, the Clinic's leadership gave *de facto* control of its medical practice to defendant Guthrie Health in return for payments from GHS.  This arrangement guaranteed the Clinic's financial survival, but it violated New York's law governing foreign medical professional corporations.  The Clinic has repeatedly filed fraudulent statements with New York state regulators to conceal the fact that it is now operating as a diagnostic and treatment center without proper license or authority for each of the Clinic's offices in New York.  As a result, the Clinic and its physicians in New York cannot submit lawfully claims for reimbursement to Medicare or Medicaid.

34.     In an unrelated reported action, the U.S. Court of Appeals for the 4th Circuit, placed emphasis on the opinion given by the former chief of the industry guidance section of the Office of Inspector General of HHS, when advising the defendant hospital in the case on an arrangement <u>exactly like</u> the facts described herein; the 4th Circuit noted Kevin McAnaney's advice that:

> *"[P]rocuring fair market valuations* [of physician compensation], *by itself, was not conclusive of the accuracy of the valuation."*  He emphasized that it would be "very hard to convince the government that a contract that paid physicians "substantially above even their collections, much less their collections minus expenses' would

16

*constitute fair market value",* noting that*, "According to McAnaney, compensation arrangements under which the contracting physicians are paid in excess of their collections were 'basically a red flag to the government" that "wouldn't pass the 'red face test'",* and that such cases would present the government with *"an easy case to prosecute."*

35.     The United States intervened in the aforesaid 4th Circuit case involving Tuomey Healthcare, in which a judgment for more than $230 million was entered, and which later settled with the government for more than $80 million.

36.     In an unrelated action (U.S. ex rel Gelfand and State of New York v. Specialcare Hospital Management, in the Eastern District of New York, settled in August, 2015), the United States asserted the position that "*the requirement that a health care provider be licensed to provide services for which it bells Medicare is so basic that, absent inadvertence, False Claims Act liability may lie as a matter of law.*"

37.     The United States intervened in the aforesaid SpecialCare case, which later settled.

38.     The Guthrie defendants had actual knowledge that lay control over the practice of the Clinic as a medical professional corporation would convert each Clinic office in New York into a "diagnostic and treatment center", requiring site-specific licensure and approval, as in the treatment centers in SpecialCare.

39.     The Guthrie defendants specifically advised a Pennsylvania court in 2011 that merging the Clinic into Guthrie Health, with its lay board and officers, would cause the Clinic's New York offices to be "diagnostic and treatment centers".

40.     In spite of the aforesaid actual knowledge of New York licensing

requirements related to "diagnostic and treatment centers" triggered by lay control over a
medical professional corporation, the parties conveyed de facto "parental" powers to Guthrie
Health over the Clinic in 2001, and effective February of 2014 drastically restated the
Clinic's corporate structure in Pennsylvania, in which it:

(A) called in all of its outstanding shares of stock, amending and restating

(B) reduced the number of physician shareholders from approximately 200 down to 1;

(C) reduced the number of authorized shares of the corporation from 3,000 down to
100;

(D) amended and restated the Clinic's Articles of Incorporation in Pennsylvania;

(E) established a new minimum qualification for a physician to be a shareholder in
the Clinic, such that in order to hold shares in the Clinic a physician was required
to sign a "Shareholder *Control* Agreement" ensuring that Guthrie Health would
have "parental authority and control" over the reorganized Clinic;

(F) advised the bond markets and rating agencies in New York that the Clinic had
undergone a restructuring, and that it was *"subject to the 'parental control' of
Guthrie Health through provisions of the Clinic's Articles of Incorporation,
Bylaws and a Shareholder Control Agreement";*

(G) Advised a Pennsylvania court having authority over the disposition of GHS'
charitable assets to Guthrie Health in the 2014 merger, that "*Through the
provisions of the articles f incorporation, bylaws and a shareholder control
agreement, will have parental authority and control over Guthrie Medical Group,
P.C. (i.e., the Clinic), Guthrie Health (aka "Guthrie Clinic Parent");*

(H) Changed the Clinic's corporate name from Guthrie Clinic Ltd. to Guthrie Medical

Group, P.C., which name the Clinic was already using as a 'dba' or fictitious name in its New York offices.

41.     Notwithstanding the aforesaid actual knowledge of the defendants as it relates to New York laws governing "diagnostic and treatment centers", as they specifically applied to the Clinic, and in spite of the significant corporate changes effected in February of 2014, the totality of the Clinic's notice to the State of New York regarding its corporate changes in 2014 included:

> *"FIRST:  The name of the corporation is Guthrie Medical Group, P.C. A change of name has been effected under the laws of the state of Pennsylvania on February 1, 2014, and the name of the corporation is Guthrie Medical Croup, P.C., (the "Corporation").  The fictitious name the Corporation has agreed to use in New York State* [i.e., "Guthrie Medical Group, P.C."] *is hereby deleted.*
>
> *IN WITNESS WHEREOF, the undersigned corporation has caused this Certificate of Amendment to be signed by a duly authorized officer thereof this 30th day of January, 2014."*

42.     In short, the totality of what the Clinic advised the State of New York about the major changes in its corporate and shareholder structure, including conveying control over the corporation to a lay corporation through a "Shareholder Control Agreement", is that was a "change of name" to that name it was already using as a fictitious name in New York.

43.     If the Clinic continued to qualify as a foreign medical professional corporation in the State of New York it would not be required to have a facility license as a "diagnostic and treatment center" at each of its locations and, accordingly, in order to avoid the "cost" of obtaining such approval as a "diagnostic and treatment center" in New York, the parties lied

to New York authorities about the extent of the corporate changes and about the lay control over the Clinic that had been part of the inter-corporate arrangement since 2001.

44.     The parties communicated the aforesaid corporate information to New York authorities by means of the U.S. Postal Service and mails, and transmission of information by electronic means, including email and wire communications.

45.     The New York Department of Health has issued advisory opinions in which it has emphasized that under New York law when "control of the facility . . . rests primarily with [a] business corporation rather than with the professional corporation" the practice is viewed as operation of "a de facto diagnostic and treatment center", in violation of §2801-a of the New York Public Health Law.

46.     Notwithstanding the parties' actual knowledge of the legal licensing requirements, the parties advised Pennsylvania authorities that complying with New York "diagnostic and treatment center" licensing and approval requirements would result in "very significant cost" and "major disruption" and, accordingly, undertook to avoid such licensing scrutiny by advising New York authorities that the sole corporate change in the Clinic as a foreign professional corporation in New York was the aforesaid "change of name".

47.     Physicians employed by the Clinic enroll in a 'group assignment account' for third party payors, including Medicare and Medicaid, such that all bills are submitted by, and all payments are made to the Clinic by all third party payors.

48.     As licensure is a pre-condition to doing any business as a diagnostic and treatment center in New York, and a condition of payment by third party payors for any and all services provided to beneficiaries of such third party programs, all claims submitted by the Clinic to governmental payors for services rendered in the State of New York are false.

49.     During the period from July 1, 2010 to the present, the United States and the State of New York paid more than $1 billion as a result of false and fraudulent claims submitted by defendants.  In addition, as a result of the Clinic's unauthorized and unlicensed practice of medicine at offices in the State of New York, and its submission of bills to Medicare and Medicaid for services rendered at such unlicensed locations, the Clinic has submitted several hundred thousand false claims to the United States and the State of New York in amounts exceeding $60 million during the same period.  These amounts do not include mandatory trebling and per-claim penalties.

50.     By transferring cash "gifts" to the Clinic for the purpose, inter alia, of retaining and increasing referrals from the Clinic's unlicensed New York offices, the Hospital Group conspired with the Clinic in the operation and expansion of such offices.

51.     Defendants' conduct is not only illegal; it is also harmful to patients and law-abiding healthcare providers in New York.  The Guthrie Defendants are diverting referrals from New York hospitals to RPH in Pennsylvania using the financial advantage resulting from their illegal cash-for-referrals scheme.  They are also acquiring medical practices from and around nearby competing hospitals in New York, offering compensation that includes funds paid illegally by GHS to the Clinic, encouraging those physicians to admit and refer patients to the Hospital Group,  and enjoying the profits that come from the additional referrals, admissions and orders for ancillary services generated by these new doctors. The acquisition of specialty practices in and around competing hospitals not only reduces the market share of such hospitals in the services in question, but also reduces and threatens to reduce the volume of such services provided at competing hospitals below the levels needed to maintain the professional skill and proficiency of physicians and specialty staff performing

such procedures and, accordingly, adversely affects and threatens patient health and safety.

The practice threatens the availability and quality of medical services in the Southern tier of

New York and derogates the rights of patients to choose their own hospitals and specialists.

**Jurisdiction and Venue**

52.    This Court has jurisdiction of the subject matter of this action pursuant to 31

U.S.C. § 3730 and 3732(a) and (b), and pursuant to 28 U.S.C. §1345.

This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. §
3732(a); the defendant PricewaterhouseCoopers can be found, resides at, or transacts
business in the Eastern District of New York, and specifically transacts or conducts business
in this District.

53.    Venue is proper in the Eastern District of New York under 28 U.S.C. §§

1391(b) and 1391(c) and under 31 U.S.C. § 3732(a), providing that "*Any action may be*

*brought in any judicial district in which the defendant or, in the case of multiple defendants,*

*any one defendant can be found, resides, transactions business, or in which any act*

*proscribed by section 3729 occurred.*" (emphasis added).    Defendant PWC transacts

business in this District.

**Parties**

54.    The United States of America, acting through the Department of Health and

Human Services ("HHS"), with its headquarters at 200 Independence Avenue, S.W.,

Washington, D.C., 20201,  and the Centers for Medicare & Medicaid Services ("CMS"),

administers the Health Insurance Program for the Aged and Disabled established by Title

XVIII of the Social Security Act (Act), 42 U.S.C. §§ 1395 *et seq*. ("Medicare"), and Grants

to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C. §§

1396 *et seq*. ("Medicaid").

55.    Rodney J. Repko is the "relator" or whistleblower.  He is a resident of

Pennsylvania and a lawyer with over 30 years of experience in healthcare.  He was General

Counsel to the Clinic until his resignation in 1998, and all of the claims and conduct of the

defendants that are the subject of this lawsuit arose well after his resignation, and subsequent

to his having any professional association or relationship with any of the defendants.

56.     Defendant Guthrie Healthcare System ("GHS"), previously known as Guthrie

Medical Center, was a holding company.  It was the sole member of Robert Packer Hospital

("RPH"), Corning Hospital ("Corning"), Troy Hospital ("Troy"), long term care facilities,

durable medical equipment company, home health company, and a taxable subsidiary, Twin

Tier Management Company, Inc, which sells durable medical equipment under the name

Guthrie MedSupplyDepot.  GHS was a not-for-profit corporation registered to do business in

New York State.  Effective February, 2014, GHS merged into "Guthrie Health", described

below, with the latter being the surviving entity.

57.     Defendant Guthrie Clinic, Ltd., (the "Clinic") is a professional corporation

located in Sayre, Pennsylvania.  The Clinic operates in the State of New York as Guthrie

Medical Group, P.C., a foreign medical professional corporation.  More than 260 physicians

practice at, and are members of, the Clinic.  Their practice is designed around a hub-and-

spoke concept, in which the specialty and sub-specialty physicians are located in offices next

to Robert Packer Hospital in Sayre, Pennsylvania, while primary care physicians were

located in satellite offices throughout Pennsylvania and the Southern tier of New York.  The

Clinic also operates an 80,000-square-foot medical office in Corning, in the Western District

of New York, and offices in Ithaca, Binghamton and other areas in the Northern District of

New York.

58.     The Robert Packer Hospital ("RPH") is a non-profit corporation located in

Sayre, Pennsylvania.  It is a wholly owned subsidiary of GHS.  With the possible exception of a few emergency room physicians and one or two psychiatrists who are employees of RPH itself, every member of the Active Medical Staff is a doctor employed by the Clinic.  These doctors have admitting privileges in every specialty and medical department within RPH. Only members of the active medical staff have admitting privileges at the hospital.  Patients presenting to the RPH emergency room must be admitted to the service of a physician with Active Staff privileges, virtually all of whom are employed by the Clinic.

59.     Corning Hospital is a full-service community hospital providing care for patients living in Steuben, Chemung and other counties in southwestern New York.  The hospital offers a broad range of inpatient and outpatient services, including a multi-specialty ambulatory surgical center.  The hospital is a wholly owned subsidiary of GHS and depends on physicians employed by the Clinic both for in-hospital services and referrals.

60.     Guthrie Health is a non-profit corporation authorized to do business in the State of New York.  Its board of directors is comprised of an equal number of executives of GHS and the Clinic.  The Clinic's representatives on the board are physicians, but GHS' representatives are lay representatives of GHS.  Guthrie Health is a shell company; it had no substantial assets and no subsidiaries at most times relevant to this complaint.  It's primary, if not its sole purpose prior to its merger in 2014 with GHS, was to serves as a place for leaders of GHS and the Clinic to meet, to discuss and agree on budgets for GHS (and all GHS subsidiaries) and the Clinic, as well as related issues like pricing, borrowing, and strategic plans.  These budget agreements included and/or are built upon very specific targets for hospital admissions, outpatient procedures, and ancillary services based on referrals from the Clinic.  The Guthrie Health board also determines the amount of cash, loans and in-kind

support that GHS will provide to the Clinic to cover its expenses, particularly the salaries and

benefits of the Clinic's physicians.

61.     Effective February 1, 2014, GHS merged into GH, which changed its

corporate name in Pennsylvania to "The Guthrie Clinic".

62.     Simultaneous with the aforesaid merger of GHS into GH, the Clinic changed

its corporate name to "Guthrie Medical Group, P.C.", a name under which it had already

been doing business in the State of New York.  For ease of reference, and to avoid confusion

resulting from the use of a deceptively similar name by Guthrie Health post-merger with

GHS, this Complaint will refer to the physician-group as the "Clinic" throughout, to Guthrie

Health by that name, or as the "joint venture", and to GHS and its collected provider-

subsidiaries as the "Hospital Group".

63.     PriceWaterhouseCoopers ("PWC") is a global accounting and consulting firm.

It has provided accounting, tax, and healthcare reimbursement advice and financial services

to GHS and other Guthrie entities since at least the early 1980s.  PWC's reported revenue for

fiscal year 2012 was $31.5 billion worldwide, and maintains offices and regularly transacts

business at multiple locations in the Eastern District of New York.

64.     PWC is involved in countless activities on behalf of GHS, including the

preparation of audited financial statements, advice to the board of directors on a variety of

issues, and support for more than $500 million of tax-exempt bonds issued by the Clinic and

GHS since 2002.  As described below, PWC assisted the parties in creating the illusion that

the defendants are part of a single vertically integrated company, with the joint venture

company Guthrie Health positioned as the owner or "sole member" of the Clinic and GHS.

PWC conspired with the Clinic and GHS to hide the true nature of their relationship from

investors and regulators, making it possible for their illegal payments-for-referrals scheme to continue undetected for more than 10 years.

65.     In the course of an earlier action brought against the Hospital Group and Clinic, PWC was specifically consulted by the defendants and/or their attorneys to assist in an "investigation" of the allegations therein, and contributed to a report submitted to the United States in response to the allegations in that matter and, as such, had actual knowledge of the existence and nature of the earlier claim. PWC also had knowledge that audited financial statements prepared by the firm were required to be attached, and were in fact attached to Cost Reports submitted to Medicare and Medicaid by the defendant hospitals, and were part of the reconciliation of amounts due from/to the provider and the government.

66.     Terence Devine, M.D., is an ophthalmologist employed by the Clinic since approximately 1984.  He has served as Chief of the Section of Ophthalmology for at least the past two decades.  In addition, Devine has served as Chairman of the board of directors of the Clinic and alternately as Chairman and Vice-Chairman of the board of directors of Guthrie Health, among many other leadership positions.  He also served on the "Physician Compensation Committee" of Guthrie Health.  As alleged below, Dr. Devine personally voted to approve of, and aided in implementing key parts of the illegal cash-for-referrals scheme, and personally referred patients to GHS in return when he knew that a large portion of the nearly $1 million in compensation he was paid by the insolvent Clinic– determined to be at or above the 90th percentile of ophthalmologist in the U.S. -- derived from the cash "gifts" and improper financial arrangement between the Clinic and GHS.

67.     Defendant Mark Stensager served as the Chief Executive Officer of GHS from approximately 1999 through FY 2012, and also served as Co-CEO of Guthrie Health

from 2001 through FY 2012.  In addition to serving as a member of the board of directors of Guthrie Health and GHS, he also attended the meetings of the Clinic board of directors, and regularly attended the meetings of the Guthrie Health Physician Compensation Committee. As alleged in detail below, Stensager was a key architect of defendants' efforts to maximize referrals from the Clinic to GHS and its subsidiaries by setting targets for admissions and rewarding physicians with millions of dollars in "equity transfers" and other payments to the Clinic.

68.     Stensager directed and oversaw the creation by management staff and/or consultants of reports the purpose of which was to measure and track referrals to the Hospital Group, and to set referral targets by-Clinic-physicians or sites to prepare reports on "hospital profit and loss by specialty" within the Hospital Group, and advised management staff that physicians and/or sites should be aware of their targets and regularly advised of their performance in relation to such targets.

69.     Both Stensager and Devine have admitted the essential elements of the conduct described in this Complaint.

70.     While the claims complained of herein cover cost reports covering the period after March of 2010 to the present, the corporate state of mind, and intent of the parties was formed in transactions and a pattern of conduct that commenced at least as early as 2001, but that continues unabated to the present.

71.     Prior to commencing activities through the "joint venture", (i.e., Guthrie Health) in 2001, all of the parties herein had actual knowledge that the joint venture model chosen for their arrangement, and the financial transactions they contemplated and intended to implement through the joint venture, implicated the Anti-kickback Statute, and the Stark

law and, accordingly, had actual knowledge that they would be violating the aforesaid statutes, as well as the False Claims Act as a result of such violations.

**The Prior Action**

72.     In 2004, Mr. Repko instituted an action against Guthrie Health, GHS, RPH, the Clinic and Devine under the *qui tam* provisions of the False Claims Act alleging unlawful upcoding, the knowing employment of a physician excluded by New York Medicaid for filing false claims, illegal inducements to independent optometrists for ophthalmology referrals, and submission of claims for "facility fees" for facilities the hospital neither owned nor leased.  The original claims covered the period through 2004 and are not part of the present action.  The United States Attorney for the Middle District of Pennsylvania declined to intervene in 2006.

73.     In the prior action Mr. Repko alleged, and the defendants admitted, employing Beverly Prince, M.D., knowing that she was excluded from New York Medicaid for filing false or fraudulent claims.

74.     In the prior action, defendants produced documents revealing that when enrolling Dr. Prince with the Clinic's commercial insurers, the defendants responded 'no' to the question of whether Dr. Prince had ever been excluded from the Medicare or Medicaid programs.

75.     In the prior action, in seeking the reinstatement of Dr. Prince in the New York Medicaid program the defendants used her enrollment in the Clinic's private commercial insurance account, and her acceptance by those insurers which was obtained only after the defendants misled those insurers about Prince's exclusion, as evidence that she was deemed

acceptable by those insurers, and therefore should be reinstated by NY Medicaid.

76.     In the 2004 action the defendants admitted that, in violation of state and federal prohibitions against doing so, they commingled funds from federal programs such as Medicare and Medicaid with funds used to pay Prince's salary and benefits, notwithstanding her known exclusion.

77.     The uncontested testimony of the Relator in the 2004 claim is that, when an earlier Clinic physician was threatened with exclusion in Pennsylvania, the governmemt's position is that no funds from any federal program, including Medicare and Medicaid, could be commingled with funds used to pay the salary or benefits of the excluded individual, and that he had communicated that governmental position on several occasions to the Clinic prior to its hiring of Dr. Prince with the knowledge that she had been excluded for fraud.

78.     In addition to Prince's exclusion from NY Medicaid program, Prince was prohibited as a matter of law from being enrolled in the Pennsylvania Medicaid program by reason of her New York exclusion for fraud.

79.     Notwithstanding the aforesaid New York and Pennsylvania exclusions and prohibitions, and the federal prohibition against commingling federal funds with funds used to pay an excluded individual, the Clinic admitted to knowingly hiring Prince, to commingling federal funds with funds used to pay her salary and benefits, and to enrolling her in the Clinic's group assignment account with Pennsylvania Medicaid.

80.     Upon the employment of Dr. Prince by the Clinic, Dr. Prince was granted Active Staff medical staff privileges at the defendant Robert Packer Hospital, which was also informed and fully aware of her exclusion, and throughout her tenure routinely admitted patients to, performed surgery in, and wrote orders for services at the Robert Packer Hospital

29

reimbursable and reimbursed by federal programs, including Medicare, New York Medicaid, and Pennsylvania Medicaid.

81.     When issuing bonds and an Official Statement related to those bonds, the defendants described legislative rules governing the conduct of their business, in which documents they specifically described the statutory prohibition against employing physicians excluded by any federal program.

82.     In 2002, when issuing municipal bonds, the Guthrie defendants' Official Statement included a notice that: "*The BBA (Balanced Budget Act) added a new monetary penalty for persons who contract with a provider that the person knows or should now is excluded from the Medicare program.*"

83.     At no time from 2002 to the present, with PWC's knowledge and assistance, in each year in which the parties issued audited financial statements, they attached such statements to the hospitals' cost reports, or submitted and certified cost report Work Sheets that called for a reconciliation each year of the amounts due to or from the Medicare and Medicaid programs, did the financial statements, worksheets, cost reports, or any other attachments submitted to the Medicare or Medicaid programs advise the government of the parties' actual knowledge that such funds were due and repayable to those programs by reason of the employment of Dr. Prince.  Each year in which such financial statements attached to cost report, along with the cost reports and worksheets, were submitted, up to and including the most recent cost reports filed hereunder, constitute a material misrepresentation or omissions designed to reduce or avoid on obligation to repay amounts known to be owed to the United States.

84.     During the course of Prince's employment the individual with senior

administrative responsibility over Dr. Prince, and involved in the Clinic's efforts to support and obtain her reinstatement in NY Medicaid program was Joseph Scopelliti, M.D., who served as the senior vice president and medical director at the Clinic, and who now serves as the CEO of The Guthrie Clinic (formerly Guthrie Health & GHS), the defendants herein.

85.    The willful and fraudulent withholding of information from the United States of information relating to Prince's employment, each and every year from at least 2002 to the present, with the full knowledge of both her exclusion and the federal prohibition relating to commingling of funds and her employment, constitutes a reverse false claim designed to avoid or unlawfully diminish amounts owed to the United States.

86.    Having been retained to assist in the preparation of responses to the 2004 action, PWC had actual knowledge of the allegations relating to Prince, of the defendants' admissions relating to her unlawful employment, and to the prohibition against commingling of federal funds in cases of excluded individuals.

87.    Mr. Repko filed amended complaints in 2006 and 2007 containing allegations based on violations of the Stark and Anti-Kickback laws.  In March 2008, the district court denied a motion to dismiss and held that the complaint stated a claim for violation of the Stark and Anti-Kickback laws, and under the False Claims Act of 1986.  *U.S. ex rel. Repko v. Guthrie Clinic, et al.*, 557 F. Supp.2d 522 (M.D. Pa. 2008).  The Court's ruling in favor of Mr. Repko's complaint essentially held that, if he could prove that which he had alleged regarding the financial arrangements between the parties, he would have made out valid claims for submitting false claims and for conspiracy under the False Claims Act of 1986.

88.    After the Court so ruled in 2008, the defendants admitted all of the alleged financial allegations and, further, admitted that GHS received "*no fair market consideration*"

in exchange for the cash transfers in question in that case.

89.     In 2011, the 2004 action was dismissed for lack of subject matter jurisdiction under the old "public disclosure" bar of the 1986 FCA.

90.     The prior action covered Medicare and Medicaid claims filed before October 2007, while the new action covers claims filed from fiscal year 2010 to the present, as cost reports filed by the Guthrie corporate defendants were not filed until at least 2011, and may not have been closed by Medicare until sometime thereafter, in the normal course of business.

**The Legal Framework**

**A. The Federal False Claims Act.**

91. The False Claims Act provides, in pertinent part that:

(a) (1) Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . . or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions.  For purposes of this section (1) the terms "knowing" and "knowingly" –

(A) mean that a person, with respect to information--
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

31 U.S.C. § 3729.

## C.  The Medicare Program

92.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A.  HHS is responsible for the administration and supervision of the Medicare program.  The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program.  Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

93.     Medicare has several parts, including Part A (which is primarily for hospital-based charges) and Part B (which is primarily for physician and other ancillary services).  CMS enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare program.

Medicare Part A – Payments for Hospital Charges

94.      On information and belief, before July 1, 2007, officers of GHS, Corning Hospital and RPH signed a new Medicare application and agreement on CMS Form 855A and submitted it to the United States. On the page directly before each officer's signature is a "Certification Statement" that contains, *inter alia*, the following language:

> "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . .  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the

Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

95.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries" or "Medicare administrative contractors."  42 U.S.C. § 1395h.  These private entities, typically insurance companies, are responsible for processing and paying claims and cost reports.

96.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays.  42 C.FR. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments on a Form UB-04 or CMS-1450.

97.     As detailed below, GHS and its subsidiaries submitted or caused to be submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

98.     As a prerequisite to payment by Medicare Part A, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report.  Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

99.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of Part A reimbursement the provider believes it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20.  *See also* 42 C.F.R. § 405.1801(b)(1).  Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  42

C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

100.    GHS, Corning and RPH were, at all times relevant to this complaint, required to, and did, submit annual hospital cost reports to the fiscal intermediary, for the purpose of obtaining reimbursement from HHS through the Medicare and Medicaid programs..

101.    During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare Part A liabilities to the provider.  This total determines Medicare's true liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Part A program or the amount due the provider.

102.    Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the hospital cost reports and financial representations made by GHS and its subsidiaries to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made.  42 C.F.R. § 413.64(f).

103.    Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.  At all times relevant to this complaint, the responsible provider official was required to certify, and did certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in

accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

104.    Thus, the provider was required to certify that the filed hospital cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark law (described below).

105.    Each year hereunder the defendants filed cost reports that included schedules or worksheets that required, inter alia, that the defendants calculate or reconcile amounts due to or from the United States and, as part of the certification referenced herein, certify the accuracy of the information provided therein.

106.    In the prior action the relator alleged, and the defendants judicially admitted, that the "equity transfers" of cash from GHS to the Clinic were not accompanied by any "fair market consideration" in return, and that Clinic physicians did not generate sufficient collections to meet its expenses, including its physician salaries and benefits.

107.    Based on the defendants' admissions in the prior action, and on the evidence obtained in discovery therein, the relator established that by virtue of the cash transfers from GHS to the Clinic, the Clinic was paid more than its physicians could generate in collections, much less what it could generate in its collections minus its expenses.

108.    The defendants' "expert witness" in that prior action was Kevin McAnaney, a former senior attorney with the Office of Inspector General of the Department of Health and

Human Services.

109.    In 2015, in an opinion rendered by the U.S. Court of appeals for the 4th

Circuit, it was revealed that, in advising his hospital client regarding a situation in which his

client-hospital paid physicians above their collections, "*much less their collections minus*

*expenses*", McAnaney advised his client that defending such a practice would "*not pass the*

*'red face test'*", and that the arrangement would present the government with "*an easy case*

*to prosecute.*"

110.    Each and every year hereunder, the Clinic could not generate sufficient fees

and collections to cover its budgeted operating expenses, including its physician salaries and

benefits and, accordingly, including the cash "gifts" from the Hospital Group hereunder, the

Clinic and its physicians were paid above collections minus expenses.

111.    As further alleged herein, the cash "gifts" hereunder were used, inter alia, to

fund physician payroll and expenses for physicians employed by the Clinic.

112.    The arrangement between the Hospital Group and the Clinic herein is virtually

identical to that described in the 2015 *Tuomey* case.

113.    On information and belief, when serving in the role of defendants' "expert

witness" in the prior action, McAnaney privately provided the same advice to Guthrie that he

provided to his *Tuomey* client about that substantially similar arrangement.

114.    Prior to entering into the "joint venture" arrangement created by the

"alignment agreement" in 2001, which evolved into a modified joint venture arrangement in

2014, the parties did so knowing their planned activity had a "*weakness*":  it "*did not*

*eliminate issues re interaction between parties (Stark, fraud and abuse. . .*").

115.    The *only* possible conduct relating to "*interaction between the parties*" that

could, as a matter of law and fact, implicate the Stark and the Anti-kickback laws would be the payment of remuneration in cash or in kind in the form of, kickbacks, inducements or rewards by the hospitals to the Clinic and its referring physicians for referrals to the Hospital Group.

116.    Accordingly, the parties knew that the very conduct they intended to engage in when entering into the joint venture in 2001 – and precisely the same type of conduct being carried out through the transfer of "gifts" from the Hospital Group to the Clinic every year hereunder – was illegal.  Nevertheless, they did it anyway.

117.    When the parties issued bonds in 2002, 2007 and 2011, they produced Official Statements in which they described, *inter alia*, the legal restrictions imposed on health care organizations, including the Stark, Anti-kickback (or "fraud and abuse") laws, in which they accurately described prohibited conduct under those laws.  Accordingly, the defendants had actual knowledge of the legal prohibitions involved in the Stark and Anti-kickback laws, as well as the False Claims Act, as described in paragraphs 113 and 114 above.

118.    Notwithstanding the prior decision of Hon. James McClure in March of 2008, the undeniable advanced knowledge of the illegality of the conduct they were contemplating in 2001, and in which they continue to engage to the present, notwithstanding their stated knowledge of the statutes implicated herein, and notwithstanding that they were advised by Kevin McAnaney that the arrangement between the Hospital Group and the Clinic was illegal, just as he had advised his hospital client in *Tuomey*, the defendants at no time took action to return any of the government funds improperly obtained in violation of the aforesaid statutes, or to advise the government that such funds were owed to it.

119.    Notwithstanding the foreknowledge described above, and the advice of Kevin McAnaney regarding the illegality of the arrangements described herein, at no time did the parties, or their independent accountants at PWC or Baker Tilly (which took over Guthrie accounting responsibilities from FY 2015 on)  report or record any reserves, losses or contingencies to account for the amounts improperly obtained in violation of the statutes referenced herein, and aided and assisted the Guthrie defendants in avoiding payment of amounts owed to the United States.

120.    At all times hereunder PWC had actual knowledge that the parties' annual cost reports contained audited financial statements prepared by PWC, through and including for FY 2015.

121.    At all times hereunder, PWC had actual knowledge that the parties provided and would continue to provide copies of audited financial statements prepared by PWC to all parties owning, buying, or selling the defendants' municipal bonds, or any interests in such bonds.

122.    At all times hereunder, PWC prepared and/or provided substantial assistance in the preparation and submission of the Guthrie corporate defendants' federal tax returns and, accordingly, had actual knowledge of the cash transfers to the Clinic designated as "gifts" or "grants" each year hereunder.

123.    At all times hereunder, PWC  had actual knowledge that payments by Robert Packer Hospial and Corning Hospital for services rendered "by" the Clinic to each of those entities were reported to the IRS and were separately accounted for the cash "gifts" referred to herein, and that such payments, recorded on Schedule R as payments under item "m", as payments for the "performance of services" by the Clinic (aka, Guthrie Medical Group,

P.C.).

124.    In preparing the Guthrie corporate tax returns, to be filed under penalty of perjury, PWC accurately recorded the aforesaid payments for the "performance of services" by the Clinic to the hospitals each year.

125.    In preparing the Guthrie corporate tax returns hereunder, to be filed under penalty of perjury, PWC accurately recorded the separate payments described hereunder under the legend "b" on the GHS (and its successor's) tax returns, describing them as a "gift".

126.    The term "gift" as used in IRS Form 990, filed by the Guthrie corporate defendants, is not a term of art under the Internal Revenue Code.

127.    At all times hereunder PWC had actual knowledge of the claim filed by the Relator in 2004 under the False Claims Act.

128.    As part of its financial accounting services, and the conduct of its annual audit of the Guthrie corporate defendants, PWC required legal counsel to provide information relating to all asserted and unasserted claims within the knowledge of legal counsel that represented a material risk of loss to its audit clients.

129.    PWC was retained by legal counsel specifically in connection with the 2004 claim in order to assist in responding to allegations contained in the claim and, accordingly, had actual knowledge of the allegations, pendency and status of the claim.

130.    On information and belief, each year hereunder the Guthrie defendants provided PWC with representations claiming they had "no knowledge of any allegations of fraud or suspected fraud affection the Corporation" received in communications from employees, former employees, analysts, regulators, short sellers, or others, as set forth in

correspondence from the Guthrie corporate defendants, and signed by the defendant

Stensager, along with Co-CEO Joseph Scopelliti,M.D., and CFO Craig M. Faerber, and dated

September 14, 2007, when PWC and each of the identified individuals all had actual

knowledge of the pendency of the 2004 claim.

131.    On information and belief, the Guthrie defendants provided a letter containing

substantially the same representation to PWC each year through FY 2015, when PWC ceased

providing accounting services to the defendants.

132.    In connection with the defense of the prior action, the Guthrie defendants'

legal counsel stated on the record in Document # 202, filed on Januray 14, 2010, that, if

successful, the claim represented a "death sentence" to the defendants, and a claim that

would "put Defendants out of business many times over".

133.    On information and belief, counsel for the defendants in the 2004 claim,

including but not limited to Eric Sitarchuk, received inquiries regarding material liabilities or

contingencies related to PWC's annual audit on behalf of the Guthrie corporate defendants.

134.    A loss or contingency that would represent a "death sentence", or that

threatened to put a corporate defendant "out of business many times over" is "material" for

financial accounting purposes.

135.    Coupled with the opinion, expressed by Kevin McAnaney, as noted by the 4th

Circuit Court of Appeals in *Tuomey*, and on information and belief as also privately provided

to the Guthrie defendants by McAnaney in connection with the 2004 claim, PWC willfully

disregarded or ignored, or paid willful indifference to the facts that: (1) the defendants had

prior knowledge that that issues regarding "interaction between the parties" implicated the

"Stark and fraud and abuse" laws; (2) the expressed opinion by defense counsel that the 2004

41

claim represented a "death sentence" to the Guthrie corporate defendants, and (3) that defendants' own expert had expressed the opinion that virtually identical conduct represented "an easy case to prosecute" for the government, PWC still failed to record any losses, reserves, or contingencies related to obligations to repay funds owed to the Medicare and Medicaid programs, notwithstanding PWC's actual knowledge that audited financial statements prepared by the firm were required to be attached to the annual hospital cost reports, and submitted to the Medicare and Medicaid programs.

136.    As set forth herein, PWC had actual knowledge of the prior action, and was consulted by the defendants in connection with preparing a response to allegations in the prior action.

137.    The dismissal of the 2004 claim was based on the trial court's conclusion that it lacked subject matter jurisdiction the hear the claim, and did not reach the claim on its merits.

138.    The dismissal of the 2004 did not include any judicial determination of the merits of the claim.

139.    In 2008, while not making any final conclusions on the evidence in the case, based upon the amended complaint then before the Court, the Court presiding over the 2004 claim denied in part the defendants' motion to dismiss the case pursuant to Rule 12(b)(6), concluding in effect that if the relator could prove that which he had alleged regarding the financial allegations in that claim, he would have made out a valid claim under the False Claims Act.

140.    Notwithstanding the aforesaid, at no time did PWC record in any financial statement any reserve or contingency for any losses pursuant to a claim based on the same or

similar allegations as those set forth in the 2004 complaint, whether brought by any

individual, or by the government, notwithstanding its actual knowledge that the cash "gifts",

for which the Clinic provided no fair market consideration in return, were not only ongoing,

but increasing in size.

141.    At all times relevant to this complaint, the hospital cost report certification

page included the following notice:

> Misrepresentation or falsification of any information contained in this cost report
> may be punishable by criminal, civil and administrative action, fine and/or
> imprisonment under federal law.  Furthermore, if services identified in this report
> were provided or procured through the payment directly or indirectly of a
> kickback or where otherwise illegal, criminal, civil and administrative action,
> fines and/or imprisonment may result.

142.    A hospital is required to disclose all known errors and omissions in its claims

for Medicare Part A reimbursement (including its cost reports) to its fiscal intermediary.

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his
> initial or continued right to any such benefit or payment . . . conceals or fails to
> disclose such event with an intent fraudulently to secure such benefit or payment
> either in a greater amount or quantity than is due or when no such benefit or
> payment is authorized . . . shall in the case of such a . . . concealment or failure . .
> . be guilty of a felony.

42 U.S.C. § 1320a-7b(a)(3).

Medicare Part B – Payments for Physician Charges

143.    To assist in the administration of Medicare Part B, CMS contracts with

"carriers."  Carriers, typically insurance companies, are responsible for processing and

paying claims.  Doctors or other providers submit Medicare Part B claims to the carrier for

payment.  Claims for Medicare Part B services are submitted on CMS form 1500.

144.    Under Part B, Medicare will generally pay 80 percent of the "reasonable"

charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C.

§§ 1395l (a)(1), 1395y(a)(1).  For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality.  42 C.F.R. §§ 405.502-504.

145.    To enroll as Medicare providers, the Clinic and its physician employees submitted enrollment applications on forms substantially similar to Form 855b now required by CMS, in addition to forms required for revalidation of its enrollment information under the Affordable Care Act.  As an enrolled provider the Clinic is required to notify CMS of changes in information required to be provided on Form 855b, including changes in ownership or managing control of the organization.

146.    When they enrolled in Medicare, the Clinic and its physician employees agreed to comply with all applicable laws, regulations and instructions, including the Stark law, the Anti-Kickback statute, and all applicable conditions of participation in the Medicare program.

**D.  The Federal Medicaid Program**

147.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

148.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 *et seq*.  In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries.  42 U.S.C. § 1396a(10), 42 U.S.C. § 1396d(a).

149.    The Medicaid Program pays participating hospitals a fixed amount per discharge based on the Medicaid beneficiary's discharge diagnosis. Specifically, the participating hospital submits a claim for reimbursement to Medicaid under the Diagnosis Related Group ("DRG") payment system, which reimburses a fixed amount per patient based on the DRG code into which the patient is classified by the hospital.  The average cost of care for each DRG determines the reimbursement amount, rather than the actual cost of care for each beneficiary.

150.    Each state participating in Medicaid is required to have a fraud detection program, and a state plan that provides for exclusion of persons who have committed fraud. Cf. 42 C.F.R. § 455.  "Fraud" means an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or some other person, [and] includes any act that constitutes fraud under applicable Federal or State law."  42 C.F.R. § 455.2.

**F.  The Stark Law and Federal Anti-Kickback Statute**

151.    Enacted as amendments to the Social Security Act, the Stark law, 42 U.S.C. § 1395nn, prohibits a hospital (or other entity providing designated health services) from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital, and prohibits Medicare from paying any such claims. The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. § 411.353 (2006).

152.    The Stark law is a strict liability statute.  It establishes the clear rule that the

45

United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers. The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

153.     Congress enacted the Stark law in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider unless a statutory or regulatory exception applies. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204. In 1993, Congress extended the Stark law (Stark II) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152. "Designated health services" include inpatient and outpatient hospital services. 42 U.S.C. § 1395nn(h)(6).

154.     In pertinent part, the Stark law provides: "*Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then – (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A)."* 42 U.S. C. § 1395nn(a)(1).

155.     The Stark law prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the

hospital has a "financial relationship," unless a statutory exception applies.  The law also prohibits the referral, if the physician has a financial relationship with the hospital.  The Stark law provides that Medicare will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a). 42 U.S.C. § 1395nn(g)(1).

156.    "Financial relationship" includes a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly to a referring physician.  42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

157.    The Stark law and regulations contain exceptions for certain compensation arrangements.  These exceptions include "bona fide employment relationships" and "personal services arrangements," among other exceptions not relevant here.  All but a few Emergency Room physicians at RPH (who do not have admitting privileges) are all employed by the Clinic, and not by any entity within the Hospital Group providing the free cash "gifts" to the Clinic.

158.    In order to qualify for the Stark law's exception for bona fide employment relationships, compensation arrangements must meet, *inter alia*, the following statutory requirements: (A) the amount of the remuneration is fair market value and not based on the value or volume of referrals, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital.  The employment agreement must also be in writing and cover "identifiable services," and it must provide fair market value for those services.  42 U.S.C. §§ 1395nn(e)(2)(B) and (e)(2)(C); 42 C.F.R. § 411.357(c).

159.    In order to qualify for the Stark law's exception for personal services

arrangements, a compensation arrangement must meet, inter alia, the following statutory requirements: (A) the compensation does not exceed fair market value, and (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further "physician incentive plan" exception as described in the statute).  42 U.S.C. § 1395nn(e)(3)(A)(v).

160.    A "physician incentive plan" under § 1395nn(e)(3) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S. C. § 1395nn(e)(3)(B)(ii).

161.    As set forth below, Guthrie Health, GHS and its subsidiaries are not the employers of the Clinic's physicians.  They are solely employed by the Clinic, which is not owned in whole or in part by Guthrie Health, GHS or its subsidiaries.  Further, the Guthrie Defendants (as defined below) have admitted that the Clinic provided no fair-market consideration for the "equity transfers" and other benefits provided by GHS.  Accordingly, the Guthrie Defendants' financial relation is not protected by any exception or safe harbor under the Stark law or the Anti-Kickback Statute.

162.    All exceptions under the Stark law that might theoretically apply to the defendants herein all incorporate a "fair market value" exception.

163.    The "fair market value" exception, and definition, set forth in the Stark regulations all condition the exception on the requirement that the compensation – regardless of its level – not take into account the volume or value of referrals from the compensated physicians or group.

164.    Defendants' own documents demonstrate that the Guthrie Health Physician

Compensation Committee "took into account" highly "confidential" reports from the Guthrie Health CFO on "Hospital Profit and Loss By Specialty", thereby taking into account hospital profits, all of which depend on Clinic admissions and referrals at RPH, thereby making any theoretical exception inapplicable to the practices herein.

165.    In the prior action, GHS CEO and defendant herein Mark Stensager admitted that the Guthrie Health Physician Compensation Committee was occasionally considered in the course of the Committee conducting its ongoing oversight of "Physician Compensation" at the Clinic.

166.    The Stark law also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a state Medicaid program.  42 U.S. C. § 1396b(s).

167.    The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), in relevant part, prohibits any person from knowingly and willfully offering or paying any remuneration, in cash or kind, overtly or covertly, directly or indirectly, to any person to induce such person to refer a patient, or to recommend or arrange for the referral of a patient, for an item or service that is reimbursable under a federal health care program, including Medicare and Medicaid.

168.    The Anti-Kickback Statute is a criminal statute.  It is a felony either to pay for a referral or to receive any remuneration in return for referring a patient to any hospital or other provider for any "item or service" that may be paid by Medicare or Medicaid.  42 U.S.C. § 1320a-7b(b).   In addition to imprisonment and criminal fines, the statute provides civil penalties of $50,000 per violation, three times the amount of remuneration paid, and exclusion from participation in federal healthcare programs.

169.    If just _one_ purpose of any remuneration in cash or kind, overtly or covertly,

directly or indirectly, to any person to induce such person to refer a patient, is to induce or reward a physician for anticipated referrals, or in exchange for referrals already given, then the federal criminal Anti-Kickback Statute is implicated.

170.    The federal Anti-kickback Statute does not require that the inducement or rewarding of a referral be the sole or primary purpose for the statute to be violated, as in the leading criminal case of *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985).

171.    The defendant Stensager has admitted that in carrying out its function the Guthrie Health Physician Compensation Committee used "*hospital revenue and profit and loss by specialty*" among the factors that it considered.

172.    In applying the Stark statute, and its verbatim definition of "remuneration" set forth in the Anti-kickback Statute, the U.S. Court of Appeals for the Third Circuit has ruled that an arrangement providing physicians "exclusive" access to a hospital department or section constitutes "in kind" remuneration to the physicians or group of physicians in question.

173.    The Robert Packer Hospital and Corning Hospital maintain expensive facilities and equipment and, in some instances, facilities and equipment unique to the primary service area of the hospitals, which facilities and equipment, and the non-physicians employed by the hospitals to staff, operate and maintain such equipment, are valuable assets to the hospitals and the Active Staff physicians providing services therein.

174.    Throughout the statutory period herein, all members of the Robert Packer Hospital Active Medical Staff Department of Surgery, with admitting privileges at RPH, are or were employees of Guthrie Clinic Ltd./Guthrie Medical Group, P.C., and had and exercised exclusive access to the facilities, equipment and staff therein, along with access to

and control over the scheduling of surgical procedures in RPH pre-operative, operating, and recovery rooms, facilities and staff.

175.    Throughout the statutory period herein, all members of the Robert Packer Hospital Active Medical Staff Department of Medicine, with admitting privileges at RPH, are or were employees of Guthrie Clinic Ltd/Guthrie Medical Group, P.C.

176.    Throughout the statutory period herein, all members of the Robert Packer Hospital Active Medical Staff Department of Family Practice, with admitting privileges at RPH, are or were employees of Guthrie Clinic Ltd/Guthrie Medical Group, P.C.

177.    Throughout the statutory period herein, all members of the Robert Packer Hospital Active Medical Staff in the Department of Radiology, with exclusive access to the RPH facilities, equipment and staff within the Department, are or were employees of Guthrie Clinic Ltd./Guthrie Medical Group, P.C.

178.    Throughout the statutory period herein, all members of the Robert Packer Hospital Active Medical Staff within the Department of Anesthesiology, with exclusive access to the RPH facilities, equipment and staff within the Department, are or were employees of Guthrie Clinic Ltd./Guthrie Medical Group, P.C.

179.    Throughout the statutory period herein, the aforesaid members of the Robert Packer Hospital Department of Anesthesiology Active Medical Staff had exclusive access to surgical and operating room schedules, and by virtue of such exclusive access were systematically scheduled to attend, participate in all surgical and operative procedures carried out at the Hospital, and were able to and did generate bills submitted to the Medicare and Medicaid programs for all services rendered therein.

180.    Throughout the statutory period herein, all members of the Robert Packer

Hospital Active Medical Staff within the Department of Pathology, with exclusive access to the RPH facilities, equipment and staff within the Department, are or were employees of Guthrie Clinic Ltd./Guthrie Medical Group, P.C.

181.    By virtue of the Active Staff relationships described herein, physicians employed by Guthrie Clinic Ltd./Guthrie Medical Group, P.C. also enjoyed substantial power, influence or control over the scheduling of access to RPH diagnostic and therapeutic facilities and equipment, and by virtue of such influence or control throughout the statutory period herein, maintained a de facto stranglehold on access to such facilities and equipment, discouraging, deterring, or blocking access to competing physicians and physician groups throughout the RPH and Corning markets.

182.    By virtue of the fact that physicians employed by Guthrie Clinic Ltd./Guthrie Medical Group, P.C., represent virtually all Active Staff admissions to RPH, the Clinic and its physicians maintain overwhelming power, influence and control over whether and under what conditions or limits competing physicians or physician groups can obtain and exercise Active Staff privileges at RPH, thereby discouraging, deterring or blocking access to any such competing physicians and physician groups.

**H.  New York State's Medical Licensure Requirements.**

183.    An entity providing health care services in New York must fall into one of two broad categories:  it is either (1) a private practice of medicine, which includes medical professional corporations; or (2) it is a "hospital," a broadly defined term including traditional hospitals and diagnostic and treatment centers.

184.    The Clinic was authorized by the State of New York to operate as a foreign

professional services corporation in the 1980s.  It operates under the name "Guthrie Medical

Group, P.C" as a condition of its permit as a foreign professional corporation.

> Medical Professional Corporations Must be
> Controlled by Physicians Licensed in New York.

185.     New York defines a foreign professional service corporation as follows:

> "Foreign professional service corporation" means a professional service
> corporation, whether or not denominated as such, organized under the laws of a
> jurisdiction other than this state, all of the shareholders, directors and officers of
> which are authorized and licensed to practice the profession for which such
> corporation is licensed to do business; *except that all shareholders, directors and
> officers of a foreign professional service corporation which provides health
> services in this state shall be licensed in this state*.

N.Y. Bus. Corp. § 1525(d) (emphasis added).  That is, foreign professional service

corporations that provide health services are required to ensure that all directors, officers and

shareholders are licensed in New York, even if they will never practice medicine in the State.

186.     The statute also addresses fundamental corporate changes, providing that

foreign professional service corporations may merge or consolidate with another corporation

"only if all of the professions practiced by such corporations . . . could be practiced by a

single professional service corporation organized in this state."  *Id*., § 1529.  In the case of

healthcare entities, a merger is possible only if the counterparty is similarly organized,

including the requirement that "*all directors, officers and shareholders*" must be licensed

physicians in New York, in this case.

187.     After a medical practice obtains authority to operate as a foreign professional

service corporation, New York law requires submission of an Annual Statement.  "In the case

of a foreign professional service corporation providing health services, such statement shall

also certify that each shareholder, officer and director of the corporation is licensed to

practice said profession in this state."   N.Y. Bus. Corp. § 1531 (emphasis added).

188.    In 2011, the defendants issued municipal bonds, through the Central Bradford

Progress Authority, with The Bank of New York Mellon Trust Company, N.A. as bond

trustee, and RBC Capital Markets, with its principal offices at 20 Vesey Street, New York,

New York.

189.    The New York State Department of Health ("DOH"), Office of Counsel,

issues advisory opinions on proposed transactions and arrangements between health care

providers.  DOH has long prohibited transactions involving medical professional

corporations that transfer effective or *de facto* control over the medical practice to a

management company.

190.    In particular, any business arrangement that transfers control of key business

decisions -- such as the size and location of the practice, hiring and compensation of medical

and administrative staff, purchase of medical equipment – away from New York-licensed

physicians to non-physician managers, is a violation of the licensing requirements for a

medical professional corporation. Under Public Health Law § 2801-a, such transactions

change the nature of the practice from a professional corporation to a Diagnostic and

Treatment Center.

> The Alternative: Diagnostic & Treatment Centers.

191.    If the Clinic fails to qualify as a professional service corporation in New York,

then it must be a hospital or "diagnostic and treatment center."  Because the Clinic does not

operate beds and is not a hospital, the only type of facility that fits the Clinic's operations is

diagnostic and treatment ("D&T") center.

192.    Under New York law, each location of any D&T center must be individually

approved, certified and licensed by the State before it can lawfully operate.  The New York

Business Corporation Law permits the formation of health care corporations subject to State certification.  N.Y. Bus. Corp. § 201(e).  In turn, the Public Health Law and its implementing regulations impose other requirements.  Diagnostic and Treatment Centers are covered by Public Health Law, Article 28, Sections 2801, *et seq*., and 10 NYCRR Parts 401, 600, 670, 703, 709, 710, and 750.

193.    A D&T center must obtain an operating certificate, which is only issued after Certificate of Need ("CON") approval.  The CON review process determines whether a proposed facility or service meets a public need, is financially feasible and is to be offered by owners and operators who are of sound character and professional competence.  In New York, the Operating Certificate serves as the license to operate each facility.  Possession of a license is a condition precedent to providing services to Medicare and Medicaid patients, and submitting claims to the government for those services.

194.    The New York State Department of Health, Division of Health Facility Planning, in the Office of Health Systems Management in Troy, New York maintains regulatory oversight over the CON process.  The agency has two primary reasons for rejecting an application: (1) failure to meet criteria for public need, and (2) failure to demonstrate the financial feasibility of a proposed service.

195.    As explained below, the Clinic violated the terms of its license to operate in New York as a foreign medical professional corporation when it transferred *de facto* control over its operations to Guthrie Health.  Knowing that it could not obtain the State's approval to operate as a D&T center, the Clinic hid the truth from DOH, the Education Department and other regulators with authority over the Clinic's operations as a foreign professional corporation in New York.  As a result, the Clinic has operated illegally in New York at all

times relevant to this complaint.

## I.  Securities Regulation

196.    Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"),

Section 17(a) of the Securities Act of 1933 ("Securities Act"), Exchange Act Rule 10b-5 and

numerous other statutes and regulations prohibit fraudulent and deceptive acts and practices

in connection with the offer, purchase, or sale of a security.  Violations of these provisions

may be established by showing that persons knowingly misrepresented or omitted material

facts in connection with securities transactions.

197.    SEC Rule 10b-5, a touchstone of securities regulation, prohibits any act or

omission that results in fraud or deceit in the purchase or sale of securities.  Numerous

additional rules require that issuers, accountants and other professionals act honestly and that

securities offering materials be free of fraudulent, manipulative, deceptive or unfair practices.

198.    Under New York law, the Martin Act provides:

It shall be illegal and prohibited for any person, partnership, corporation, company,
trust or association, or any agent or employee thereof, to use or employ any of the
following acts or practices:

(a) Any fraud, deception, concealment, suppression, false pretense or fictitious or
pretended purchase or sale; . . .

(c) Any representation or statement which is false, where the person who made such
representation or statement: (i) knew the truth; or (ii) with reasonable effort could
have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv)
did not have knowledge concerning the representation or statement made;

where engaged in to induce or promote the issuance, distribution, exchange, sale,
negotiation or purchase within or from this state of any securities or commodities….

N.Y. Gen. Bus. Law § 352-c.

## The Fraudulent Scheme

199.    Beginning in or before 2001 and continuing to the present, the Hospital Group

and the Clinic conspired and participated in a cash-for-referrals scheme.  GHS and its

subsidiaries paid at least $180 million to the Clinic's physicians in return for referrals of

designated health services, including more than $130 million during the six-year period

ending on June 30, 2015.

200.    GHS, as parent of RPH, Corning and other hospitals and related entities,

received payments each year from its subsidiaries in the nature of payments for

'administrative' services ostensibly provided from a central location at the parent level.

201.    The aforesaid cash payments, along with other more substantial "upstream"

payments from RPH  placed GHS in a strong cash position relative to its competitors, and

relative to the insolvent Clinic.  All of GHS' cash was derived either from :

(A) Upstream payments from its hospital subsidiaries; or

(B) Earnings from payments received from its hospital subsidiaries.

202.    GHS conducted no independent business outside of the aforesaid cash

transfers and its relationship with its subsidiaries (with the exception of the Clinic),  and all

of the cash at its disposal to make "equity transfers" or "Gifts" or "grants" to the Clinic

derived exclusively from the above named source(s).

203.    Since July 1, 2010, RPH and Corning alone have submitted false and

fraudulent claims for payment to Medicare and Medicaid resulting in payments by the United

States and the State of New York of approximately **$926 million**.

204.    Virtually all of the aforesaid claims at RPH, and the vast majority at Corning,

related to inpatient and outpatient designated health services rendered to patients who were

referred to the Corning and RPH by Clinic physicians who received payments under financial

arrangements that violated the Anti-Kickback and Stark statutes.  These payments to the

Clinic far exceeded fair market value, were not commercially reasonable, and were based in part on, or otherwise took into account, the volume or value of the actual and projected referrals and other business generated by the Clinic for the benefit of GHS and its subsidiaries.

205.    The parties agreed, at least as early as 2002, on a written "Policy" on cash transfers to the Clinic providing that the Hospital Group, or one of its constituent parts, would transfer sufficient cash to the Clinic to cover the Clinic's "budgeted" losses or "shortfalls" over the course of the coming year.

206.    The aforesaid cash transfers to the Clinic were referred to as "equity transfers" in tax and other internal documents by the parties.

207.    Few if any of the aforesaid payments were earmarked, targeted, or otherwise restricted for the use of a charitable activity or program but, instead, were used to cover "budgeted" operating losses incurred by the Clinic over the course of a year, which operating expenses included significant salaries and benefits for Clinic physicians who refer and admit patients to the Hospital Group.

208.    In practice, the Clinic would make a written request to GHS and/or the joint-venture entity Guthrie Health for a cash transfer, requiring the approval of the GHS CEO, its CFO, and the Guthrie Health "co-CEO" for medicine, who served in that role ex-officio as President of the Clinic.

209.    Routinely, such written requests for cash were very specifically designated for "physician payroll", or the transfers were requested to be completed by the first business day of a given month, as the Clinic's physicians' payroll was released on the first business day of each month.

210.     In addition to requests to cover "physician payroll", requests for cash were also made to cover payment of the Clinic's "malpractice insurance" premiums.

211.     In the Commonwealth of Pennsylvania, purchasing medical malpractice insurance at prescribed levels is a condition of medical licensure, personal to each individual physician, and payment of such expenses for employed physicians is normally an ordinary business expense of a physician or physician group, such as the Clinic.

212.     The transfers referred to as "equity transfers" are of the same type and kind as those that, since at least FY 2011, have been designated by the parties under the legend "b" in Part V of Schedule R on the tax returns filed under penalty of perjury with the Internal Revenue Service.

213.     By way of example of the "Policy" agreed to by the parties, and the aforesaid "equity transfers" matching "budgeted losses", Guthrie documents revealed that for the years covering July 1, 2002 to June 30, 2007, the "equity transfers" and "budgeted losses" were as follows:

**Clinic "Budgeted Losses" Matching "Equity Transfers" 2003-2007**

| Fiscal Year | "Budgeted Loss" | "Equity Transfer" |
|---|---|---|
| 2003 | ($7,614,093) | $7,614,093 |
| 2004 | ($5,700,903) | $5,700,903 |
| 2005 | ($9,844,756) | $9,844,756 |
| 2006 | ($16,929,600) | $16,929,600 |
| 2007 | ($25,154,376) | $25,154,376 |

214.    Budgets for all entities within the Hospital Group, and for the Clinic are developed and submitted to Guthrie Health for final approval each year, pursuant to the "Alignment Agreement" controlling the arrangement between the Clinic and GHS prior to the merger of GHS into Guthrie Health on February 1, 2014. An equal number of Clinic physician leaders and lay GHS representatives meet as the Guthrie Health board to review and approve all budgets, which include the volume of services provided within the Hospital Group, along with the physician "compensation pool" for Clinic physicians.

215.    On information and belief, the same relationship between "Budgeted" losses and "equity transfers", or the "gifts" described herein, has carried forward and occurred each year within the statutory period herein, and the same Policy giving rise to the arrangement remains in effect.

216.    The same group of individuals, acting as the board of Guthrie Health, meet regularly to review and monitor progress and performance in relation to the budgets, and specifically to determine whether 'targets' for the volume of admissions, procedures and ancillary services such as radiology and laboratory services, are being met.

217.    By virtue of the Active Staff relationship, with admitting privileges,  between physicians employed by the Clinic and  RPH,  the aforesaid budgeted 'targets' measure the level and volume of referrals and admissions to RPH by physicians employed by the Clinic, and meeting the budgeted level of admissions and services at RPH each year requires Clinic physicians to admit and refer sufficient numbers of patients in order for RPH to meet such budgeted targets.

218.    In adopting budgets, the defendants factor in the 'payor mix' of the respective hospitals, calculating the different reimbursement methodologies and amounts received for

services provided within each hospital, including the percentage of admissions and services to be provided to Medicare and Medicaid patients, and including the volume of claims to be submitted for reimbursement for those programs, and the amount of cash receipts anticipated as a result of such claims.

219.    When Clinic leaders sitting on the board of directors of Guthrie Health vote to approve budgets at RPH and Corning, including anticipated targets for the volume of admissions and ancillary services provided at the hospitals on an inpatient and outpatient basis, they do so with the knowledge that a specific portion of the services comprising those budgets will, accordingly, result in the submission of claims to, and the receipt of payment from, the Medicare and Medicaid programs.

220.    When the Clinic physicians and the lay members of the Guthrie Health board of directors adopt and approve budgets calling for the Clinic to sustain an operating loss each year, they do so with the actual knowledge that such 'budgeted' losses will be off-set by 'equity transfers', or "gifts" (as they are designated on the GHS tax returns each year), to the Clinic.

221.    When the Clinic physicians sitting on the Guthrie Health board of directors vote to adopt and approve budgets for the members of the Hospital Group, they do so knowing that funds from the Hospital Group will be used to make the "equity transfers" or "gifts" to the Clinic.

222.    When the Clinic physicians sitting on the Guthrie Health board of directors vote to adopt the aforesaid budgets, which include and make provision for the cash transfers described herein, they do so knowing that, but for such transfers the Clinic could not cover or pay for its ongoing operating expenses, including the salaries and benefits of Clinic

physicians, and their own salaries and benefits.

223.    Every budget for the Clinic voted upon and approved within the statutory period hereunder made provision for and included within the Clinic's operating expenses the cost of the Clinic's "Profit Sharing Plan", or defined contribution plan, including provision for at least at 3% "discretionary" contribution to the Profit Sharing Plan.

224.    The aforesaid "discretionary" contribution to the Clinic "Profit Sharing Plan" is calculated as a percentage of the Clinic employee's annual salary or compensation, and is a tax-free payment in addition to such annual salary or compensation.

225.    Pursuant to the aforesaid "alignment", GHS appointed 6 lay members to the joint-venture, (Guthrie Health) board, and the Clinic also appointed 6 physician members of that board, with the CEO of each entity sitting on the joint venture ex-officio.

226.    The same relationship between "Budgeted" losses and "equity transfers", or the "gifts" described herein, has carried forward and occurred each year within the statutory period herein, and the same Policy giving rise to the arrangement remains in effect.

227.    The same group of individuals, acting as the board of Guthrie Health, meet regularly to review and monitor progree and performance in relation to the budgets, and specifically to determine whether "targets" for the volume of admissions, procedures, and ancillary services such as radiology and laboratory servces, are being met.

228.    By virtue of the Active Staff relationship, with admitting privileges,  between physicians employed by the Clinic and  RPH,  the aforesaid budgeted 'targets' measure the level and volume of referrals and admissions to RPH by physicians employed by the Clinic, and meeting the budgeted level of admissions and services at RPH each year requires Clinic physicians to admit and refer sufficient numbers of patients in order for RPH to meet such

budgeted targets.

229.    In adopting budgets, the defendants factor in the 'payor mix' of the respective hospitals, calculating the different reimbursement methodologies and amounts received for services provided within each hospital, including the percentage of admissions and services to be provided to Medicare and Medicaid patients, and including the volume of claims to be submitted for reimbursement for those programs, and the amount of cash receipts anticipated as a result of such claims.

230.    When Clinic leaders sitting on the board of directors of Guthrie Health vote to approve budgets at RPH and Corning, including anticipated targets for the volume of admissions and ancillary services provided at the hospitals on an inpatient and outpatient basis, they do so with the knowledge that a specific portion of the services comprising those budgets will, accordingly, result in the submission of claims to, and the receipt of payment from, the Medicare and Medicaid programs.

231.    When the Clinic physicians and the lay members of the Guthrie Health board of directors adopt and approve budgets calling for the Clinic to sustain an operating loss each year, they do so with the actual knowledge that such 'budgeted' losses will be off-set by 'equity transfers', or "gifts" (as they are designated on the GHS tax returns each year), to the Clinic.

232.    When the Clinic physicians sitting on the Guthrie Health board of directors vote to adopt and approve budgets for the members of the Hospital Group, they do so knowing that funds from the Hospital Group will be used to make the "equity transfers" or "gifts" to the Clinic.

233.    When the Clinic physicians sitting on the Guthrie Health board of directors

vote to adopt the aforesaid budgets, which include and make provision for the cash transfers described herein, they do so knowing that, but for such transfers the Clinic could not cover or pay for its ongoing operating expenses, including the salaries and benefits of Clinic physicians, and their own salaries and benefits.

234.    Every budget for the Clinic voted upon and approved within the statutory period hereunder made provision for and included within the Clinic's operating expenses the cost of the Clinic's "Profit Sharing Plan", or defined contribution plan, including provision for at least at 3% "discretionary" contribution to the Profit Sharing Plan.

235.    The aforesaid "discretionary" contribution to the Clinic "Profit Sharing Plan" is calculated as a percentage of the Clinic employee's annual salary or compensation, and is a tax-free payment in addition to such annual salary or compensation.

236.    In accordance with the terms of the joint venture "alignment" between the Clinic and GHS,  Guthrie Health developed and approved budgets for GHS and its subsidiaries (the Hospital Group), and for the Clinic, which budgets are submitted and approved prior to the July 1 commencement of the budget/fiscal year in question.

237.    The collective budgets for RPH, Corning, and other provider-subsidiaries of GHS included specific targets for volume, utilization and admissions and, where applicable, ancillary services and revenue for the coming year.

238.    The only physicians with Active Staff, and/or Admitting privileges at Robert Packer Hospital are physicians employed by the Clinic, with the possible exception of fewer than 6 psychiatrists.

239.    While some emergency physicians are employed by RPH, emergency room physicians did not have admitting privileges at RPH for the period in question and,

accordingly, were required to refer patients to the service of a Clinic physician for purposes of being admitted to RPH.

240.     In excess of 75% of the admissions at Corning are the result of referrals and admissions by Clinic physicians.

241.     A budget represents a financial plan for the period that is the subject of a budget.

242.     When agreeing on and voting to approve the budgets for all entities within the Hospital Group, and for the Clinic, the members of the Guthrie Health board of directors are agreeing on a form of plan.

243.     The budget for the Clinic each year since at least FY 2002 called for the Clinic to sustain an operating loss.

244.     Since at least 2002 the parties agreed and understood that the "budgeted" losses of the Clinic as contained in the aforesaid budget would be off-set by cash transfers, variously referred to as "equity transfers" or designated as "gifts" or "grants" on tax returns and the defendants' internal documents.

245.     The budget for the Clinic each year included and includes budgeted amounts for "physician compensation" and benefits.

246.     In FY 2010, the budgets approved by the Guthrie Health board, including the Clinic physicians sitting on that board, included budgeted operating losses for the Clinic.

247.     In FY 2010, the budgets for RPH, Corning, and other health-care subsidiaries of GHS within the Hospital Group included and/or were based upon projected or targeted volumes of admissions, inpatient and outpatient procedures, and various ancillary procedures, such as radiology procedures.

248.     In FY 2010, pursuant to a policy agreed on by the parties, GHS budgeted for, and anticipated transferring cash to the Clinic to cover the budgeted losses contained in the Clinic's budget.

249.     In FY 2010 the budgets for RPH, Corning and other health-care provider subsidiaries of GHS within the Hospital Group provided for and anticipated that a substantial portion of revenue for RPH and Corning would come from the Medicare and Medicaid programs.

250.     In FY 2010 the budgets of RPH, Corning and other subsidiaries of GHS provided for payments to GHS from such subsidiaries.

251.     In FY 2010, RPH, Corning and other health-provider subsidiaries of GHS did in fact receive admissions and referrals from Clinic physicians for services, for which claims were subsequently submitted to HHS and Medicare and Medicaid programs by each respective hospital.

252.     For FY 2010 the claims submitted to HHS for the Medicare and Medicaid programs for services resulting from referrals and admissions from Clinic physicians included some or all of the services defined as "designated health services' under the Stark law.

253.     In FY 2011, the budgets approved by the Guthrie Health board, including the Clinic physicians sitting on that board, included budgeted operating losses for the Clinic.

254.     In FY 2011, the budgets for RPH, Corning, and other health-care subsidiaries of GHS within the Hospital Group included and/or were based upon projected or targeted volumes of admissions, inpatient and outpatient procedures, and various ancillary procedures, such as radiology procedures.

255.    In FY 2011, pursuant to a policy agreed on by the parties, GHS budgeted for, and anticipated transferring cash to the Clinic to cover the budgeted losses contained in the Clinic's budget.

256.    In FY 2011 the budgets for RPH, Corning and other health-care provider subsidiaries of GHS within the Hospital Group provided for and anticipated that a substantial portion of revenue for RPH and Corning would come from the Medicare and Medicaid programs.

257.    In FY 2011 the budgets of RPH, Corning and other subsidiaries of GHS provided for payments to GHS from such subsidiaries.

258.    In FY 2011, RPH, Corning and other health-provider subsidiaries of GHS did in fact receive admissions and referrals from Clinic physicians for services, for which claims were subsequently submitted to HHS and Medicare and Medicaid programs by each respective hospital.

259.    For FY 2011 the claims submitted to HHS for the Medicare and Medicaid programs for services resulting from referrals and admissions from Clinic physicians included some or all of the services defined as "designated health services' under the Stark law.

260.    In FY 2012, the budgets approved by the Guthrie Health board, including the Clinic physicians sitting on that board, included budgeted operating losses for the Clinic.

261.    In FY 2012, the budgets for RPH, Corning, and other health-care subsidiaries of GHS within the Hospital Group included and/or were based upon projected or targeted volumes of admissions, inpatient and outpatient procedures, and various ancillary procedures, such as radiology procedures.

262.    In FY 2012, pursuant to a policy agreed on by the parties, GHS budgeted for, and anticipated transferring cash to the Clinic to cover the budgeted losses contained in the Clinic's budget.

263.    In FY 2012 the budgets for RPH, Corning and other health-care provider subsidiaries of GHS within the Hospital Group provided for and anticipated that a substantial portion of revenue for RPH and Corning would come from the Medicare and Medicaid programs.

264.    In FY 2012 the budgets of RPH, Corning and other subsidiaries of GHS provided for payments to GHS from such subsidiaries.

265.    In FY 2012, RPH, Corning and other health-provider subsidiaries of GHS did in fact receive admissions and referrals from Clinic physicians for services, for which claims were subsequently submitted to HHS and Medicare and Medicaid programs by each respective hospital.

266.    For FY 2012 the claims submitted to HHS for the Medicare and Medicaid programs for services resulting from referrals and admissions from Clinic physicians included some or all of the services defined as "designated health services' under the Stark law.

267.    In FY 2013, the budgets approved by the Guthrie Health board, including the Clinic physicians sitting on that board, included budgeted operating losses for the Clinic.

268.    In FY 2013, the budgets for RPH, Corning, and other health-care subsidiaries of GHS within the Hospital Group included and/or were based upon projected or targeted volumes of admissions, inpatient and outpatient procedures, and various ancillary procedures, such as radiology procedures.

269.    In FY 2013, pursuant to a policy agreed on by the parties, GHS budgeted for, and anticipated transferring cash to the Clinic to cover the budgeted losses contained in the Clinic's budget.

270.    For FY 2013 the budgets for RPH, Corning and other health-care provider subsidiaries of GHS within the Hospital Group provided for and anticipated that a substantial portion of revenue for RPH and Corning would come from the Medicare and Medicaid programs.

271.    In FY 2013 the budgets of RPH, Corning and other subsidiaries of GHS provided for payments to GHS from such subsidiaries.

272.    In FY 2013, RPH, Corning and other health-provider subsidiaries of GHS did in fact receive admissions and referrals from Clinic physicians for services, for which claims were subsequently submitted to HHS and Medicare and Medicaid programs by each respective hospital.

273.    For FY 2013 the claims submitted to HHS for the Medicare and Medicaid programs for services resulting from referrals and admissions from Clinic physicians included some or all of the services defined as "designated health services' under the Stark law.

274.    In FY 2014, the budgets approved by the Guthrie Health board, including the Clinic physicians sitting on that board, included budgeted operating losses for the Clinic.

275.    In FY 2014, the budgets for RPH, Corning, and other health-care subsidiaries of GHS within the Hospital Group included and/or were based upon projected or targeted volumes of admissions, inpatient and outpatient procedures, and various ancillary procedures, such as radiology procedures.

276.     In FY 2014, pursuant to a policy agreed on by the parties, GHS budgeted for, and anticipated transferring cash to the Clinic to cover the budgeted losses contained in the Clinic's budget.

277.     In FY 2014 the budgets for RPH, Corning and other health-care provider subsidiaries of GHS within the Hospital Group provided for and anticipated that a substantial portion of revenue for RPH and Corning would come from the Medicare and Medicaid programs.

278.     In FY 2014 the budgets of RPH, Corning and other subsidiaries of GHS provided for payments to GHS from such subsidiaries.

279.     In FY 2014, RPH, Corning and other health-provider subsidiaries of GHS did in fact receive admissions and referrals from Clinic physicians for services, for which claims were subsequently submitted to HHS and Medicare and Medicaid programs by each respective hospital.

280.     For FY 2014 the claims submitted to HHS for the Medicare and Medicaid programs for services resulting from referrals and admissions from Clinic physicians included some or all of the services defined as "designated health services' under the Stark law. In FY 2010, the budgets approved by the Guthrie Health board, including the Clinic physicians sitting on that board, included budgeted operating losses for the Clinic.

281.     In FY 2015, the budgets for RPH, Corning, and other health-care subsidiaries of GHS within the Hospital Group included and/or were based upon projected or targeted volumes of admissions, inpatient and outpatient procedures, and various ancillary procedures, such as radiology procedures.

282.     In FY 2015, pursuant to a policy agreed on by the parties, GHS budgeted for,

70

and anticipated transferring cash to the Clinic to cover the budgeted losses contained in the Clinic's budget.

283.   In FY 2015 the budgets for RPH, Corning and other health-care provider subsidiaries of GHS within the Hospital Group provided for and anticipated that a substantial portion of revenue for RPH and Corning would come from the Medicare and Medicaid programs.

284.   In FY 2015 the budgets of RPH, Corning and other subsidiaries of GHS provided for payments to GHS from such subsidiaries.

285.   In FY 2015, RPH, Corning and other health-provider subsidiaries of GHS did in fact receive admissions and referrals from Clinic physicians for services, for which claims were subsequently submitted to HHS and Medicare and Medicaid programs by each respective hospital.

286.   For FY 2015 the claims submitted to HHS for the Medicare and Medicaid programs for services resulting from referrals and admissions from Clinic physicians included some or all of the services defined as "designated health services' under the Stark law.

287.   In FY 2016, the budgets approved by the Guthrie Health board, including the Clinic physicians sitting on that board, included budgeted operating losses for the Clinic.

288.   In FY 2016, the budgets for RPH, Corning, and other health-care subsidiaries of GHS within the Hospital Group included and/or were based upon projected or targeted volumes of admissions, inpatient and outpatient procedures, and various ancillary procedures, such as radiology procedures.

289.   In FY 2016, pursuant to a policy agreed on by the parties, GHS budgeted for,

71

and anticipated transferring cash to the Clinic to cover the budgeted losses contained in the Clinic's budget.

290.    In FY 2016 the budgets for RPH, Corning and other health-care provider subsidiaries of GHS within the Hospital Group provided for and anticipated that a substantial portion of revenue for RPH and Corning would come from the Medicare and Medicaid programs.

291.    In FY 2016 the budgets of RPH, Corning and other subsidiaries of GHS provided for payments to GHS from such subsidiaries.

292.    In FY 2016, RPH, Corning and other health-provider subsidiaries of GHS did in fact receive admissions and referrals from Clinic physicians for services, for which claims were subsequently submitted to HHS and Medicare and Medicaid programs by each respective hospital.

293.    For FY 2016 the claims submitted to HHS for the Medicare and Medicaid programs for services resulting from referrals and admissions from Clinic physicians included some or all of the services defined as "designated health services' under the Stark law.

294.    At no time, in any of the votes on budgets referenced herein, by any member of the Guthrie Health board, or any member of the boards of RPH, Corning, or other GHS subsidiaries, or of any member of the Clinic board, did any such vote include a dissenting, 'nay', or negative vote, or any abstention, by any physician or hospital representative casting such vote(s), including without limitation every vote on every budget cast by the physicians identified in Paragraph 5 hereof.

295.    With respect to every vote on every budget referenced above, every voting

member of the respective boards of directors had actual knowledge that at least a substantial

portion and, in the case of RPH, virtually all of the volume of projected admissions, inpatient

and outpatient procedures, and ancillary services would be the result of an admission, referral

or order of a Clinic physician.  All individual board member voting on any such budgets had

the aforesaid knowledge and information.

296.    Accordingly, when GHS and Clinic representatives met to approve "budgets"

at least once each year the leadership of the Clinic whose physicians were responsible for

virtually 100% of the admissions at RPH, and for the vast majority of the admissions and

related revenue at Corning, voted to approve the hospital budgets calling for and/or

predicated upon a targeted volume of admissions and referrals.

297.    In voting to approve budgets projecting, anticipating, or establishing targets

for the volume of admissions and referrals for services within the Hospital Group, Clinic

leaders were knowingly affirming and agreeing to efforts by the Clinic and its physicians in

the forthcoming year to achieve budgeted volumes.

298.    At the same time, the lay GHS members of the joint venture board voting to

approve budgets calling for payments of as much as $26 million per year in "equity

transfers" or "gifts" to the Clinic, knowing that the Clinic's physicians are responsible for

providing virtually all admissions and related revenue at RPH, and the vast majority at

Corning as hereinabove described.

299.    The board meetings at which budgets were developed and approved by the

respective boards, and all corporate, individual and committee activity contributing to the

development and adoption of such budgets, constitute a conspiracy between the members of

the Hospital Group, on the one hand, and the Clinic, on the other, as well as between and

among the Clinic physicians participating in such meetings, and the lay representatives, managers and executives of the Hospital Group involved.

300.    Above and beyond the "equity transfers" and cash "gifts" made to the Clinic each year, RPH and Corning also remit tens of millions of dollars each year for administrative services provided by the Clinic and its physicians.

301.    By way of example in FY 2013 GHS reported "gifts" to the Clinic in the amount of $24,263,286, while in the same year RPH reported payments to the Clinic of $28,966,286 for "Performance of services . . . *by*" the Clinic, and Corning paid the Clinic an additional $3,195,359 in 2013 for services actually provided by the Clinic and/or its employed physicians.

302.    Payments of a type described at paragraph 139 above are separate and apart from the "equity transfers", or cash transfers designated as "gifts" or "grants" on the parties' tax returns and internal documents.

303.    The defendant Stensager has admitted that the "equity transfers" and cash "gifts" described herein are separate and apart from payments to the Clinic for supporting medical education or research.

304.    Using the revenues generated from the hospitals, including Medicare and Medicaid reimbursements, GHS paid these huge sums to the Clinic in order to maximize referrals from Clinic physicians to GHS hospitals and to discourage referrals to competing providers.  Without this money, the Clinic would have collapsed under the weight of salaries it could not afford to pay and competition from other medical providers in the same market. If the Clinic had failed, GHS would have lost a stream of referrals worth far more than what it paid to keep the Clinic afloat.  This financial relationship is a classic kickback, and a

flagrant violation of the law.

305.    During the course of the deliberations of the Guthrie Health "Physician Compensation Committee", that committee considered the value of Clinic physicians to the Hospital Group "*as a whole*", in spite of the fact that the Clinic itself consistently operates at a substantial loss.

306.    As a result of the cash-for-referrals scheme, GHS amassed **$665 million** in *unrestricted cash and investments* through March of 2017, according to its own financial records.  The Guthrie Defendants continue to reap the benefits of the cash-for-referrals scheme to the present.

307.    Over the course of the statutory period herein, the Clinic has acquired the practices of several specialty physician groups, notwithstanding that has operated at a significant loss every year since at least 2001, and depends on transfers of cash from the Hospital Group to cover its normal operating expenses.

308.    By way of example, the Clinic acquired the cardiology practice of Vincent LaDelia, M.D., along with two of his cardiology associates and staff in Pine City, NY.  At the time of the acquisition Dr. LaDelia and his partners exercised staff privileges at Arnot Ogden Medical Center in Elmira, NY, the nearest competitor to RPH with programs in invasive cardiology and open-heart surgery.  Virtually immediately upon the acquisition of the cardiology group Dr. LaDelia and his partners ceased admitting patients to Arnot, and began referring and admitting patients to facilities within the Hospital Group, including Corning and RPH.

309.    Notwithstanding that the Clinic did not have sufficient funds to cover its existing expenses, they completed the LaDelia acquisition using funds at least in part derived

from the Hospital Group.

310.    Notwithstanding limitations on the acquisition of physician practices under the Anti-Kickback and Stark statutes, all physicians within the LaDelia group remain in a position to refer patients to RPH, Corning and other entities within the Hospital Group at least 3 years subsequent to the practice acquisition.

311.    The Clinic has engaged in similar patterns and practices in connection with the acquisition of specialty practices it cannot afford, and for which it depends upon cash from the Hospital Group to complete, including but not limited to acquisition of the Ithaca Orthopaedic Group, whose physicians immediately commenced referring and admitting patients to RPH, Corning, and the Guthrie Ambulatory Surgical facility in Big Flats, NY. The acquisition resulted in the same pattern of the cessation of admissions to the local hospital, and the immediate commencement of admissions and referrals to facilities within the Hospital Group, all facilitated with the cash and resources of the Hospital Group.

312.    Regulations implementing the Anti-Kickback Statute relating to the acquisition of physician practices create a 'safe harbor' for such acquisitions providing, inter alia, that the practitioner selling his or her office "will not be in a professional position after completion of the sale to make or influence referrals to, or otherwise generate business for, the purchasing hospital or entity for which payment may be made in whole or in part under the Medicare, Medicaid, or other Federal health care programs after 1 year from the date of the first agreement pertaining to the sale." 42 CFR 1001.952(e)(2)(ii).

313.    All physician practices and groups acquired or employed by the Clinic within its service area are transactions that could not be completed without the cash "gifts" or "equity transfers", or loans, from the Hospital Group to the Clinic, and all physicians

becoming employed as a result of any such acquisition within the statutory period are or were

in a professional position to refer patients or to influence referrals to the Hospital Group

more than one year from the date of the first agreement pertaining to such transaction.

**A.  Defendants' Documents and Admissions**

314.   Between 2008 and 2010, the parties to the prior action conducted discovery.

The Guthrie Defendants produced approximately 130,000 pages of documents and testified

in many depositions.  They filed their answer to the Third Amended Complaint, responded to

requests for admissions and submitted statements of undisputed material facts.  In the

process, the Guthrie Defendants, Devine and Stensager, in his capacity as an officer of GHS

and Guthrie Health, judicially admitted each of the allegations relating to the cash-for-

referrals scheme.

315.   Mr. Repko is the original source of the information on which the allegations

and transactions described in this Complaint are based.  As the plaintiff-relator in the prior

action, his efforts after the Government declined to intervene caused the disclosure of the

Guthrie Defendants' incriminating documents and admissions.  He has knowledge that is

independent of and materially adds to the publicly disclosed allegations or transactions, and

he voluntarily provided the information to the State before filing this action.

316.   Among other things, the Guthrie Defendants admitted that the Clinic is the

primary source of referrals to Robert Packer Hospital, the largest subsidiary of GHS.  They

admitted that Clinic physicians, and that Devine specifically, refer and admit patients to RPH

and other GHS subsidiary providers for designated health services covered by the Medicare

and Medicaid programs.

317.   They admitted that GHS made "equity transfers" to the Clinic, including cash

and related financial transfers from GHS to the Clinic totaling more than $60 million through

fiscal year 2007.  The relevant tax returns show that these transfers continue to the present,

including payments of approximately $25 million *each* in FY 2011 and 2012, and $26

million in FY 2015.

318.    The Guthrie Defendants admitted that the Clinic "*did not provide fair market*

*value consideration to GHS in exchange for these transactions*."  In fact, the Clinic was paid

separately for its legitimate services to the Hospital Group. Since that time the Clinic's

operating performance and losses have generally increased substantially, and accordingly its

need for the cash transfers has increased, and the "gifts" described herein are essentially

identical in kind to the "equity transfers" that were the subject of the aforesaid admissions by

the defendants.

319.    The cash "gifts" are buried in tax returns of the Hospital Group filed with the

IRS under penalty of perjury.

320.    The Guthrie Defendants admitted that "*funds from these transactions were*

*used to support the ongoing operations of [the Clinic] whose existing expenses otherwise*

*exceed its revenues during the years relevant to this case."*  The "equity transfers" were paid

to supplement the salaries of Clinic physicians, in return for a continuing stream of profitable

referrals to Corning Hospital, RPH and other service providers.  As above, the cash "gifts"

complained of herein are of an essentially identical nature to the transfers that were the

subject of the admissions above, and such "gifts" are similarly used, inter alia, to cover the

salary and benefit expenses of Clinic physicians.

321.    The Guthrie Defendants admitted that the Clinic's referrals generated claims

submitted to Medicare and Medicaid.  GHS and its subsidiaries provide all of the Designated

Health Services covered by the Stark Law. They submit annual Medicare cost reports and cost report schedules, and they obtain payments from Medicare and Medicaid for services provided to patients referred by Clinic physicians.

322.    Devine admitted that, while he was referring patients to RPH, he knew that GHS was making "equity transfers" to the Clinic, that but for those transfers the Clinic could not pay its operating expenses, and that those expenses included the salaries and benefits of Clinic physicians, including his own.

323.    In short, each element of a Stark Law and Anti-Kickback violation has been admitted. There is an unbroken chain from the payments to the referrals, to the hospitals' medical services, to the cost reports and reimbursement from Medicare and Medicaid.

**B.  The Guthrie Defendants' Corporate Structure**

324.    For at least 16 years, the defendants have invested time and resources in an effort to disguise their corporate structure. They are particularly interested in hiding two key facts from the investing public and from government regulators: (i) that the Guthrie Clinic is not owned, in whole or in part, by Guthrie Health, GHS or any of its affiliates; and (ii) that the Clinic agreed to give key corporate powers to Guthrie Health in return for the promise of a steady stream of cash payments from GHS.

325.    GHS served as a holding company. It is the sole owner of Robert Packer Hospital, Corning Hospital, Troy Hospital, long-term care facilities, and a taxable subsidiary, Twin Tier Management Company, Inc, which sells durable medical equipment. Subsequent to its merger with Guthrie Health on February 1, 2014, Guthrie Health assumed those parental responsibilities over the Hospital Group.

326.    Neither GHS nor Guthrie Health has nor ever had any legal ownership interest

in the Clinic.  The following chart is an accurate depiction of the corporate affiliations of

GHS and the Clinic:



327.    The Clinic is a physician-owned professional corporation.  It is not owned by

GHS or any of its affiliates, in whole or in part.  The Clinic's physicians are employed only

by the Clinic.  They are not employees of Guthrie Health, GHS or any of its subsidiaries.

328.    Guthrie Health was created in 2001 as a joint venture between the Clinic and

GHS.  Guthrie Health has no ownership interest in either the Clinic or GHS.

329.    Guthrie Health engages in no business and owns no significant assets.  It is

simply a corporate shell where the leaders of GHS and the Clinic meet to carry out their

illegal activities.  As a shell, Guthrie Health might just as well have existed as physical

building, where representatives of the Clinic and of the Hospital Group met privately to agree

on the volume of admissions the Hospital Group would receive from Clinic physicians over

the coming year, and the amount of cash "Gifts" the Clinic would receive in return over the

same period.  Guthrie Health served no other purpose, operated no programs, and engaged in

no charitable activities that were not, or that could not have been, operated prior to its

creation as a "joint venture" between GHS and the Clinic.

330.    The Board of Directors of Guthrie Health consists of non-physician executives from GHS and physician members and officers of the Clinic.  The Board often acts through its committees, including a Physician Compensation Committee and a Finance Committee. These committees, like the Board itself, are comprised of leaders of both GHS and the Clinic.

331.    The relationship among Guthrie Health, GHS and the Clinic is defined by a contract called the Alignment Agreement.  In that agreement, GHS and the Clinic gave the directors of Guthrie Health control over the "strategic plan, budget development and management process" for all of the Guthrie Defendants.  The process included setting "performance expectations and accountability for the Clinic and Hospital."  *See* Alignment Agreement at 15-16.

332.    In return for access to the Clinic's referrals, GHS gave up control over its own revenues.  It authorized Guthrie Health to send cash generated by the hospitals and other GHS subsidiaries to the Clinic.  Under the Alignment Agreement, Guthrie Health has the power and authority to "allocate all cash flow from operations" among the Guthrie Defendants "in its sole discretion."  Guthrie Health may "require contributions in cash or cash equivalents . . . in an aggregate amount not to exceed $40 million in any one year, to support working capital needs or capital projects of any one or more Members."  *See* Alignment Agreement, at 20.

333.    On numerous occasions, the defendants have misrepresented their corporate structure.   For example, the 2011 bond offering includes a corporate chart that shows the Clinic as a direct subsidiary of Guthrie Health.  *See* ¶ 174 below.

334.    The parties included a similar chart in the cost reports submitted to Medicare in 2002, falsely showing the Clinic as both a subsidiary of Guthrie Health and a parent of

RPH, Corning Hospital and other subsidiaries that are actually solely owned by GHS:



*See* Guthrie Defendants 033858.

335. In 2006, the Guthrie Defendants also submitted a false report of their internal "investigation" to the Department of Justice in the prior action. That report repeatedly described Guthrie Health, GHS and the Clinic as an "integrated system" in which GHS and the Clinic are "sole members" of Guthrie Health. *See* Guthrie Defts. 051406 at 11. Defendants made these false representations to the Government without disclosing that Guthrie Health, GHS and the Clinic are three separate corporations.

336. Defendants used these false statements to deceive the public and regulators by portraying their cash-for-referrals scheme as nothing more than internal transfers among affiliated companies.

**C.  The Budget Process**

337.    Each year, representatives of GHS and the Clinic, sitting as directors of Guthrie Health, approve the budgets for each corporation.  The budgets for RPH, Corning Hospital and other GHS hospital subsidiaries include targets for admissions, ancillary services, and procedures to be performed in each hospital.  This data forms the basis for the revenue and financial budget for each institution for the coming year.

338.    At the same time, and in the same meetings, representatives of GHS and the Clinic, sitting as directors of Guthrie Health, also set an annual budget for the Clinic, including an estimate of its operating losses for the fiscal year.  By agreement among the Guthrie Defendants, this estimate triggers approval of an "equity transfer" to the Clinic in the approximate amount of its budgeted loss.  Guthrie Health adopted a "policy" to provide cash and other remuneration to the Clinic in the amount of the "budgeted shortfall."  *See* GD 38699, 71350.

339.    The Guthrie Health Board also sets the "salary pool" from which Clinic physicians are paid.  Remarkably, Guthrie Health maintains a "Physician Compensation Committee" even though it employs no physicians.  The committee addresses issues relating to the salary pool and compensation of individual Clinic physicians.

340.    Guthrie Health regularly reviews profit and loss figures for the Clinic and GHS, including revenues generated by RPH and Corning Hospital by-specialty and losses generated by each department of the Clinic.  This process explicitly ties physician compensation to the "volume or value" of referrals by Clinic physicians to the Hospital Group.

341.    For example, at a meeting on March 18, 2005, Guthrie Health's Physician

Compensation Committee discussed the 2006 budget for the Clinic.  The committee anticipated extensive operating losses:  *"[W]e are budgeting a $25K loss per physician for primary care, a $350K loss per physician for cardiothoracic surgery, a $116K loss per physician for anesthesiology, and a $68K loss per physician for new physicians*."  *See* GD7128.  Guthrie Health planned to make up for those losses with cash payments to the Clinic, "trying to achieve a 2% operating margin" for GHS.  *Id.*

342.    In other words, the Committee approved payments that allowed the Clinic to support these money-losing physician practices because it anticipated that the referrals provided by these doctors to RPH, Corning and other GHS subsidiaries would allow GHS to generate profits of 2% per year.

343.    In their internal "investigation" report submitted to the Government in 2006, the Guthrie Defendants falsely described this budget process to the Government.  *See* Guthrie Defts. 051406 at 21.  They flatly denied that physician salaries are "*tied in any way to referrals to RPH*."  *Id*. at 22.   At the same time, the "investigation" cited with approval prior Advisory Opinions of the OIG of HHS, all of which conditioned the approving opinions on the absence of evidence of tracking referrals by the hospitals in question, without informing the government that extensive documentary evidence demonstrates the Guthrie defendants employed referral tracking and setting targets for referrals, or that the defendant Stensager demonstrated an obsession with referral tracking reports.

**D.  The Illegal Payments from the Hospital Group to the Clinic**

344.    The Clinic lists its physicians on its website at http://www.guthrie.org/find-a-provider.  Each of the physicians listed at that URL is a salaried employees of the Clinic.  Other physicians have been employed by the Clinic during the period relevant to this

Complaint.

345.    The Clinic obtains revenue for medical services provided directly to patients by its physician-employees.  These services are paid to the Clinic by the patients, private insurers and Medicare, Medicaid and other government payors.

346.    The Clinic also obtains revenue from GHS and its subsidiaries for specific services that its physician-employees perform at RPH, Corning Hospital and other providers. These services are paid pursuant to specific contracts that are not at issue here.  They include administrative services to RPH and other GHS subsidiaries, such as serving as hospital department chairmen, section chiefs, and program directors, as well as participating in support of medical education and research.  In addition, the Clinic obtains revenue from third-party companies for physicians' participation in clinical research.

347.    Since the 1990s, these legitimate sources of revenue have been inadequate to pay the Clinic's ongoing operating expenses.   As a result, the Clinic has experienced an operating deficit ranging from a few million dollars to $34 million per year.

348.    At the time of the Alignment Agreement in 2001, the Clinic was insolvent and dependent on GHS to pay doctors' salaries, benefits and insurance.   The Clinic reported operating losses for each year from 2001 to 2015.  As shown in the following table, the Clinic's financial situation – excluding the improper payments from the Hospital Group – has not improved in recent years:

| FY Ending June 30 | Clinic Loss |
|---|---|
| 2010 | ($19,833,989) |
| 2011 | ($24,507,108) |
| 2012 | ($18,101,113) |
| 2013 | ($34,640,435) |
| 2014 | ($35,892,802) |
| 2015 | ($37,282,572) |
| **TOTAL** | **($169,258,019)** |

349.    To ensure the survival of the Clinic and its stream of referrals, GHS and its subsidiaries, acting through the shell corporation Guthrie Health, annually make cash payments to the Clinic in amounts roughly equivalent to the Clinic's losses.  In addition to "equity transfers" to cover the Clinic's "budgeted" operating losses, GHS also enters into and extends loans and lines of credit to the Clinic to cover unanticipated deficits.

350.    The following table shows the correlation between the Clinic's losses and the payments from GHS:

| Fiscal Year Ending June 30 | Clinic Actual Loss | Amount Transferred to Clinic As "Gifts" |
|---|---|---|
| 2010 | ($19,833,989) | $16,701,663 |
| 2011 | ($24,507,108) | $25,826,959 |
| 2012 | ($18,101,113) | $25,001,899 |
| 2013 | ($34,640,435) | $24,263,286 |
| 2014 | ($34,892,802) | $12,758,770 |
| 2015 | ($37,282,572) | $26,292,772 |
| TOTAL | ($169,258,019) | $130,845,394 |

The Policy referred to herein at paragraph 206 et seq provided that, in addition to cash transfers to cover the Clinic's "budgeted losses", the Hospital Group would "loan" the Clinic funds to cover "unbudgeted" losses that might occur in any given year; the transfers reflected above include only the cash "gifts" made to cover the "budgeted" portion of Clinic losses.

351.    The Hospital Group paid the Clinic the amounts listed in this table in each fiscal year from 2010 through 2015.  On information and belief, the Hospital Group paid the Clinic additional amounts during fiscal years 2016 and 2017 year to date.

352.    In addition to the "gifts" and "equity transfers" described herein, in the event the Clinic's losses exceed the "budgeted losses" each year, the 'policy' agreed to by the

parties in 2002 provides that the Hospital Group will "loan" the insolvent Clinic additional

funds at the rate of approximately six percent per year.

353.    The financial condition and credit of the Clinic is such that it could not obtain

"loans" in the commercial markets on terms and at the rates under which it receives loans

from the Hospital Group, and all such "loans" to the Clinic are accordingly at below market

rates.

354.    The Hospital Group providing "loans" to a Clinic with accumulated losses

since FY 2001 in excess of $269 million, with a negative net worth, and with evidence that

such losses are increasing over time, constitutes a separate and distinct violation of the Anti-

Kickback and Stark statutes.

355.    As above, such payments are separate from, and in addition to, payments by

individual hospitals within the Hospital Group for services actually provided for, inter alia,

providing physicians to support the hospitals' administrative, medical education and research

activities.

356.    In the prior action, the Guthrie Defendants admitted that, without the cash

transfers from GHS, the Clinic would have been unable to meet its operating expenses,

including its physician payroll: "funds from these transactions were used to support the

ongoing operations of the Clinic whose existing expenses otherwise exceeded its revenues

during the years relevant to this case."  *See* Appendix of Judicial Admissions, ¶ 62.

**E.  The Clinic Receives Cash for Physician
      Payroll and Other Forms of Remuneration**

357.    The Clinic pays its physicians on the first business day of each month.

358.    GHS regularly made "equity transfers" to the Clinic just before end of the

month, often in response to memos from Clinic officers reporting a shortfall and asking for

assistance in meeting "physician payroll."

359.    In some cases, when the Clinic's losses exceed the budgeted amount, GHS "loans" the excess amount to the Clinic.  For example, in two 2008 memoranda, Clinic CFO Armstrong asked for "additional cash" to "catch up" for prior years' understatement of what the Clinic should have received to make up for its operating losses, plus a $3 million increase in a revolving credit line:

> "As you know, the Clinic may request cash in the form of equity transfers throughout the fiscal year up to a amount equal to its budgeted net loss.  However, since the Clinic does not possess an unrestricted cash and investments reserve, additional cash needs are often required . . . .   In addition, working capital shortfalls associated with the timing of cash receipts and payments often arise.
>
> A revolving credit loan with Guthrie Health has been in place for several years.   In February 2008, the Clinic requests that it be extended $3 million in net incremental revolving credit.  Additional future loan requests are expected for this fiscal year as budget targets shortfalls are expected."

360.    Armstrong also requested additional "equity transfers" in excess of $6.7 million, in order to "catch up" after what he described as shortfalls in prior-year "equity transfers."  In effect, Armstrong complained that GHS did not pay the Clinic as much as it needed to cover its losses, and asked for $6.7 million more than GHS had already paid.

361.    In his 2008 memorandum, Armstrong is justifying additional retroactive cash transfers on the basis that the Clinic did not get enough money in prior years to make up for its "budgeted net loss."  One month later, Armstrong requested an additional $2.5 million in credit from GHS.  Guthrie Health then approved the request, and GHS transferred the funds to the Clinic.  *See* GD 39499-500, 71350.

362.    Coming at a time when the Clinic, standing alone, was insolvent and unable to raise capital in any arm's length transaction, these extensions of credit are clear evidence of "remuneration" under both the Anti-Kickback and Stark laws.

363.    In judicial admissions, with respect to transactions identical in kind to those complained of herein the Guthrie defendants stated, "*Defendants do not dispute the facts of these financial transactions.*"  They admitted that there was no "*fair market value consideration to GHS in exchange for these transactions.*"  Defendants Statement of Material Facts in Support of Defendants' Motion for Summary Judgment, ¶¶ 52 & 53 (emphasis added).

364.    The Clinic maintains a defined contribution plan known as the "Profit Sharing Plan" for the benefit of the physicians and other employees of the Clinic.  The Clinic's contribution to the Plan is stated as a percentage of each participant's annual compensation.  Because most of the highly paid employees of the Clinic are physicians, they receive a substantial portion of this contribution.

365.    Each year, Guthrie Health approves the amount of the Clinic's contribution to the Profit Sharing Plan, including a 3% "*discretionary*" contribution.  This contribution is included in the calculation of the Clinic's annual operating deficit when budgets are submitted and approved each year.  A portion of the annual payment from GHS, including revenues obtained from Medicare and Medicaid, subsidizes this contribution to the Plan.

366.    The benefits transferred from GHS and Guthrie Health to the Clinic take many forms other than cash transfers and off-the-book loans.  For example, GHS has also advanced payments, as reflected on its Form 990 filed with the IRS, for the Clinic's information systems and software maintenance.  The Clinic disclosed no such payments in its tax returns.

367.    The parties have instituted an electronic patient record system that holds records for the Clinic's satellite offices in NY and Pennsylvania.  GHS is paying for the development and maintenance of that system for the Clinic's benefit.

368.    In 2007, the Clinic asked Stensager and other GHS officers to provide $7 million to pay the Clinic's "malpractice insurance funding requirements due this month." *See* GD 57278.  The Clinic's tax returns disclose cash reserves of more than $40 million held by a South Carolina subsidiary of GHS.  On information and belief, those funds were provided by GHS to pay for the Clinic's malpractice insurance.

369.    These are the type of expenses that any independent group of physicians would normally pay with its own assets.  By paying those expenses for the Clinic, GHS is providing illegal remuneration to the physicians who refer the majority of its patients.

370.    The Clinic has also profited from access to the borrowing power of GHS and its subsidiaries.  The Clinic participated in three tax-exempt bond offerings with a total value of more than $500 million.  In 2011, bonds issued by Guthrie Health with subordinate obligations of the Clinic and Hospital raised $102 million.  The Clinic benefited directly and indirectly from these funds, which were used for equipment purchases and property improvements, and to pay down earlier debt obligations.

371.    Because the Clinic, standing alone, was insolvent, GHS and its affiliates in effect "loaned" their collective borrowing power to the Clinic.  That benefit represents in-kind remuneration prohibited by the Stark law and the Anti-Kickback Statute.

372.    Finally, GHS provides Clinic physicians , access to Robert Packer Hospital. With only minor exceptions, the entire Active Medical Staff at RPH is comprised of Clinic physicians.  They have the exclusive right to admit patients, to staff every department of the hospital and use the hospital's equipment, nurses and technicians with no concerns about cost or competition.  Such exclusive access includes, but is not limited to, exclusive access to cardiac catheterization laboratories, operating rooms, and other procedural and diagnostic

testing facilities.

373.    The Third Circuit in *U.S. ex rel Kosenske v Carlisle HMA, Inc*, has held providing physicians with exclusive access to hospital facilities represents valuable in-kind remuneration under the Stark law and the Anti-Kickback Statute.

**Using Physician "Productivity" to Set Physician Compensation**

374.    In addition to considering "hospital profit and loss by-specialty" in setting the compensation of the very physicians responsible for the referrals and admissions to RPH and Corning, the defendants have admitted that they also use physician "productivity" to set individual physician compensation levels, and in the original action submitted sworn declarations to that effect by Clinic physicians, and directors and officers of each of the corporate defendants.

375.    Contrary to the suggestion that considering "productivity" when setting individual physician compensation, the practice as used by Guthrie guarantees that the value or volume of referrals to the Hospital Group are taken into account.

376.    In the process of tracking referrals from Clinic physicians to the Hospital Group, and in measuring the volume of such referrals, as early as 2003 the parties developed a model that correlated the "productivity" in a given Clnic office with the volume of referrals that could be expected, or that 'fall out' of a specific volume of productivity for that office.

377.    The aforesaid measurements specifically projected, to a site and location-specific level, the volume of admissions and referrals that should result per 1000 patient encounters, demonstrating a higher rate of referrals expected from offices in Sayre, where RPH is located, than were expected from the Clinic's office, for example, in Apalachin, NY, where the Clinic maintains a primary care office closer to Binghamton and its two competing

hospitals.

378.    Accordingly, knowing that for every 1000 encounters at a given location, or specialty, a set number of admissions and referrals can be expected, creates a simple conversion tool for the parties, and makes "productivity" a simple proxy for admissions.

379.    Accordingly, by admitting under oath that physician compensation is based on "productivity", knowing what volume of admissions and referrals fall out of a given level of productivity, depending on the physician's location and specialty, the defendants have admitted knowingly considering the value or volume of referrals by Clinic physicians when setting their individual compensation.  The aforesaid factor is in addition to the incontrovertible fact demonstrated from minutes of the Guthrie Health Physician Compensation Committee, and as admitted by CEO Mark Stensager in the prior action, that that Committee considered "hospital profit and loss by specialty" in deliberating on physician compensation.

**F.  The Role of Dr. Devine and other Clinic Physician Directors and Officers: Approving Illegal Payments for His Own Referrals**

380.    At all times relevant to this complaint, Devine was a practicing ophthalmologist employed by the Clinic at a salary of approximately $900,000 per year.

381.    As a member and officer of the Guthrie Health board of directors, Devine voted to approve the 2002 policy regarding cash transfers to the Clinic, including specifically the policy that GHS would transfer cash each year in the amount of the Clinic's "budgeted loss."

382.    As a member of the Guthrie Health "Physician Compensation Committee" Devine participated in the budget process and agreed to accept the annual "equity transfer"

and other benefits on behalf of the Clinic.

383.     As Chief of the section of Ophthalmology at the Clinic, Devine's responsibilities included assisting in the development of a budget each year, which included anticipated volumes of surgical procedures to be performed at RPH and/or the Guthrie Ambulatory Surgical facility in Big Flats, NY, or Vestal, NY.

384.     As a member of the Guthrie Health board of directors, Devine voted to approve hospital budgets that incorporated:

(A) specific volumes of admissions and ancillary services at RPH and/or the Ambulatory Surgcial facility in Big Flats, NY, that included admissions and orders for ancillary services he would provide over the course of the coming year; and also included

(B)  budgeted losses for the Clinic for the coming year; and that also

(C)  made provision for cash transfers from the Hospital Group to the Clinic to cover its "budgeted" losses for the year; and also

(D) voted to approve budgets that made provision for the size of the Clinic's physician compensation pool, which included funds for his own salary and benefits; and that also

(E) made provision for payment of expenses for the Clinic's benefit plans, in which plans he participated and was fully vested, and which budgets included payment of a "discretionary" contribution to the Clinic's "Profit Sharing Plan" each year hereunder.

385.     With respect to cash gifts and "equity transfers" identical to the "gifts" referenced herein, Devine has judicially admitted that but for the "equity transfers" received

by the Clinic it could not cover its normal operating expenses, which includes his own salary and benefits.

386.    Physician salaries and benefits are a significant component of the Clinic's ordinary operating expenses.

387.    In the course of the salary survey conducted by the Clinic each year, in which the salaries of Clinic physicians are compared to the salaries of other physicians, by specialty, in the United States, Devine has been found to be compensated at or above the 90th percentile.

388.    In addition to Devine, other Clinic physicians sitting as members of boards of directors, officers, or managers of clinical sites, sections or departments, and who participate in, or vote on budgets that make provision for the same items outlined in paragraph 228 above, as more fully identified and described in Paragraphs 5-9 above.

389.    Devine repeatedly voted to approve "discretionary contributions" to the Clinic's Profit Sharing Plan while he was a vested participant in the Plan.  He knew that these contributions included revenues generated by RPH, including Medicare and Medicaid reimbursements.

390.    In the prior action, Devine judicially admitted (A) referring patients covered by Medicare and Medicaid programs to Robert Packer Hospital, (B) knowing of the "equity transfers" from GHS to the Clinic; (C) knowing that but for the said "equity transfers" the Clinic was unable to meet its operating expenses; (D) that GHS received no "fair market consideration" in exchange for the financial transactions from GHS to the Clinic, and (E) that the Robert Packer Hospital and Clinic use the U.S. Postal Service and mails, and transmission of information by electronic means, including email and wire for the submission

of claims under federally funded programs.   Accordingly, Devine has admitted all of the essential facts to support both civil and criminal liability under the Stark and Anti-kickback statutes.

**G.  The Role of Mark Stensager: Targeting and Tracking Clinic Referrals to GHS**

391.    Defendant Mark Stensager served as the Chief Executive Officer of GHS from approximately 1999 through FY 2012, and also served as Co-CEO of Guthrie Health from 2001 through FY 2012.  He also attended regularly meetings of the Clinic board of directors and meetings of the Guthrie Health Physician Compensation Committee.

392.    Several companies, including Corning Hospital and the Clinic, have settled allegations under the False Claims Act for conduct that occurred under Stensager's management.  As regional vice president of Phycor, Inc., a now defunct hospital management company, Stensager was responsible for the Straub Clinic in Hawaii.  Straub later settled claims under the False Claims Act covering the period of Stensager's leadership.

393.    Stensager admitted in testimony that the purpose of the Guthrie Health Physician Compensation Committee is "determining the size of the [physician] compensation pool."  He also admitted that the committee determined the compensation of Clinic physicians based in part on whether their activities were "profitable for RPH."

394.    At all relevant times, Guthrie Health's budget process has included efforts to track and increase the number of referrals from the Clinic to GHS and its subsidiaries.   For example, in 2004, the Guthrie Defendants adopted a "Work Plan" to improve tracking of "referral activity" and to "implement tailored interventions/tactics" with individual physicians "to increase patient referrals to Guthrie Providers and Services."  *See* GD 5491,

5428-33, 9115.

395.    Defendant Stensager personally led efforts to develop "forecasts" for annual admissions.  By increasing admissions through referrals from the Clinic, he wrote, "[o]ur goal is for the hospitals to make a profit on Medicare."  *See* GD 49457-59.

396.    It was Stensager's responsibility to meet the system-wide revenue targets set by the annual budget.  To meet those targets, Stensager developed "*a rigorous program across the delivery system to keep referrals inside*."  *See* GD 48624, GD 9603.  "*It has now become the expectation that whenever possible the inpatient and subspecialty referrals should be made to Guthrie physicians and facilities*."  *See* GD 47404.  By the emphasizing the need to "keep referrals inside", he clearly means referrals from the Clinic's physicians.

397.    With his increasingly strident emphasis on "keep[ing] referrals inside", Stensager's direction, coupled with the tens of millions of dollars of free cash GHS provided to the Clinic to cover its payroll and benefits, yielded substantial financial benefits to the Hospital Group.

398.    This initiative focused on referrals generated by the Clinic's practice in New York State.  In a 2005 PowerPoint presentation, Hospital management highlighted the need to "*leverage Guthrie Clinic's 40% market share [in Chemung County, NY] and strengthen admissions to Guthrie hospital facilities*."  The strategy is to restrict Clinic patient "admissions to SJH, RPH, Corning, effective January 2004."[1]

399.    Defendants' objective was clear: "*We need to explore every opportunity we can to keep referrals from non-Guthrie providers*."  *See* GD 47664.  The way to keep referrals was to discipline the Clinic doctors, because "outside of emergency room use,

---

[1] "SJH" refers to St. Joseph's Hospital in Elmira, Chemung County, NY.  GHS was hoping to merge with SJH, but the merger never happened.  RPH and Corning of course are the two largest GHS hospitals.

people often don't select their hospitals . . . doctors do."  *See* GD 50284.

400.    In 2007, GHS implemented a <u>tracking</u> system that "*reviews and tries to understand all leakage from the clinic physicians to outside docs and hospitals*."  Hospital management emphasized <u>to the Clinic CEO</u> that this type of <u>leakage "*should be rare*</u>." Noting "*at least 4,000 annual admissions generated by clinic docs that go to non-Guthrie facilities,*" GHS warned that "*all surgical referrals from a clinic doc within an hour driving time of Guthrie facilities should come to Guthrie facilities*."  *See* GD 49710.

401.    Stensager directed the development of "transfer stats" to report all of the transfers out of Corning Hospital to competing facilities, and the individual physicians responsible for those transfers.  *See* GD 70142.   Stensager knew that tracking alone would not raise revenues, so he directed management officials to tell Clinic doctors exactly how many referrals GHS expected its hospitals to receive.  "**We have established admission *targets* by practice. . . .  Each physician should be aware of their targets and fully engaged in achieving the targets.**"  *See* GD 50459 (emphasis added).

402.    GHS saw immediate financial benefits from this effort to maximize referrals of New York patients from the Clinic to RPH and Corning Hospital.  By tracking and targeting these referrals, GHS amassed over $665 million in unrestricted cash through March of 2017.

403.    HHS-OIG and other federal agencies have consistently identified this type of referral tracking and targeting as a red flag for illegal financial arrangements.  Stensager knew these tactics were illegal, but he persisted even as he and other GHS executives attended meetings of the Guthrie Health Board and set the terms of cash payments, loans and other remuneration to the Clinic.

404.     In their internal investigation report in 2006, the Guthrie Defendants withheld from the Government the fact that they use a rigorous tracking system to measure referrals, including the "leakage" of referrals to competing hospitals, and to advise Clinic physicians of their "targets. *See* Guthrie Defts. 051406.

**H. The Role of PriceWaterhouseCoopers: Aiding and Abetting the Fraud**

405.     PWC and the Guthrie defendants conspired to camouflage and conceal the illegal financial arrangements between the Clinic and GHS from State and Federal regulators in order to protect the stream of Medicare and Medicaid reimbursements flowing to the Guthrie defendants.

406.     Since 2000, GHS has paid PWC more than $6.5 million in fees for services that PWC provided to the Guthrie Defendants.

407.     In 2006, GHS retained PWC to assist in an internal "investigation" in response to the Government's investigation of Mr. Repko's complaint in the prior action.  As noted above, the investigation report was deliberately false and misleading in that it (a) falsely described the Guthrie Defendants' corporate structure, (b) asserted that physician compensation was not tied to referrals, and (c) failed to disclose the system for tracking and targeting referrals to maximize profits.  *See* Guthrie Defts. 051406.  PWC was aware of the truth, but conspired with the other defendants to submit this false report to the Government.

Misrepresenting the Guthrie Defendants' Corporate Structure

408.     In its capacity as independent auditor, PWC knowingly misrepresented the true corporate structure of the Guthrie Defendants to make them look like a single, vertically integrated, healthcare organization.  PWC provided critical assistance to the Guthrie Defendants in their efforts to deceive the public and regulators by portraying their cash-for-

referrals scheme as nothing more than internal transfers among affiliated companies.

409.    In the consolidated audited financial statements of the Guthrie Defendants, from 2002 through 2009, PWC stated:  "In 2001, Guthrie Clinic Ltd. (the "Clinic") and Guthrie Healthcare System (GHS) entered into an alignment agreement that brought the two health care institutions together *under the sole membership* of a non-profit organization called Guthrie Health."  *See* Guthrie Health audited financial statement for the year ending 6/30/2009, Note 1 (emphasis added).  As a matter of law, and as a matter of fact, this is simply not true.

410.    At all times relevant to this complaint, PWC knew that the Clinic and Hospital were collaborating under cover of Guthrie Health, an empty shell for their joint venture. They were not acting "under the sole membership" of Guthrie Health.

411.    Finally, in 2010, after Mr. Repko's prior lawsuit revealed that this description was false, PWC changed the financial statements to accurately describe the corporate relationships between the parties.  Nothing had changed on the ground; there were no amended articles or bylaws in 2010.  The only thing that changed was PWC's description. In 2011, the Guthrie Defendants included a false corporate chart in their bond offering documents:



*See* Official Statement, Central Bradford Progress Authority Revenue Bonds (Guthrie Health Issue), Series 2011, Appendix A at ii.

412.    This chart clearly portrays Guthrie Health as the parent corporation, with GHS and the Clinic as its subsidiaries.  In fact, as explained above, Guthrie Health has no ownership interest in any other corporation, and GHS and the Clinic are not subsidiaries of any other entity.  PWC knew that this chart was false but allowed it to be included in the bond offering materials distributed to investors.

413.    In addition, PWC falsely described Twin Tier Management Corporation as a wholly owned subsidiary of the Clinic.  *See* Clinic Form 990, Schedule R, Part IV for Fiscal Years 2009 and 2010.  This allowed the Clinic to claim a share of revenue and assets that actually belonged to GHS, the true parent of Twin Tier.

414.    Given its familiarity with these corporations, it is clear that PWC had actual knowledge that this tax return was false when it was filed with the IRS.  Twin Tier is not, and

has never been "100%" owned by the Clinic.  PWC had actual knowledge of the fact that the assets of Twin Tier were not assets of the Clinic. <u>Concealing and Disguising Millions in Equity Transfers to the Clinic</u>

415.    PWC knew about the cash payments and other transfers to the Clinic and was actively involved in efforts to conceal those transfers.  As a result, government agencies, including CMS and the State Department of Health, did not know that the Clinic was insolvent and dependent on illegal cash payments from GHS.  The investing public purchased $500 million in bonds based on false representations that the Guthrie Defendants were financially strong and operating in compliance with all applicable laws.

416.    PWC had access to minutes of the Guthrie Health Finance Committee, which established the policy of transferring cash as "equity transfers" to the Clinic to match the Clinic's budgeted losses each year.  But PWC never disclosed those massive fund transfers in the notes to the financial statements or in any other document prepared for GHS or Guthrie Health, so the information remained hidden.

417.    In many of the Clinic's Form 990 tax returns since 2008, a cash payment is reported as an "equity transfer" without identifying the source of the funds.  It is necessary to conduct a detailed analysis of changes in net assets, the Clinic's losses year-over-year, and to cross-reference those losses with GHS tax returns and financial statements to determine that the source of funds is GHS and its subsidiaries.

418.    PWC knew that the transfers were *not* ordinary income derived from the Clinic's normal operations.  The transfers were based on the Guthrie Defendants' estimates of the Clinic's projected losses each year.  Therefore, PWC knew that the Clinic's survival depended on an unpredictable stream of cash from GHS and its subsidiaries – a fact that most

auditors would consider "material."  But PWC continued to certify the Clinic as a "going concern" without disclosing that its existence depended on a promise of continued subsidies from GHS.

419.    In 2008, the District Court in the prior action denied the Guthrie Defendants' motion to dismiss the complaint, and held that the allegations stated a claim under the False Claims Act.  PWC then conspired with the Guthrie Defendants to hide and disguise the record of such transfers in the parties' filed tax returns and financial statements.

420.    For example, PWC prepared tax returns for the Clinic for fiscal year 2008 in which it appears that the Clinic received more than $13.8 million from Guthrie Risk Retention Group (GRRG), a captive insurer whose business does not include the provision of Designated Health Services.  GRRG is a subsidiary of GHS.  The same tax return shows an "equity transfer" from unspecified "affiliates" in the amount of $4.8 million.

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93490133007339 |
|---|---|---|

**TY 2007 Other Changes in Net Assets Schedule**

Name: Guthrie Clinic LTD
EIN: 25-0815795

| Description | Amount |
|---|---|
| EQUITY TRANSFER TO/FROM AFFILATES | 4,870,728 |
| RETENTION GROUP | 13,829,002 |
| CHANGE IN FMV OF DERIVATIVE INSTRUMENT | 1,795,737 |
| CHANGE IN NET UNREALIZED LOSSES | 1,441,424 |

421.    The Clinic's tax return is false.  GRRG did not make any transfer to the Clinic or any other third party, other than a transfer of $7,800 to GHS, in the relevant time period. Instead, internal spreadsheets show that GHS made three transfers to the Clinic in the total amount of $18,699,751 – or only $21 more than the first two entries combined.

422.    It is clear that PWC saw the amount of "equity transfers" and tried to hide

them by splitting the transfers into smaller amounts and falsely identifying their source.  The funds did not come from GRRG, and GHS is not an "affiliate" of the Clinic.

423.    PWC described the transferring entity as "Retention Group" rather than the correct corporate name of "Guthrie Risk Retention Group."  PWC intended to create the impression that $13.8 million came from a third party, and not from GHS or its subsidiaries.

424.    In fiscal years 2009 and 2010, while the prior action was pending, the tax returns filed by PWC completely failed to disclose the multi-million dollar transfers from GHS to the Clinic.  The returns show large discrepancies between the Clinic's operational losses and its net assets, suggesting that the Clinic had some positive infusion of assets other than its operating revenue.

425.    For example, internal documents show that the Clinic's projected budget called for $39 million to be paid by GHS in fiscal year 2009.  *See* GD 70761.  The Clinic's reported losses for the 2009 fiscal year were more than $34 million, so it is likely that there were transfers in 2009 of at least $34 million from GHS to the Clinic.  But there is nothing in the tax return disclosing that transfer – only a mysterious improvement in the Clinic's net assets from one year to the next.  The same is true of the Clinic's return for 2010.

426.    The District Court dismissed Mr. Repko's prior action in September 2011.  The subsequent tax returns prepared by PWC for the Clinic in 2012 and 2013 show $25 million in "equity transfers" from GHS in each year.  With the risk of liability removed, PWC saw no reason to hide the transfers.

427.    As further described herein, PWC had actual knowledge of the prior action, the allegations involving Prince, the opinion of counsel that it represented a "death sentence", and the opinion of the defendants' 'expert' McAnaney that the arrangement between the

hospital group and the Clinic implicated the Stark and Anti-kickback laws, and nevertheless failed to disclose, or agreed with defendants to withhold from the defendants financial statements, information regarding funds owed to the government, and failed to report or disclose any loss reserves or contingencies for any such amounts owed, knowing that the financial statements were required to be, and that they were, attached to the cost reports filed and certified by the defendants each year hereunder.

Securities Fraud: False Statements in Guthrie's Bond Offerings.

428.     The Guthrie Defendants have issued more than $500 million in municipal bonds over the past 11 years.  They could not have raised any part of that sum, and certainly not at the credit rating and interest rates they obtained, without the active assistance of PWC. PWC provided not only the regular audited financial statements included in the offering materials, but also a set of interim year-to-date financials specially prepared for each bond offering. These documents were false and misleading, and investors relied on them when they purchased the Guthrie bonds.

429.     In 2002, 2007 and 2011, just above the signature lines for the Guthrie executives, the Official Statement for each bond issue admonishes the reader that all of the exhibits and appendices to the Official Statement are "integral parts of this Official Statement and must be read in their entirety."[2]  As noted above, the financial statements and organizational chart included in these exhibits and appendices contained flatly false statements about the "structure" of the Guthrie Defendants.

430.     The appendix includes the Alignment Agreement, where the parties asserted in unequivocal terms: "Management believes that all arrangements currently in place with its

---

[2] *See*, for example, Official Statement, Central Bradford Progress Authority Revenue Bonds (Guthrie Health Issue), Series 2011, at 36.

physicians have been appropriately structured so as to avoid violating the Stark Law." *See* 2002 Guthrie Health Bonds, Series 2002 A and B.

431.    As for PWC, the same appendix asserts: "The GHS financial statements fairly present the respective consolidated financial positions of GHS and the GHS Affiliates." It makes the same assertion for the Clinic's financial statements. *Id.*, §§ 5.11, 6.11.

432.    In July 2011, the defendants included the false chart of their corporate structure as an appendix to the bond offering statement. *See* ¶ 174 above. The financial statements and tax returns also misstated the cash transfers between the Clinic and GHS.

433.    The parties' bond commitments require the Clinic and GHS to maintain certain debt ratios, and PWC assisted in those calculations. PWC knew that GHS had an undisclosed obligation to fund the Clinic, and that the Clinic could not support its own debt without that assistance. But these facts were not disclosed in PWC's financial statements.

434.    When the bonds were issued, the parties met with rating agencies to discuss their plans to improve financial performance. Standard & Poor's circulated draft rating releases to Guthrie, inviting comments and edits. Those S&P releases in 2007 represented that the Clinic and GHS were the "first-tier subsidiaries" of Guthrie Health. That was not an invention of S&P; the Guthrie defendants made that representation, and used the PWC financial statements to support it. The defendants had an opportunity to correct the statement when it was circulated in draft form. No change was made.

435.    Many funds holding the Guthrie bonds are permitted to hold only investment grade bonds, or bonds above specified ratings. If PWC and the Guthrie Defendants had disclosed the truth about their corporate structure and financial arrangements, the bonds would have not received investment grade ratings, and these funds would not have purchased

them.

436.     In summary, the rating agencies and the investment community relied on

PWC's financial statements and the integrity of its audit when they invested $500 million in

the Guthrie defendants.  The statements and offering documents were false, and PWC

actively conspired with the Guthrie Defendants to hide the truth.

**I.  The Clinic's Unlicensed Practice in New York**

437.     The Clinic and its doctors have deceived the State of New York in order to

practice medicine as a foreign professional services corporation.

438.     In the Alignment Agreement, the Clinic gave Guthrie Health control over its

leadership, staffing, salaries and strategic plans.

439.     The Alignment Agreement gave Guthrie Health "power and authority to

determine the aggregate amount of compensation to be paid to physicians employed" by the

Clinic, as well as the number and specialties of Clinic physicians.  *See* Alignment Agreement

at 22.

440.     The Alignment Agreement authorized Guthrie Health to remove the CEO of

GHS and the president of the Clinic for poor performance.  "[T]he Guthrie Health Board . . .

may require the GHS Board to remove the individual serving as the GHS CEO, from such

office and/or the Clinic shareholders to remove the individual service as the Clinic President

from such office, as applicable."  *See* Alignment Agreement at 18-19.

441.     The Clinic also ceded to Guthrie Health "the power and authority to add,

modify, relocate or discontinue any patient care or diagnostic program or health care service

(including, without limitation, the relocation or transfer of any program or service to another

member or a third party) that would . . . have Enterprise Wide Implications. *See* Alignment
Agreement at 21.

442.    Finally, the Clinic gave Guthrie Health *de facto* control over the power to
"determine the number and/or type of physicians" to be employed by the Clinic, as well as
the power to "approve non-compete" clauses for physician contracts.

443.    In short, while the Clinic maintained its "autonomy" as a matter of law, as a
matter of fact it ceded control to a non-profit corporation with lay board members and
officers.  The Clinic remained a physician-owned professional corporation, but in reality
Guthrie Health had control over its leadership, hiring, salaries and services.

444.    That shift of control made the Clinic ineligible to practice in New York as a
foreign professional services corporation, because the law requires that "all of the
shareholders, directors and officers" must be "authorized and licensed to practice" medicine
in New York.  The Department of Health has long held that an agreement giving *de facto*
control over a medical practice to non-physicians violates the rules governing professional
corporations.

445.    To avoid disqualification, the Clinic, with the knowing participation of the
other Guthrie Defendants, falsely described the relationship between the Clinic and Guthrie
Health to New York regulators.  They intended to make it appear that the Clinic is an
independent medical practice controlled by doctors licensed to practice in New York State.

446.    The Guthrie Defendants knew that the Clinic would not qualify to operate as a
Diagnostic & Treatment Center, so disclosure of Guthrie Health's control over the Clinic
would mean the end of the Clinic's operations in New York.

447.    Shortly after signing the Alignment Agreement, the Guthrie Defendants twice

submitted statements to New York regulators that failed to disclose the critical fact that the
Clinic was no longer an independent medical practice controlled by New York-licensed
doctors.  They informed a Pennsylvania court, a federal court, the IRS and the financial
markets, but they did not inform the State of New York.

448.    On information and belief, at no time since the Clinic conveyed *de facto*
control of the Clinic to Guthrie Health did the Clinic advise Medicare or New York Medicaid
that non-physicians now control all essential operations of the Clinic.

449.    In its Annual Statements to New York regulators to the present, the Clinic has
failed to disclose it relationship with Guthrie Health, in spite of New York Education
Department requirements that changes to corporate articles be disclosed within 30 days.
Instead, it continues to file certifications reflecting the names and license numbers of Clinic
shareholders, as if no change ever took place.

450.    According to the NPI Registry maintained by CMS, the Clinic operates
approximately 46 facilities in New York State.

451.    The doctors practicing in New York under the auspices of the Clinic are
operating a D&T center without the necessary license or certificates from New York State.

452.    The Clinic holds itself out to the public as the operator of nearly two dozen
treatment "centers" in New York State.  These include cancer centers, cardiac centers, and
pediatric centers, all listed on the Clinic's website.  These "centers" have all the attributes of
D&T centers under New York law, but the Clinic is operating them without the required
review, licensing and approval required by New York State law.

453.    As a condition to billing third-party payors, including Medicare and Medicaid,
a healthcare provider must first have all of the valid licenses and approvals necessary to

provide the services being billed in the state where they are rendered.  This is a fundamental prerequisite to participate in Medicare and Medicaid, and is part of the enrollment process for both programs.

454.    The Clinic disqualified itself as a professional corporation in 2001 and thereafter actively withheld material information from the State to create the impression that it still qualifies to practice medicine as Guthrie Medical Group, P.C.  The conduct described above demonstrates a deliberate effort by the defendants to obtain and maintain a profitable presence in New York, using illegal tactics and fraudulent statements to deceive regulators, competitors and patients.

455.    As a result of this illegal conduct, *every claim relating to its practice in New York State that the Clinic filed with Medicare and Medicaid is false*.

456.    The Clinic submits claims to Medicare and Medicaid on its own behalf, and it requires a valid institutional license to operate in New York as a prerequisite for those claims.  These claims are submitted by the facility under a group assignment account, and not by the individual physician.

457.    Payments for the Clinic's claims are remitted to the Clinic as the billing facility, and not to individual physicians.  Physicians employed by the Clinic are required as a condition of their employment to reassign to the Clinic all payments to which they are entitled for services rendered to patients enrolled in Medicare and Medicaid.

458.    More than 78,000 individual claims for services by Clinic physicians in New York were submitted to and paid by the Medicare and Medicaid programs each year during the relevant time period.

**False and Fraudulent Claims and Statements**

459.    Before July 1, 2007, the Clinic and its physicians entered into prohibited financial relationships with GHS and its subsidiaries, as described above.  From July 1, 2007 to the present, while participating in those financial relationships, the Clinic and its physicians referred patients, including Medicare and Medicaid patients, to GHS and its subsidiaries in violation of the Stark law, the Anti-Kickback Statute and the applicable laws of New York State.  This conduct is ongoing.

460.    From July 1, 2007 to the present, RPH, Corning Hospital and other GHS subsidiaries, in turn, submitted claims for payment to the Medicare and Medicaid programs for designated health services that they provided to patients referred by the Clinic and its physicians.  These defendants thereby obtained payments from the United States and the State of New York in violation of the Stark law, the Anti-Kickback Statute and the applicable laws of New York State.  This conduct is ongoing.

461.    From July 1, 2007 to the present, the Clinic and its physicians also submitted claims to the Medicare and Medicaid programs for designated health services that they provided to patients referred by the Clinic and its physicians.  These defendants thereby obtained payments from the United States and the State of New York in violation of the Stark law, the Anti-Kickback Statute and the applicable laws of New York State.  This conduct is ongoing.

462.    All claims submitted to Medicare or Medicaid by the Guthrie Defendants for designated health services referred by any of the Clinic's physicians on or after July 1, 2007 are false claims submitted to the United States and the State of New York.

463.    The Guthrie Defendants presented, or caused to be presented, all of these false claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard

that such claims were false and fraudulent.

**A.  Specific False Claims**

464.    The Clinic's website, http://www.guthrie.org/find-a-provider, lists its current physician employees.  Additional physicians have been employed by the Clinic during the period relevant to this complaint.  The same website identifies the Clinic's offices in New York State and the physicians currently practicing in each office.

465.    At all times relevant to this complaint, GHS and its subsidiaries received between 46.8% and 49.9% of their revenues from Medicare payments, and between 8.6% and 10.7% from Medicaid payments:

**Guthrie Health**
**Sources of Patient Revenue and Third Party Reimbursement**
**Fiscal Years 2006 - 2009**

| Payor | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Medicare | 44.8% | 46.8% | 48.2% | 47.4% |
| Medicaid | 9.3% | 8.6% | 8.7% | 8.8% |
| Blue Cross | 19.8% | 19.1% | 18.2% | 19.1% |
| Other | 26.0% | 25.5% | 24.9% | 24.6% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |

Percentages exclude Tioga facilities sold 12/31/2007.

**Guthrie Health**
**Sources of Patient Revenue and Third Party Reimbursement**
**Fiscal Years 2011 - 2014**

| Payor | 2011 | 2012 | 2013 | 9/30/2013 |
|---|---|---|---|---|
| Medicare | 48.2% | 47.8% | 49.4% | 49.9% |
| Medicaid | 10.3% | 10.2% | 10.7% | 10.6% |
| Blue Cross | 21.6% | 22.4% | 22.1% | 21.5% |
| Self Pay | 3.2% | 3.5% | 3.1% | 3.8% |
| Other | 16.7% | 16.1% | 14.7% | 14.2% |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% |

Source:  Guthrie Health records

Includes reclassification related to expanded New York Managed Medicaid

**The Guthrie Clinic**
**Sources of Patient Revenue and Third Party Reimbursement**
**Fiscal Years 2014 - 2017**

| Payor | 2014 | 2015 | 2016 | 03/31/2017 |
|---|---|---|---|---|
| Medicare | 49.0% | 50.2% | 49.8% | 50.2% |
| Medicaid | 11.2% | 12.1% | 13.4% | 14.0% |
| Blue Cross | 22.5% | 22.2% | 21.6% | 20.8% |
| Self Pay | 3.1% | 2.2% | 1.8% | 1.9% |
| Other | 14.2% | 13.3% | 13.4% | 13.1% |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% |

Source:  The Guthrie Clinic records
Based on Gross Charges

466.    Each UB-04 form submitted to Medicare and Medicaid by any of the Guthrie

Defendants identifies the attending physician and operating physician by name and Unique

Physician Identification Number.  Approximately 100% of the UB-04 forms submitted by

RPH identify physicians employed by the Clinic as the attending physician and/or operating physician.  Approximately 70% of the UB-04 forms submitted by Corning Hospital identify physicians employed by the Clinic as the attending physician and/or operating physician.

467.    The Clinic physician listed on any UB-04 form submitted by facility within the Hospital Group is the physician who referred the patient to GHS.

468.    Each UB-04 form that identifies a Clinic physician as the attending physician and/or operating physician is a false and fraudulent claim because that referral occurred at a time when the physician had an improper financial relationship with GHS.

469.    The Form UB-04 contains required fields for the National Provider Identified ("NPI"), a unique identification number for health care providers, who must use the NPI in submitting claims to HHS.

470.    UB-04 claim forms containing false claims include, but are not limited to, claims identifying any of the Clinic physicians set forth in Exhibit B, by name and/or by number.  Exhibit B is attached hereto and incorporated herein by reference.

471.    Each claim described in the preceding paragraph was submitted by the Guthrie Defendants to Medicare or Medicaid from July 1, 2010 to the present while the defendants were participating in the illegal cash-for-referrals scheme.

472.    In addition, each UB-04 form that identifies a Clinic physician who was practicing medicine in New York State as the attending physician and/or operating physician is a false and fraudulent claim because that referral occurred at a time when the Clinic and its physicians operated illegally in New York State as an unlicensed diagnostic and treatment center.

473.    Each claim described in the preceding paragraph was submitted by the Clinic

and/or its physicians to Medicare or Medicaid from July 1, 2010 to the present while the

Clinic was operating illegally in New York State as an unlicensed diagnostic and treatment

center.

**B.  Specific False Statements**

474.    Each Medicare cost report submitted by any of the Guthrie Defendants for

years on or after 2010 is false and fraudulent, along with each individual Medicare and

Medicaid claim in which any of the physicians identified by name or NPI number as a

referring, ordering or treating physician.

475.    For example, each cost report submitted by RPH states that the hospital paid a

certain amount to its parent company, GHS, for administrative and management services.

This is a false statement because RPH knows that a substantial part of those funds will be

transferred to the Clinic to compensate Clinic physicians for their referrals to RPH.  The cost

report deliberately overstates the amount paid to GHS and fails to disclose kickbacks paid to

the Clinic.

**Damages to the United States**

476.    The false statements and fraudulent misrepresentations contained in the

Forms 2552, UB-04 and CMS-1450 filed by the Guthrie Defendants were a prerequisite for

the Government to pay millions of dollars to the defendants in Medicare reimbursements.

The false statements and fraudulent misrepresentations contained in the Medicaid Electronic

Certification, filed by the Guthrie Defendants, were a prerequisite for New York State to pay

millions of dollars to the defendants in Medicaid reimbursements.

477.    All Medicare and Medicaid claims presented by the Guthrie Defendants

supported by the false and fraudulent certifications alleged above were claims which those

defendants, under law, were not entitled to collect from the United States.  All Medicare and

Medicaid reimbursements that defendants did in fact collect supported by the submission of

such false certifications were unlawfully collected as the result of the false statements

alleged above.  The United States was damaged by the payment of such claims in an amount

equal to the total amount of such payments.

478.    All Medicare and Medicaid claims presented by the Guthrie Defendants to the

United States for payment based upon services rendered by physicians who (a) had received

financial inducements to refer patients to GHS and its subsidiaries, or (b) were in prohibited

financial relationships with GHS, were claims that the Guthrie Defendants were not entitled

to collect from the United States and New York State.  All payments which defendants did in

fact collect based on such claims were unlawfully collected as the result of the false

statements alleged above. The United States and New York State were damaged by the

payment of such claims in an amount equal to the total amount of such payments.

479.    On information and belief, agencies and other governmental entities of the

United States purchased, directly or indirectly through mutual funds, securities issued by the

Guthrie Defendants with the active participation of PWC.

480.    Federal entities damaged by defendants' securities fraud may include:

a.  The Thrift Savings Plan, a defined contribution plan operated in a fashion

analogous to a private 401(k) plan.  See 5 U.S.C. §§ 8431-8440(f).  Nearly

every federal employee participates in the TSP.  See 5 U.S.C. §§ 2015 and

8401(11)-8402.

b. The U.S. Army Non-Appropriated Fund Employee Retirement Fund ("NAF Fund"), a retirement program for federal Department of Defense employees who are compensated through funds not appropriated by Congress.

c. The Pension Benefit Guaranty Corporation ("PBGC"), a federal agency established by the Employee Retirement Income Security Act of 1974.  29 U.S.C. §1001 *et seq*, to protect private-sector defined benefit pension plans. If a private defined benefit plan terminates without sufficient funds to pay all benefits, PBGC's insurance program will pay benefits up to the limits set by law.

## CAUSES OF ACTION

### COUNT ONE

(False Claims Act: Presentment of False or
Fraudulent Claims in violation of 31 U.S.C. § 3729(a)(1)(a)
(against the Guthrie Defendants)

481.    Relator repeats and re-alleges paragraphs 1 through 480 as if fully set forth herein.

482.    Through the acts and omissions described above, the Guthrie Defendants and their agents and employees knowingly presented or caused to be presented to the United States false and fraudulent claims in order to obtain reimbursement through the Medicare and Medicaid programs for health services provided in violation of the Stark law and Anti-Kickback Statute.

483.    As described more specifically above, Medicare cost reports and other claims for payment submitted to the United States by GHS and its subsidiaries, including RPH and Corning Hospital, for services provided on or after July 1, 2007, were false or fraudulent

because they included claims for reimbursement for services rendered to patients unlawfully referred to GHS and its subsidiaries by physicians to whom GHS provided kickbacks and/or illegal remuneration and/or with whom GHS entered into a prohibited financial relationship in violation of the state and federal Anti-Kickback Statutes and/or the Stark Law.

484.    The physicians receiving such kickbacks and/or illegal remuneration include all physicians employed by the Clinic on or after July 1, 2007.

485.    Any claims for reimbursement by Medicare or Medicaid submitted by GHS or its subsidiaries in respect of patients referred by those physicians on or after July 1, 2007 is a false claim.

486.    In addition, each claim for medical services performed or referred by a physician employed by the Clinic in New York State is a false claim because the Clinic violated New York law governing foreign medical professional corporations and failed to obtain approval to operate in New York as a diagnostic and treatment center.

487.    A valid license and compliance with state law governing the practice of medicine are conditions of payment by Medicare and Medicaid.  With each cost report and other claim for payment, the Guthrie Defendants falsely certified that the Clinic and its physicians were authorized to practice in New York.

488.    Through the acts and omissions described above, the Clinic and its physicians knowingly presented or caused to be presented to the United States false and fraudulent claims in order to obtain reimbursement from the Medicare and Medicaid programs, in violation of 31 U.S.C. § 3729(a)(1)(a).  These claims include claims for services that Clinic physicians provided at RPH and Corning Hospital for patients referred by Clinic physicians.

489.    The United States, unaware that the records, statements, and claims made or

117

submitted by defendants were false or fraudulent, paid and continues to pay defendants for claims that would not otherwise be paid if the truth were known.

490.    As a result of the foregoing, defendants are liable to the United States under the Act for treble its damages plus a civil penalty of $5,500 and $11,000 for each false or fraudulent claim or false statement, record or document submitted to the United States.

**COUNT TWO**

(False Claims Act: Creation and Use of False Records
and Statements in violation of 31 U.S.C. § 3729(a)(1)(b))
(against the Guthrie Defendants)

491.    Relator repeats and re-alleges paragraphs 1 through 490 as if fully set forth herein.

492.    Through the acts and omissions described above, the Guthrie Defendants and their agents and employees knowingly made, used and/or caused to be made or used, false records and statements in order to get false and fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(2).

493.    As described more specifically above, the Guthrie Defendants submitted cost reports and other claims for payment on or after July 1, 2007, that contained a false and fraudulent certification.  Among other things, these defendants certified that the services identified in each cost report were provided in compliance with applicable laws and regulations.  The Guthrie Defendants knew that each and every such certification was false and fraudulent.

494.    The United States, unaware that the records, statements, and claims made or

submitted by Defendants were false or fraudulent, paid and continues to pay the Guthrie

Defendants for claims that would not otherwise be paid if the truth were known.

495.    By virtue of these false or fraudulent statements, the United States has

suffered damages in an amount to be determined at trial.

496.    As a result of the foregoing, the Guthrie Defendants are jointly and severally

liable to the United States under the Act for treble its damages plus a civil penalty of $5,500

and $11,000 for each false or fraudulent claim or false statement, record or document

submitted to the United States.

## COUNT THREE

(False Claims Act: Conspiracy in violation of 31 U.S.C. § 3729(a)(1)(c))
(against all Defendants)

497.    Relator repeats and re-alleges paragraphs 1 through 496 as if fully set forth

herein.

498.    Defendants PWC, Stensager and Devine,  knowingly conspired with the

Guthrie Defendants to get false and fraudulent claims allowed and paid by the United States,

through the submission of false or fraudulent cost reports and other claims, in violation of 31

U.S.C. § 3729(a)(1)(c).

499.    Defendant members of the Hospital Group and the Clinic, with the assistance

of  PWC, knowingly conspired to get false and fraudulent claims allowed and paid by the

United States, through the submission of false or fraudulent cost reports and other claims, in

violation of 31 U.S.C. § 3729(a)(1)(c).

500.    As described in detail above, the defendants entered into an agreement to

maximize revenues by (i) conducting an illegal cash-for-referrals scheme, (ii) tracking and targeting referrals to discourage Clinic physicians from using competing hospitals, and (iii) submitting false claims for reimbursement to Medicare and Medicaid.  As Stensager said, by increasing admissions through referrals from the Clinic, "[o]ur goal is for the hospitals to make a profit on Medicare."  *See* GD 49457-59.

501.    The "budget process" described above constitutes a conspiracy among separate corporations – Guthrie Health, GHS (and all of its subsidiaries), RPH, and Corning, on the one hand,  and the Clinic on the other– to set targets for admissions and referrals from the Clinic in exchange for the transfer of tens of millions of dollars each year to support physician salaries and other operating expenses of the Clinic, including "discretionary" contributions to the Clinic Profit Sharing Plan.

502.    Each of PWC, Stensager and Devine participated in the agreement and took the specific actions described above to maximize Medicare and Medicaid reimbursements through the illegal cash-for-referrals scheme.

503.    The agreement to conspire began no later than 2001 with the execution of the Alignment Agreement.  It was renewed repeatedly thereafter, including on the occasion of each Guthrie bond offering in 2002, 2005 and 2011, and each annual budget adopted by Guthrie Health from 2002 to the present.  The conspiracy is ongoing.

504.    The individual members of the board of directors of Guthrie Health, including the physicians from the Clinic and lay representatives from the Hospital Group, conspired to establish targeted volumes of admissions and referrals at facilities within the Hospital Group, while at the same time guaranteeing that all of the Clinic's "budgeted losses" would be covered by "equity transfers" or "gifts" from GHS and/or the Hospital Group each year

hereunder.

505.    The specific acts undertaken pursuant to this agreement occurred at a time

when the Guthrie Defendants were engaged in an illegal, undisclosed financial relationship,

and the submission of claims for reimbursement by Medicare and Medicaid, all as more fully

alleged above.  All of the defendants, including PWC, Stensager and Devine, knew that the

financial relationship among the Guthrie Defendants violated the Stark law and Anti-

Kickback Statute, and that claims submitted by the Guthrie Defendants to Medicare or

Medicaid on or after March of 2010 were fraudulently submitted, and are false claims.

506.    In furtherance of this conspiracy, the Guthrie Defendants performed the

various acts are alleged above in order to get false and fraudulent claims allowed and paid by

the United States.

507.    As a result of the foregoing, all of the defendants are jointly and severally

liable to the United States under the Act for treble its damages plus a civil penalty of $5,500

and $11,000 for each false or fraudulent claim or false statement, record or document

submitted to the United States.


**COUNT FOUR**

(False Claims Act: Reverse False Claims in violation of 31 U.S.C. § 3729(a)(1)(g))
(All Defendants)

508.    Relator repeats and re-alleges paragraphs 1 through 507 as if fully set forth

herein.

509.    The Guthrie Defendants knowingly made, used, or caused to be made or used,

false records and statements material to an obligation to pay or transmit money to the

Government, and knowingly concealed and improperly avoided an obligation to pay or

transmit money to the United States, in violation of 31 U.S.C. § 3729(a)(1)(g).  As a result, the United States did not seek to recover the funds owed to it due to the United States' payment of false claims in reliance upon fraudulent certifications contained in the Guthrie Defendants' cost reports, worksheets and related documents and statements attached as required to such cost reports, each and every year hereunder.

510.     The defendants submitted annual cost reports, and PWC combined and conspired with the Guthrie defendants to issue financial statements misrepresenting or fraudulently omitting or making provision for amounts owed to the United States, notwithstanding the actual knowledge of the defendants starting at least in 2001, and continuing to the present, that the financial "interaction between the parties" implicated the Stark, Anti-kickback and False Claims Act laws.

511.     Each year from 2001 to the present, when filing annual cost reports, the defendants were required to, and did, attach financial statements prepared by PWC which, notwithstanding the knowledge of the financial arrangements described herein, and of the opinion of the defendants that the said conduct implicated the Stark and Anti-kickback statutes, omitted entirely any reserve, contingency, note, or disclosure of any mounts due and owed to the United States.

512.     PWC had actual knowledge of the fact that its financial statements were required to be attached to, and that they were in fact attached to, each cost report filed hereunder.

513.     Each cost report filed from 2001 to the present required the defendants' certification of amounts owed to or from the United States.

514.     Each occasion on which the defendants filed a cost report omitting any

reference to amounts owed to the United States by reason of the 2004 claim, or by reason of the defendant's knowledge of the fact that the financial arrangements between the parties implicated the Stark and Anti-kickback laws, constituted a new reverse false claim, pulling forward to the present the damages owed to the government which, but for the fraudulent representations and omissions, would have due and paid on a timely basis.

515.    The Defendant Stensager reviewed, authorized and issued or approved the issuance of each audited financial statement hereunder, each one of which was attached to cost reports submitted each year hereunder.

516.    As a result of the foregoing, the Defendants are joint and severally liable to the United States under the Act for treble its damages plus a civil penalty of $5,500 and $11,000 for each false or fraudulent claim or false statement, record or document submitted to the United States.

## COUNT FIVE

Securities Fraud in violation of Federal False Claims Act
31 U.S.C. §§3729(a)(1)(A)-(B)
(Against the Guthrie Defendants and PWC)

517.    Relator repeats and re-alleges paragraphs 1 through 516 as if fully set forth herein.

518.    The Guthrie Defendants issued municipal bonds in 2002, 2007 and 2011 in a total amount exceeding $500 million.  The bonds are denominated Health Care Facilities Authority of Sayre Revenue Bonds (Guthrie Health Issue), Series 2002 A and B and Series 2007, and Central Bradford Progress Authority Revenue Bonds (Guthrie Health Issue), Series 2011 (collectively, the "Guthrie Health Bonds").  The bonds are available for purchase

by the public and traded in book-entry form on markets in New York State.

519.    In connection with the sale of the Guthrie Health Bonds, the Guthrie

Defendants and PWC made material false statements in the offering documents and in

meetings and correspondence with ratings agencies, including Fitch Ratings, Inc., and

Standard & Poor's Financial Services, LLC.

520.    In reliance on these false statements, agencies and other governmental entities

of the United States purchased, directly or indirectly through mutual funds, shares in the

Guthrie Health Bonds.

521.    By virtue of the acts described above, the Guthrie Defendants and PWC

knowingly made, used, or caused to be made or used false or fraudulent records and

statements, and omitted material facts, to induce the Government to purchase the Guthrie

Health Bonds.

522.    By reason of these acts, the United States has been damaged, and continues to

be damaged, in a substantial amount to be determined at trial.


## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff, on behalf of the United States and Relator, demands

and prays that judgment be entered in its favor against Defendants, jointly and severally, as

follows:

1.    On the First, Second, Third, Fourth and Fifth Causes of Action under the False

Claims Act, as amended, treble the amount of damages sustained by the United States and

civil penalties for each false claim or false statement, as provided by law;  and

2.    Relator Repko, on behalf of himself and the United States Government, prays:

(i)    this Honorable Court enter a judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's violations of the False Claims Act;

(ii)    this Honorable Court enter a judgment against Defendant for a per-claim penalty of no less than $5,500 and no more than $11,000 for each claim submitted in violation of the False Claims Act;

(iii)    Relator Repko counsel be awarded all reasonable attorneys' fees in bringing this action;

(iv)    in the event the United States Government proceeds with this action, Relator Repko be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

(v)    in the event the United States Government does not proceed with this action, Relator Repko be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action plus all costs of this action, with interest, reasonable attorneys' fees to counsel, and including the cost to the United States Government for its expenses related to this action;

(vi)    Relator Repko be awarded prejudgment interest;

(vii)    a trial by jury be held on all issues so triable;

(viii)    Relator Repko and the United States of America receive all relief to which either or both may be entitled at law or in equity whether or not so claimed or plead

herein.

### Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, relator Rodney J. Repko

hereby demands a trial by jury.

State of Pennsylvania
**County of Bradford**          )

Personally appeared before me, the undersigned authority, in and for said State and
County, Rodney J. Repko, who being by me first duly sworn, doth deposes and say that
the statements contained in the foregoing Complaint are true and correct to the best of his
knowledge.

_____
**RELATOR /PETITIONER**

SWORN to and subscribed before me this the 22ⁿᵈ day of December, 2017.

_____
**NOTARY PUBLIC / STATE AT LARGE**
**My Commission Expires:** 03-29-2021

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Sadie A Roth, Notary Public
Forty-Fort Borough
Luzerne County
My Commission Expires 03-29-2021

_____                _____
Michael Guy Holton (HOL106)              William H. Fuller (FUL026)
Counsel for Relator
Fuller, Taylor & Holton P.C.
5748 Carmichael Parkway, Suite D
Montgomery, Alabama 36117
gholtonattorney@gmail.com
bhfuller@att.net
(334)244-0447

_____
Ronald V. Santora
Bresset & Santora, LLP
1188 Wyoming Avenue
Forty Fort, PA

## TABLE OF AUTHORITIES

1. **Anti-Kickback Statute, 42 U.S.C. § 1320a-7b**

2. **Stark Law, 42 U.S.C. §1395nn**

3. Anti-Kickback Statute – Safe Harbor regulations at 42 CFR §1001.952(a)-(u)

4. Stark Law - 42 CFR §411.355 regulations regarding general exceptions

5. Stark Law - 42 CFR §411.357 – regulations regarding exceptions for compensation arrangements

6. *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985), leading case establishing "one purpose" rule for criminal violations of the Anti-Kickback Statute

7. *U.S. ex rel Drakeford v. Tuomey Healthcare System, Inc,* 792 F.3d 364 (4th Cir. 2015) – in which the 4th circuit cited approvingly former OIG official's opinion that when defendant hospital pays physicians more than they generate in professional fees (less expenses), it is an "easy case to prosecute" under the Stark and Anti-kickback laws.

8. *U.S. ex rel Kosenske v Carlisle HMA*, 554 F.3d 88 (3rd Cir. 2009) – Third Circuit holding that providing exclusive access to a hospital department is valuable "in kind" remuneration under Stark and the Anti-kickback law definitions

U.S. ex rel Repko v Guthrie Healthcare System, et al, E.D. of New York

EXHIBIT A --  Robert Packer Hospital Medicare & Medicaid Payments
as reported in IRS Form 990 for FY 2010, 2011,
2012, 2013, 2014, 2015 and 2016

Excerpts of Cover Page, and Relevant Schedule from
each tax return.

Form **990**

OMB No 1545-0047

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public

▶ Information about Form 990 and its instructions is at *www.IRS.gov/form990*

**2014**

Department of the Treasury
Internal Revenue Service

**Open to Public Inspection**

**A** For the 2014 calendar year, or tax year beginning 07-01-2014 , and ending 06-30-2015

| B Check if applicable | C Name of organization ROBERT PACKER HOSPITAL | D Employer identification number |
|---|---|---|
| ☐ Address change | % MICHELE SISTO | 24-0795463 |
| ☐ Name change | Doing business as | |
| ☐ Initial return | | |
| ☐ Final return/terminated | Number and street (or P O box if mail is not delivered to street address) | Room/suite | E Telephone number |
| | ONE GUTHRIE SQUARE | | (570) 887-4625 |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code | |
| ☐ Application pending | SAYRE, PA 18840 | G Gross receipts $ 708,077,531 |

| F Name and address of principal officer MARIE DROEGE GUTHRIE SQUARE SAYRE, PA 18840 | H(a) Is this a group return for subordinates? ☐ Yes ☑ No |
|---|---|
| | H(b) Are all subordinates included? ☐ Yes ☐ No If "No," attach a list (see instructions) |
| I Tax-exempt status ☑ 501(c)(3) ☐ 501(c) ( ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527 | |
| J Website: ▶ WWW GUTHRIE ORG | H(c) Group exemption number ▶ |
| K Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶ | L Year of formation 1885 | M State of legal domicile PA |

## Part I  Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities
THE PROVISION OF CHARITABLE HEALTHCARE SERVICES TO RESIDENTS OF THE SURROUNDING COMMUNITY ON AN IN-PATIENT AND OUT-PATIENT BASIS

2 Check this box ▶☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| 3 Number of voting members of the governing body (Part VI, line 1a) | | 3 | 15 |
| 4 Number of independent voting members of the governing body (Part VI, line 1b) | | 4 | 10 |
| 5 Total number of individuals employed in calendar year 2014 (Part V, line 2a) | | 5 | 2,033 |
| 6 Total number of volunteers (estimate if necessary) | | 6 | 181 |
| 7a Total unrelated business revenue from Part VIII, column (C), line 12 | | 7a | 0 |
| b Net unrelated business taxable income from Form 990-T, line 34 | | 7b | 0 |

**Revenue**

| | | Prior Year | Current Year |
|---|---|---|---|
| 8 | Contributions and grants (Part VIII, line 1h) | 165,331 | 80,604 |
| 9 | Program service revenue (Part VIII, line 2g) | 273,299,023 | 296,590,851 |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 12,037,853 | 16,979,589 |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 6,764,817 | 11,048,622 |
| 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 292,267,024 | 324,699,666 |

**Expenses**

| | | | |
|---|---|---|---|
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3) | 16,250 | 73,750 |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 94,952,374 | 95,875,632 |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| b | Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 149,435,111 | 167,470,814 |
| 18 | Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | 244,403,735 | 263,420,196 |
| 19 | Revenue less expenses Subtract line 18 from line 12 | 47,863,289 | 61,279,470 |

**Net Assets or Fund Balances**

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| 20 | Total assets (Part X, line 16) | 525,453,121 | 577,137,977 |
| 21 | Total liabilities (Part X, line 26) | 204,054,115 | 200,786,101 |
| 22 | Net assets or fund balances Subtract line 21 from line 20 | 321,399,006 | 376,351,876 |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| **Sign Here** | Signature of officer | 2016-05-09 Date |
|---|---|---|
| | MARIE DROEGE PRESIDENT Type or print name and title | |

| **Paid Preparer Use Only** | Print/Type preparer's name ANTONIO C RUSSO | Preparer's signature ANTONIO C RUSSO | Date | Check ☐ if self-employed | PTIN P00858539 |
|---|---|---|---|---|---|
| | Firm's name ▶ PRICEWATERHOUSECOOPERS LLP | | | Firm's EIN ▶ | |
| | Firm's address ▶ 2001 MARKET ST SUITE 1800 PHILADELPHIA, PA 19103 | | | Phone no (267) 330-3000 | |

May the IRS discuss this return with the preparer shown above? (see instructions) ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.          Cat No 11282Y          Form **990** (2014)

| **Part VIII** | **Statement of Revenue** | | | | | |
|---|---|---|---|---|---|---|

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . ☑

| | | | | **(A)**<br>Total revenue | **(B)**<br>Related or exempt function revenue | **(C)**<br>Unrelated business revenue | **(D)**<br>Revenue excluded from tax under sections 512-514 |
|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1a** | Federated campaigns . . | **1a** | | | | |
| | **b** | Membership dues . . . | **1b** | | | | |
| | **c** | Fundraising events . . . . | **1c** | | | | |
| | **d** | Related organizations . . . | **1d** | 7,000 | | | |
| | **e** | Government grants (contributions) | **1e** | 22,970 | | | |
| | **f** | All other contributions, gifts, grants, and similar amounts not included above | **1f** | 50,634 | | | |
| | **g** | Noncash contributions included in lines 1a-1f $ | | | | | |
| | **h** | **Total.** Add lines 1a-1f . . . . . . . ▶ | | 80,604 | | | |
| **Program Service Revenue** | | | Business Code | | | | |
| | **2a** | NET PATIENT SERVICE REVENUES | 621990 | 150,145,460 | 150,145,460 | | |
| | **b** | EDUCATIONAL SERVICES | 611600 | 306,011 | 306,011 | | |
| | **c** | MEDICARE AND MEDICAID PAYMENTS | 621990 | 146,139,380 | 146,139,380 | | |
| | **d** | | | | | | |
| | **e** | | | | | | |
| | **f** | All other program service revenue | | | | | |
| | **g** | **Total.** Add lines 2a-2f . . . . . . ▶ | | 296,590,851 | | | |
| **Other Revenue** | **3** | Investment income (including dividends, interest, and other similar amounts) . . . ▶ | | 7,262,033 | | | 7,262,033 |
| | **4** | Income from investment of tax-exempt bond proceeds . ▶ | | 0 | | | |
| | **5** | Royalties . . . . . . . . . . . ▶ | | 0 | | | |
| | | | (i) Real | (ii) Personal | | | |
| | **6a** | Gross rents | 5,344 | | | | |
| | **b** | Less rental expenses | 4,605 | | | | |
| | **c** | Rental income or (loss) | 739 | 0 | | | |
| | **d** | Net rental income or (loss) . . . . . . ▶ | | 739 | | | 739 |
| | | | (i) Securities | (ii) Other | | | |
| | **7a** | Gross amount from sales of assets other than inventory | 392,992,840 | 97,976 | | | |
| | **b** | Less cost or other basis and sales expenses | 383,276,176 | 97,084 | | | |
| | **c** | Gain or (loss) | 9,716,664 | 892 | | | |
| | **d** | Net gain or (loss) . . . . . . . . ▶ | | 9,717,556 | | | 9,717,556 |
| | **8a** | Gross income from fundraising events (not including $ _____ of contributions reported on line 1c) See Part IV, line 18 . . **a** | | | | | |
| | **b** | Less direct expenses . . . **b** | | | | | |
| | **c** | Net income or (loss) from fundraising events . . ▶ | | 0 | | | |
| | **9a** | Gross income from gaming activities See Part IV, line 19 . . . . **a** | | | | | |
| | **b** | Less direct expenses . . . **b** | | | | | |
| | **c** | Net income or (loss) from gaming activities . . . ▶ | | 0 | | | |
| | **10a** | Gross sales of inventory, less returns and allowances . **a** | | | | | |
| | **b** | Less cost of goods sold . . **b** | | | | | |
| | **c** | Net income or (loss) from sales of inventory . . ▶ | | 0 | | | |
| | | Miscellaneous Revenue | Business Code | | | | |
| | **11a** | MEANINGFUL USE/MITIGATION/STABILITY | 900099 | 2,707,782 | 2,707,782 | | |
| | **b** | ALL OTHER REVENUE | 900099 | 8,340,101 | | | 8,340,101 |
| | **c** | | | | | | |
| | **d** | All other revenue . . . . . | | | | | |
| | **e** | **Total.** Add lines 11a-11d . . . . . ▶ | | 11,047,883 | | | |
| | **12** | **Total revenue.** See Instructions . . . . . ▶ | | 324,699,666 | 299,298,633 | | 25,320,429 |

# Return of Organization Exempt From Income Tax

Form **990**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ rs on this form as it may be made public.
▶ Information about Form 990 and its instructions is at *www.irs.gov/form990*.

OMB No. 1545-0047

**2013**

Open to Public Inspection

o not enter Social Security numbe

Department of the Treasury
Internal Revenue Service

**A** For the 2013 calendar year, or tax year beginning **07/01**, 2013, and ending **06/30, 20 14**

| | | |
|---|---|---|
| **B** Check if applicable: | **C** Name of organization  ROBERT PACKER HOSPITAL | **D** Employer identification number |
| Address change | Doing Business As | 24-0795463 |
| Name change | Number and street (or P.O. box if mail is not delivered to street address)  Room/suite  ONE GUTHRIE SQUARE | **E** Telephone number  (570) 887-4625 |
| Initial return | City or town, state or province, country, and ZIP or foreign postal code  SAYRE, PA 18840 | **G** Gross receipts $ 754,985,840. |
| Terminated | | |
| Amended return | **F** Name and address of principal officer:   MARIE DROEGE | **H(a)** Is this a group return for subordinates? ☐ Yes ☒ No |
| Application pending | GUTHRIE SQUARE SAYRE, PA 18840 | **H(b)** Are all subordinates included? ☐ Yes ☐ No |

**I** Tax-exempt status: ☒ 501(c)(3)  ☐ 501(c) (  ) ◀ (insert no.)  ☐ 4947(a)(1) or  ☐ 527

If "No," attach a list. (see instructions)

**J** Website: ▶ WWW.GUTHRIE.ORG

**H(c)** Group exemption number ▶

**K** Form of organization: ☒ Corporation  ☐ Trust  ☐ Association  ☐ Other ▶     **L** Year of formation: 1885  **M** State of legal domicile: PA

## Part I  Summary

| Activities & Governance | | |
|---|---|---|
| 1 | Briefly describe the organization's mission or most significant activities: ROBERT PACKER HOSPITAL PROVIDES HEALTHCARE TO THE SURROUNDING COMMUNITY ON AN IN-PATIENT AND OUT-PATIENT BASIS. APPROXIMATELY 14,907 PATIENTS WERE ADMITTED TO RPH IN FYE 6/30/14. | |
| 2 | Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets. | |
| 3 | Number of voting members of the governing body (Part VI, line 1a) | **3** 15. |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | **4** 10. |
| 5 | Total number of individuals employed in calendar year 2013 (Part V, line 2a) | **5** 2,031. |
| 6 | Total number of volunteers (estimate if necessary) | **6** 181. |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** 0 |
| b | Net unrelated business taxable income from Form 990-T, line 34 | **7b** 0 |

| Revenue | | Prior Year | Current Year |
|---|---|---|---|
| 8 | Contributions and grants (Part VIII, line 1h) | 1,090,408. | 165,331. |
| 9 | Program service revenue (Part VIII, line 2g) | 258,818,356. | 273,299,023. |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 16,463,128. | 12,037,853. |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 5,282,510. | 6,764,817. |
| 12 | Total revenue - add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 281,654,402. | 292,267,024. |

| Expenses | | | |
|---|---|---|---|
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1-3) | 15,925. | 16,250. |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 95,902,278. | 94,952,374. |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| b | Total fundraising expenses (Part IX, column (D), line 25) ▶ 0 | | |
| 17 | Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 143,472,952. | 149,435,111. |
| 18 | Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 239,391,155. | 244,403,735. |
| 19 | Revenue less expenses. Subtract line 18 from line 12 | 42,263,247. | 47,863,289. |

| Net Assets or Fund Balances | | Beginning of Current Year | End of Year |
|---|---|---|---|
| 20 | Total assets (Part X, line 16) | 463,856,823. | 525,453,121. |
| 21 | Total liabilities (Part X, line 26) | 207,701,305. | 204,054,115. |
| 22 | Net assets or fund balances. Subtract line 21 from line 20 | 256,155,518. | 321,399,006. |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| | | |
|---|---|---|
| **Sign Here** | ▶ Signature of officer | Date |
| | ▶ Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN  P00853132 |
|---|---|---|---|---|---|
| | Firm's name ▶ PRICEWATERHOUSECOOPERS LLP | | | Firm's EIN ▶ 13-4008324 | |
| | Firm's address ▶ 2001 MARKET ST, SUITE 1700 PHILADELPHIA, PA 19103 | | | Phone no.  267-330-3000 | |

May the IRS discuss this return with the preparer shown above? (see instructions) ☒ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.

Form **990** (2013)

JSA
3E1010 1.000

Form 990 (2013)    ROBERT PACKER HOSPITAL                                    24-0795463    Page **9**

**Part VIII** **Statement of Revenue**

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . . . . . . . . . . ☐

| | | | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512-514 |
|---|---|---|---|---|---|---|
| **1a** | Federated campaigns . . . . . . . | **1a** | | | | |
| **b** | Membership dues . . . . . . . . | **1b** | | | | |
| **c** | Fundraising events . . . . . . . | **1c** | | | | |
| **d** | Related organizations . . . . . | **1d** | | | | |
| **e** | Government grants (contributions) . . | **1e** | 17,122. | | | |
| **f** | All other contributions, gifts, grants, | | | | | |
| | and similar amounts not included above | **1f** | 148,209. | | | |
| **g** | Noncash contributions included in lines 1a-1f: $ | | 553. | | | |
| **h** | **Total.** Add lines 1a-1f . . . . . . . . . . . ▶ | | 165,331. | | | |
| | | **Business Code** | | | | |
| **2a** | NET PATIENT SERVICE REVENUE | 621990 | 133,540,845. | 133,540,845. | | |
| **b** | EDUCATIONAL SERVICES | 611600 | 337,016. | 337,016. | | |
| **c** | MEDICARE AND MEDICAID PAYMENTS | 621990 | 135,651,755. | 135,651,755. | | |
| **d** | MEANINGFUL USE/MITIGATION/STABILITY | 621990 | 3,769,407. | 3,769,407. | | |
| **e** | | | | | | |
| **f** | All other program service revenue . . . . | | | | | |
| **g** | **Total.** Add lines 2a-2f . . . . . . . . . . . ▶ | | 273,299,023. | | | |
| **3** | Investment income (including dividends, interest, and other similar amounts). . . . . . . . . . . . ▶ | | 7,440,651. | | | 7,440,651. |
| **4** | Income from investment of tax-exempt bond proceeds . . . ▶ | | 0 | | | |
| **5** | Royalties . . . . . . . . . . . . . . . . ▶ | | 0 | | | |

| | | (i) Real | (ii) Personal | | | | |
|---|---|---|---|---|---|---|---|
| **6a** | Gross rents . . . . | | | | | | |
| **b** | Less: rental expenses . . . | | | | | | |
| **c** | Rental income or (loss) . . | | | | | | |
| **d** | Net rental income or (loss) . . . . . . . . . . . . . . ▶ | | | 0 | | | |

| | | (i) Securities | (ii) Other | | | | |
|---|---|---|---|---|---|---|---|
| **7a** | Gross amount from sales of assets other than inventory . | 467,267,311. | 48,707. | | | | |
| **b** | Less: cost or other basis and sales expenses . . . | 462,538,714. | 180,102. | | | | |
| **c** | Gain or (loss) . . . . . . | 4,728,597. | -131,395. | | | | |
| **d** | Net gain or (loss) . . . . . . . . . . . . . . . . ▶ | | | 4,597,202. | | | 4,597,202. |
| **8a** | Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 . . . . . . . . . . **a** | | | | | | |
| **b** | Less: direct expenses . . . . . . . . . . **b** | | | | | | |
| **c** | Net income or (loss) from fundraising events . . . . . . ▶ | | | 0 | | | |
| **9a** | Gross income from gaming activities. See Part IV, line 19 . . . . . . . . . . **a** | | | | | | |
| **b** | Less: direct expenses . . . . . . . . . . **b** | | | | | | |
| **c** | Net income or (loss) from gaming activities . . . . . . . ▶ | | | 0 | | | |
| **10a** | Gross sales of inventory, less returns and allowances . . . . . . . . . **a** | | | | | | |
| **b** | Less: cost of goods sold . . . . . . . . . **b** | | | | | | |
| **c** | Net income or (loss) from sales of inventory . . . . . ▶ | | | 0 | | | |

| | Miscellaneous Revenue | **Business Code** | | | | |
|---|---|---|---|---|---|---|
| **11a** | CHANGE IN DERIVATIVE INSTRUMENT | 622110 | -3,116,315. | | | -3,116,315. |
| **b** | N/A | | | | | |
| **c** | N/A | | | | | |
| **d** | All other revenue . . . . . . . . . . . . . | | 9,881,132. | | | 9,881,132. |
| **e** | **Total.** Add lines 11a-11d . . . . . . . . . . . ▶ | | 6,764,817. | | | |
| **12** | **Total revenue.** See instructions . . . . . . . . . | | 292,267,024. | 273,299,023. | | 18,802,670. |

JSA
3E1051 1.000

Form **990** (2013)

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

**Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)**

▶ The organization may have to use a copy of this return to satisfy state reporting requirements

OMB No 1545-0047

## 2012

**Open to Public Inspection**

**A** For the 2012 calendar year, or tax year beginning 07-01-2012 , 2012, and ending 06-30-2013

| **B** Check if applicable | **C** Name of organization ROBERT PACKER HOSPITAL | | **D** Employer identification number |
|---|---|---|---|
| ☐ Address change | | | 24-0795463 |
| ☐ Name change | Doing Business As | | |
| ☐ Initial return | | | |
| ☐ Terminated | Number and street (or P O box if mail is not delivered to street address) ONE GUTHRIE SQUARE Suite | Room/suite | **E** Telephone number (570) 887-4625 |
| ☐ Amended return | | | |
| ☐ Application pending | City or town, state or country, and ZIP + 4 SAYRE, PA 18840 | | **G** Gross receipts $ 653,206,925 |

| **F** Name and address of principal officer MARIE DROEGE GUTHRIE SQUARE SAYRE,PA 18840 | **H(a)** Is this a group return for affiliates? ☐ Yes ☑ No |
|---|---|
| | **H(b)** Are all affiliates included? ☐ Yes ☐ No If "No," attach a list (see instructions) |
| **I** Tax-exempt status ☑ 501(c)(3)  ☐ 501(c) ( ) ◄ (insert no )  ☐ 4947(a)(1) or ☐ 527 | |
| **J** Website: ▶ WWW GUTHRIE ORG | **H(c)** Group exemption number ▶ |
| **K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation 1885  **M** State of legal domicile PA |

## Part I Summary

**Activities & Governance**

**1** Briefly describe the organization's mission or most significant activities
ROBERT PACKER HOSPITAL PROVIDES HEALTHCARE SERVICES TO RESIDENTS OF THE SURROUNDING COMMUNITY ON AN IN-PATIENT AND OUT-PATIENT BASIS  APPROXIMATELY 14,826 PATIENTS WERE ADMITTED TO RPH IN FYE 6/30/13

**2** Check this box ▶☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) . . . . | **3** | 14 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . . | **4** | 10 |
| **5** Total number of individuals employed in calendar year 2012 (Part V, line 2a) . . . . | **5** | 1,966 |
| **6** Total number of volunteers (estimate if necessary) . . . . | **6** | 212 |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . | **7a** | 0 |
| **b** Net unrelated business taxable income from Form 990-T, line 34 . . . . | **7b** | 0 |

**Revenue**

| | Prior Year | Current Year |
|---|---|---|
| **8** Contributions and grants (Part VIII, line 1h) . . . . | 1,118,089 | 1,090,408 |
| **9** Program service revenue (Part VIII, line 2g) . . . . | 272,336,280 | 258,818,356 |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . . | 18,847,726 | 16,463,128 |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 6,557,982 | 5,282,510 |
| **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) . . . . | 298,860,077 | 281,654,402 |

**Expenses**

| | | |
|---|---|---|
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | 14,950 | 15,925 |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | 0 | 0 |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 88,147,045 | 95,902,278 |
| **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . | 0 | 0 |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . . | 160,167,845 | 143,472,952 |
| **18** Total expenses  Add lines 13–17 (must equal Part IX, column (A), line 25) . . . . | 248,329,840 | 239,391,155 |
| **19** Revenue less expenses  Subtract line 18 from line 12 . . . . . . . | 50,530,237 | 42,263,247 |

**Net Assets or Fund Balances**

| | Beginning of Current Year | End of Year |
|---|---|---|
| **20** Total assets (Part X, line 16) . . . . . . . . | 426,796,580 | 463,856,823 |
| **21** Total liabilities (Part X, line 26) . . . . . . . . | 236,079,304 | 207,701,305 |
| **22** Net assets or fund balances  Subtract line 21 from line 20 . . . . | 190,717,276 | 256,155,518 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

**Sign Here**

| | |
|---|---|
| Signature of officer | 2014-05-06 Date |
| MARIE DROEGE EXECUTIVE VP Type or print name and title | |

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| Firm's name ▶ PricewaterhouseCoopers LLP | | | Firm's EIN ▶ | |
| Firm's address ▶ 2001 MARKET ST SUITE 1700 PHILADELPHIA, PA  19103 | | | Phone no (267) 330-3000 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . ☐ Yes ☐ No

**For Paperwork Reduction Act Notice, see the separate instructions.**   Cat No 11282Y   Form **990** (2012)

Case 1:17-cv-06091-RJD-SJB Document 6 Filed 12/27/17 Page 134 of 185 PageID #: 463

**Part VIII** Statement of Revenue

Check if Schedule O contains a response to any question in this Part VIII . . . . . . . . . . ⌐

| | | | | (A)<br>Total revenue | (B)<br>Related or exempt function revenue | (C)<br>Unrelated business revenue | (D)<br>Revenue excluded from tax under sections 512, 513, or 514 |
|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1a** | Federated campaigns . . | **1a** | | | | |
| | **b** | Membership dues . . . . | **1b** | | | | |
| | **c** | Fundraising events . . . . | **1c** | | | | |
| | **d** | Related organizations . . . | **1d** | 15,003 | | | |
| | **e** | Government grants (contributions) | **1e** | 207,341 | | | |
| | **f** | All other contributions, gifts, grants, and similar amounts not included above | **1f** | 868,064 | | | |
| | **g** | Noncash contributions included in lines 1a-1f $ | | 1,199 | | | |
| | **h** | **Total.** Add lines 1a-1f . . . . . . . . ▶ | | 1,090,408 | | | |
| **Program Service Revenue** | | | **Business Code** | | | | |
| | **2a** | NET PATIENT SERVICE REVENUE | 621990 | 129,684,012 | 129,684,012 | | |
| | **b** | EDUCATIONAL SERVICES | 611600 | 275,540 | 275,540 | | |
| | **c** | MEDICARE AND MEDICAID PAYMENTS | 621990 | 125,735,341 | 125,735,341 | | |
| | **d** | MEANINGFUL USE REVENUE | 621990 | 3,123,463 | 3,123,463 | | |
| | **e** | | | | | | |
| | **f** | All other program service revenue | | | | | |
| | **g** | **Total.** Add lines 2a–2f . . . . . . . . ▶ | | 258,818,356 | | | |
| **Other Revenue** | **3** | Investment income (including dividends, interest, and other similar amounts) . . . . . . ▶ | | 7,525,737 | | | 7,525,737 |
| | **4** | Income from investment of tax-exempt bond proceeds . . ▶ | | 0 | | | |
| | **5** | Royalties . . . . . . . . . . . . . ▶ | | 0 | | | |

| | | (i) Real | (ii) Personal | | | | |
|---|---|---|---|---|---|---|---|
| | **6a** | Gross rents | | | | | |
| | **b** | Less rental expenses | | | | | |
| | **c** | Rental income or (loss) | 0 | 0 | | | |
| | **d** | Net rental income or (loss) . . . . . . . . ▶ | | 0 | | | |

| | | (i) Securities | (ii) Other | | | | |
|---|---|---|---|---|---|---|---|
| | **7a** | Gross amount from sales of assets other than inventory | 380,480,779 | 9,135 | | | |
| | **b** | Less cost or other basis and sales expenses | 371,429,804 | 122,719 | | | |
| | **c** | Gain or (loss) | 9,050,975 | -113,584 | | | |
| | **d** | Net gain or (loss) . . . . . . . . . ▶ | | 8,937,391 | | | 8,937,391 |
| | **8a** | Gross income from fundraising events (not including $ _____ of contributions reported on line 1c) See Part IV, line 18 . .     **a** | | | | | |
| | **b** | Less direct expenses . . . **b** | | | | | |
| | **c** | Net income or (loss) from fundraising events . . ▶ | | 0 | | | |
| | **9a** | Gross income from gaming activities See Part IV, line 19 . . . .     **a** | | | | | |
| | **b** | Less direct expenses . . . **b** | | | | | |
| | **c** | Net income or (loss) from gaming activities . . ▶ | | 0 | | | |
| | **10a** | Gross sales of inventory, less returns and allowances .     **a** | | | | | |
| | **b** | Less cost of goods sold . . **b** | | | | | |
| | **c** | Net income or (loss) from sales of inventory . . ▶ | | 0 | | | |
| | | Miscellaneous Revenue | **Business Code** | | | | |
| | **11a** | LOSS ON DERIVATIVE INSTRUMENT | 900099 | -3,922,238 | | | -3,922,238 |
| | **b** | ALL OTHER REVENUE | | 9,204,748 | | | 9,204,748 |
| | **c** | | | | | | |
| | **d** | All other revenue . . . . . | | | | | |
| | **e** | **Total.** Add lines 11a–11d . . . . . . . ▶ | | 5,282,510 | | | |
| | **12** | **Total revenue.** See Instructions . . . . . . ▶ | | 281,654,402 | 258,818,356 | | 21,745,638 |

Form **990** (2012)

Form **990**

Department of the Treasury
Internal Revenue Service

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No. 1545-0047

**2011**

Open to Public Inspection

**A** For the 2011 calendar year, or tax year beginning  07/01, 2011, and ending  06/30, 20 12

| B Check if applicable: | C Name of organization | | | D Employer identification number |
|---|---|---|---|---|
| ☐ Address change | ROBERT PACKER HOSPITAL | | | 24-0795463 |
| ☐ Name change | Doing Business As | | | |
| ☐ Initial return | Number and street (or P.O. box if mail is not delivered to streets ddress) ONE GUTHRIE SQUARE | Room/suite | | E Telephone number (570) 887-4625 |
| ☐ Terminated | City or town, state or country, and ZIP + 4 SAYRE, PA 18840 | | | G Gross receipts $  821,111,901. |
| ☐ Amended return | F Name and address of principal officer:  MARIE DROEGE | | | H(a) Is this a group return for affiliates?  ☐ Yes ☒ No |
| ☐ Application pending | GUTHRIE SQUARE SAYRE, PA 18840 | | | H(b) Are all affiliates included?  ☐ Yes ☐ No If "No," attach a list. (see instructions) |

**I** Tax-exempt status:  ☒ 501(c)(3)  ☐ 501(c) ( ) ◀ (insert no.)  ☐ 4947(a)(1) or ☐ 527

**J** Website: ▶ WWW.GUTHRIE.ORG

H(c) Group exemption number ▶  N/A

**K** Form of organization: ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶  | **L** Year of formation: 1885 | **M** State of legal domicile: PA

### Part I  Summary

| Activities & Governance | 1 | Briefly describe the organization's mission or most significant activities: ROBERT PACKER HOSPITAL PROVIDES HEALTHCARE SERVICES TO RESIDENTS OF THE SURROUNDING COMMUNITY ON AN IN-PATIENT AND OUT-PATIENT BASIS. APPROXIMATELY 14,818 PATIENTS WERE ADMITTED TO RPH IN FYE 6/30/12. | | |
|---|---|---|---|---|
| | 2 | Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets. | | |
| | 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 14. |
| | 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 10. |
| | 5 | Total number of individuals employed in calendar year 2011 (Part V, line 2a) | 5 | 1,871. |
| | 6 | Total number of volunteers (estimate if necessary) | 6 | 208. |
| | 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0 |
| | b | Net unrelated business taxable income from Form 990-T, line 34 | 7b | 0 |

| | | | Prior Year | Current Year |
|---|---|---|---|---|
| Revenue | 8 | Contributions and grants (Part VIII, line 1h) | 2,040,853. | 1,118,089. |
| | 9 | Program service revenue (Part VIII, line 2g) | 263,735,137. | 272,336,280. |
| | 10 | Investment income (Part VIII, column (A), lines 3,4 , and 7d) | 9,769,400. | 18,847,726. |
| | 11 | Other revenue (Part VIII, column (A), lines 5,6 d,8 c,9 c,10 c,and 11e) | 4,751,467. | 6,557,982. |
| | 12 | Total revenue – add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 280,296,857. | 298,860,077. |
| Expenses | 13 | Grants and similar amounts paid (Part IX, column (A), lines 1-3) | 15,600. | 14,950. |
| | 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| | 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 81,752,577. | 88,147,045. |
| | 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| | b | Total fundraising expenses (Part IX, column (D), line 25) ▶ _____ | | |
| | 17 | Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 148,963,309. | 160,167,845. |
| | 18 | Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 230,731,486. | 248,329,840. |
| | 19 | Revenue less expenses. Subtract line 18 from line 12 | 49,565,371. | 50,530,237. |

| | | | Beginning of Current Year | End of Year |
|---|---|---|---|---|
| Net Assets or Fund Balances | 20 | Total assets (Part X, line 16) | 345,324,611. | 426,796,580. |
| | 21 | Total liabilities (Part X, line 26) | 159,605,290. | 236,079,304. |
| | 22 | Net assets or fund balances. Subtract line 21 from line 20 | 185,719,321. | 190,717,276. |

### Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | ▶ | Signature of officer | | | Date | | |
|---|---|---|---|---|---|---|---|
| | ▶ | Type or print name and title | | | | | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN P00853132 |
|---|---|---|---|---|---|
| | Firm's name ▶ PRICEWATERHOUSECOOPERS LLP | | | Firm's EIN ▶ 13-4008324 | |
| | Firm's address ▶ 2001 MARKET ST., SUITE 1700 PHILADELPHIA, PA 19103 | | | Phone no. 267-330-3000 | |

May the IRS discuss this return with the preparer shown above? (see instructions)   ☒ Yes  ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.   Form **990** (2011)

JSA
1E1010 1.000

101540 1467   **PA DEPT. OF STATE** v 11-6.5   PAGE 1

MAY 1 6 2013.

Form 990 (2011)          ROBERT PACKER HOSPITAL                          24-0795463          Page **9**

| **Part VIII** | **Statement of Revenue** | | | | (A)<br>Total revenue | (B)<br>Related or<br>exempt<br>function<br>revenue | (C)<br>Unrelated<br>business<br>revenue | (D)<br>Revenue<br>excluded from tax<br>under sections<br>512, 513, or 514 |
|---|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | 1a | Federated campaigns | 1a | | | | | |
| | b | Membership dues | 1b | | | | | |
| | c | Fundraising events | 1c | | | | | |
| | d | Related organizations | 1d | 15,924. | | | | |
| | e | Government grants (contributions) | 1e | 369,839. | | | | |
| | f | All other contributions, gifts, grants,<br>and similar amounts not included above | 1f | 732,326. | | | | |
| | g | Noncash contributions included in lines 1a-1f: $ | | 3,046. | | | | |
| | h | **Total.** Add lines 1a-1f | | ▶ | 1,118,089. | | | |

| **Program Service Revenue** | | | **Business Code** | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2a | NET PATIENT SERVICE REVENUE | 621990 | | 150,881,536. | 150,881,536. | | |
| | b | EDUCATIONAL SERVICES | 611600 | | 257,259. | 257,259. | | |
| | c | MEDICARE AND MEDICAID PAYMENTS | 621990 | | 121,197,485. | 121,197,485. | | |
| | d | | | | | | | |
| | e | | | | | | | |
| | f | All other program service revenue | | | | | | |
| | g | **Total.** Add lines 2a-2f | | ▶ | 272,336,280. | | | |

| | 3 | Investment income (including dividends, interest, and<br>other similar amounts) | | ▶ | 9,224,052. | | | 9,224,052. |
|---|---|---|---|---|---|---|---|---|
| | 4 | Income from investment of tax-exempt bond proceeds | | ▶ | 0 | | | |
| | 5 | Royalties | | ▶ | 0 | | | |

| | | | (i) Real | (ii) Personal | | | | |
|---|---|---|---|---|---|---|---|---|
| | 6a | Gross rents | | | | | | |
| | b | Less: rental expenses | | | | | | |
| | c | Rental income or (loss) | | | | | | |
| | d | Net rental income or (loss) | | ▶ | 0 | | | |

| | | | (i) Securities | (ii) Other | | | | |
|---|---|---|---|---|---|---|---|---|
| | 7a | Gross amount from sales of<br>assets other than inventory | 531,864,618. | 10,890. | | | | |
| | b | Less: cost or other basis<br>and sales expenses | 522,140,126. | 111,698. | | | | |
| | c | Gain or (loss) | 9,724,492. | -100,818. | | | | |
| | d | Net gain or (loss) | | ▶ | 9,623,674. | | | 9,623,674. |

| **Other Revenue** | 8a | Gross income from fundraising<br>events (not including $ _____<br>of contributions reported on line 1c).<br>See Part IV, line 18 | a | | | | | |
|---|---|---|---|---|---|---|---|---|
| | b | Less: direct expenses | b | | | | | |
| | c | Net income or (loss) from fundraising events | | ▶ | 0 | | | |
| | 9a | Gross income from gaming activities.<br>See Part IV, line 19 | a | | | | | |
| | b | Less: direct expenses | b | | | | | |
| | c | Net income or (loss) from gaming activities | | ▶ | 0 | | | |
| | 10a | Gross sales of inventory, less<br>returns and allowances | a | | | | | |
| | b | Less: cost of goods sold | b | | | | | |
| | c | Net income or (loss) from sales of inventory | | ▶ | 0 | | | |

| | | Miscellaneous Revenue | **Business Code** | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 11a | CHANGE IN DERIVATIVE INSTRUMENT | 900099 | | -4,094,228. | | | -4,094,228. |
| | b | ALL OTHER REVENUE | | | 10,652,210. | | | 10,652,210. |
| | c | | | | | | | |
| | d | All other revenue | | | | | | |
| | e | **Total.** Add lines 11a-11d | | ▶ | 6,557,982. | | | |
| | 12 | **Total revenue.** See instructions | | ▶ | 298,860,077. | 272,336,280. | | 25,405,709. |

JSA<br>1E1051 1.000

Form **990** (2011)

**efile GRAPHIC print - DO NOT PROCESS** | **As Filed Data -** | DLN: 93493135039082

Form **990**

Department of the Treasury
Internal Revenue Service

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements

OMB No 1545-0047

**2010**

**Open to Public Inspection**

**A** For the 2010 calendar year, or tax year beginning 07-01-2010 and ending 06-30-2011

| B Check if applicable | C Name of organization ROBERT PACKER HOSPITAL | D Employer identification number |
|---|---|---|
| ☐ Address change | | 24-0795463 |
| ☐ Name change | Doing Business As | |
| ☐ Initial return | | E Telephone number |
| ☐ Terminated | Number and street (or P O box if mail is not delivered to street address) Room/suite ONE GUTHRIE SQUARE | (570) 887-4625 |
| ☐ Amended return | City or town, state or country, and ZIP + 4 SAYRE, PA 18840 | G Gross receipts $ 531,720,610 |
| ☐ Application pending | | |

| F Name and address of principal officer MARIE DROEGE GUTHRIE SQUARE SAYRE,PA 18840 | H(a) Is this a group return for affiliates? ☐ Yes ☑ No |
|---|---|
| | H(b) Are all affiliates included? ☐ Yes ☐ No If "No," attach a list (see instructions) |
| **I** Tax-exempt status ☑ 501(c)(3) ☐ 501(c) ( ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527 | H(c) Group exemption number ▶ |
| **J** Website: ▶ WWW GUTHRIE ORG | |
| **K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation 1885 | **M** State of legal domicile PA |

### Part I Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities
ROBERT PACKER HOSPITAL PROVIDES HEALTHCARE SERVICES TO RESIDENTS OF THE SURROUNDING COMMUNITY ON AN IN-PATIENT AND OUT-PATIENT BASIS APPROXIMATELY 14,628 PATIENTS WERE ADMITTED TO RPH IN FYE 6/30/11

2 Check this box ▶☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| 3 Number of voting members of the governing body (Part VI, line 1a) . . . . | **3** | 14 |
| 4 Number of independent voting members of the governing body (Part VI, line 1b) . . . . . | **4** | 10 |
| 5 Total number of individuals employed in calendar year 2010 (Part V, line 2a) . . . | **5** | 1,735 |
| 6 Total number of volunteers (estimate if necessary) . . . . | **6** | 194 |
| 7a Total unrelated business revenue from Part VIII, column (C), line 12 . . | **7a** | 0 |
| b Net unrelated business taxable income from Form 990-T, line 34 . . . | **7b** | 0 |

**Revenue**

| | | Prior Year | Current Year |
|---|---|---|---|
| 8 | Contributions and grants (Part VIII, line 1h) . . . . . . . | 1,824,613 | 2,040,853 |
| 9 | Program service revenue (Part VIII, line 2g) . . . . . | 240,099,269 | 263,735,137 |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . | 15,375,473 | 9,769,400 |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | -2,477,988 | 4,751,467 |
| 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) . . . . . . . . . . . . . . | 254,821,367 | 280,296,857 |

**Expenses**

| | | | |
|---|---|---|---|
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | 15,925 | 15,600 |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) . . . | 0 | 0 |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) . . . . . . . . . . . . | 74,736,374 | 81,752,577 |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) . . . . | 0 | 0 |
| b | Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24f) . . . . | 133,967,056 | 148,963,309 |
| 18 | Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | 208,719,355 | 230,731,486 |
| 19 | Revenue less expenses Subtract line 18 from line 12 . . . . . . | 46,102,012 | 49,565,371 |

**Net Assets or Fund Balances**

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| 20 | Total assets (Part X, line 16 ) . . . . . . . . | 290,767,514 | 345,324,611 |
| 21 | Total liabilities (Part X, line 26) . . . . . . . | 176,817,165 | 159,605,290 |
| 22 | Net assets or fund balances Subtract line 21 from line 20 . . . . . | 113,950,349 | 185,719,321 |

### Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | ▶ Signature of officer | 2012-05-08 Date |
|---|---|---|
| | ▶ MARIE DROEGE PRESIDENT & COO Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed ▶ | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ PricewaterhouseCoopers LLP | | | | Firm's EIN ▶ |
| | Firm's address ▶ 2001 MARKET ST SUITE 1700 PHILADELPHIA, PA 19103 | | | | Phone no ▶ (267) 330-3000 |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . . ☐ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions. | Cat No 11282Y | Form **990** (2010)

Case 1:17-cv-06091-RJD-SJB   Document 6   Filed 12/27/17   Page 138 of 185 PageID #: 467

**Part VIII**  **Statement of Revenue**

| | | | (A)<br>Total revenue | (B)<br>Related or exempt function revenue | (C)<br>Unrelated business revenue | (D)<br>Revenue excluded from tax under sections 512, 513, or 514 |
|---|---|---|---|---|---|---|
| **Contributions, gifts, grants and other similar amounts** | **1a** Federated campaigns | **1a** | 0 | | | |
| | **b** Membership dues | **1b** | 0 | | | |
| | **c** Fundraising events | **1c** | 0 | | | |
| | **d** Related organizations | **1d** | 18,500 | | | |
| | **e** Government grants (contributions) | **1e** | 464,104 | | | |
| | **f** All other contributions, gifts, grants, and similar amounts not included above | **1f** | 1,558,249 | | | |
| | **g** Noncash contributions included in lines 1a-1f  $ | | 3,456 | | | |
| | **h Total.** Add lines 1a-1f . . . . . . . . ▶ | | | 2,040,853 | | | |

| | | Business Code | | | | |
|---|---|---|---|---|---|---|
| **Program Service Revenue** | **2a** NET PATIENT SERVICE REVENUE | 621990 | 140,228,189 | 140,228,189 | | |
| | **b** EDUCATIONAL SERVICES | 611600 | 282,538 | 282,538 | | |
| | **c** MEDICARE AND MEDICAID PAYMENTS | 621990 | 123,224,410 | 123,224,410 | | |
| | **d** | | | | | |
| | **e** | | | | | |
| | **f** All other program service revenue | | | | | |
| | **g Total.** Add lines 2a–2f . . . . . . . . ▶ | | 263,735,137 | | | |

| | | | (A) | (B) | (C) | (D) |
|---|---|---|---|---|---|---|
| **Other Revenue** | **3** Investment income (including dividends, interest and other similar amounts) . . . . . ▶ | | | 5,597,620 | | | 5,597,620 |
| | **4** Income from investment of tax-exempt bond proceeds . . ▶ | | | 0 | | | |
| | **5** Royalties . . . . . . . . . . . . ▶ | | | 0 | | | |
| | | (i) Real | (ii) Personal | | | | |
| | **6a** Gross Rents | | | | | | |
| | **b** Less rental expenses | | | | | | |
| | **c** Rental income or (loss) | 0 | 0 | | | | |
| | **d** Net rental income or (loss) . . . . . . . ▶ | | | 0 | | | |
| | | (i) Securities | (ii) Other | | | | |
| | **7a** Gross amount from sales of assets other than inventory | 255,539,892 | 55,641 | | | | |
| | **b** Less cost or other basis and sales expenses | 251,011,266 | 412,487 | | | | |
| | **c** Gain or (loss) | 4,528,626 | -356,846 | | | | |
| | **d** Net gain or (loss) . . . . . . . . . . ▶ | | | 4,171,780 | | | 4,171,780 |
| | **8a** Gross income from fundraising events (not including $ _____ 0 of contributions reported on line 1c) See Part IV, line 18 . . . **a** | | 0 | | | | |
| | **b** Less direct expenses . . . **b** | | 0 | | | | |
| | **c** Net income or (loss) from fundraising events . . ▶ | | | 0 | | | |
| | **9a** Gross income from gaming activities See Part IV, line 19 . **a** | | 0 | | | | |
| | **b** Less direct expenses . . . . . . . . . . **b** | | 0 | | | | |
| | **c** Net income or (loss) from gaming activities . . . ▶ | | | 0 | | | |
| | **10a** Gross sales of inventory, less returns and allowances . **a** | | 0 | | | | |
| | **b** Less cost of goods sold . . **b** | | 0 | | | | |
| | **c** Net income or (loss) from sales of inventory . . ▶ | | | 0 | | | |
| | Miscellaneous Revenue | Business Code | | | | | |
| | **11a** CHANGE IN DERIVATIVE INSTRUMENT | 900099 | | -4,212,083 | | | -4,212,083 |
| | **b** GAIN ON RETIREMENT OF DEBT | 900099 | | 1,172,854 | | | 1,172,854 |
| | **c** ALL OTHER REVENUE | | | 7,790,696 | | | 7,790,696 |
| | **d** All other revenue | | | | | | |
| | **e Total.** Add lines 11a–11d . . . . . . . ▶ | | | 4,751,467 | | | |
| | **12 Total revenue.** See Instructions . . . ▶ | | | 280,296,857 | 263,735,137 | 0 | 14,520,867 |

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | | DLN: 93493133047291 |
|---|---|---|---|

**Form 990**

Department of the Treasury
Internal Revenue Service

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

► The organization may have to use a copy of this return to satisfy state reporting requirements

OMB No 1545-0047

**2009**

**Open to Public Inspection**

**A** For the 2009 calendar year, or tax year beginning 07-01-2009   and ending 06-30-2010

| **B** Check if applicable | **C** Name of organization ROBERT PACKER HOSPITAL | **D** Employer identification number |
|---|---|---|
| ☐ Address change | Please use IRS label or print or type. See Specific Instructions. | 24-0795463 |
| ☐ Name change | Doing Business As | **E** Telephone number |
| ☐ Initial return | Number and street (or P O box if mail is not delivered to street address) Room/suite ONE GUTHRIE SQUARE | (570) 887-4625 |
| ☐ Terminated | | **G** Gross receipts $ 398,170,367 |
| ☐ Amended return | City or town, state or country, and ZIP + 4 SAYRE, PA  18840 | |
| ☐ Application pending | | |

| **F** Name and address of principal officer MARIE DROEGE GUTHRIE SQUARE SAYRE, PA  18840 | **H(a)** Is this a group return for affiliates? ☐ Yes ☑ No |
|---|---|
| | **H(b)** Are all affiliates included? ☐ Yes ☐ No If "No," attach a list (see instructions) |
| **I** Tax-exempt status  ☑ 501(c) ( 3 ) ◄ (insert no ) ☐ 4947(a)(1) or ☐ 527 | **H(c)** Group exemption number ► |
| **J** Website: ► WWW GUTHRIE ORG | |

| **K** Form of organization  ☑ Corporation ☐ Trust ☐ Association ☐ Other ► | **L** Year of formation 1885 | **M** State of legal domicile PA |
|---|---|---|

### Part I  Summary

**Activities & Governance**

**1** Briefly describe the organization's mission or most significant activities
ROBERT PACKER HOSPITAL PROVIDES HEALTHCARE SERVICES TO RESIDENTS OF THE SURROUNDING COMMUNITY ON AN IN-PATIENT AND OUT-PATIENT BASIS  APPROXIMATELY 14,167 PATIENTS WERE ADMITTED TO RPH IN FYE 6/30/10

**2** Check this box ►☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a)  . . . . . . . | **3** | 14 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b)  . . . . | **4** | 10 |
| **5** Total number of employees (Part V, line 2a)  . . . . . | **5** | 1,731 |
| **6** Total number of volunteers (estimate if necessary)  . . . . | **6** | 248 |
| **7a** Total gross unrelated business revenue from Part VIII, column (C), line 12  . . | **7a** | 0 |
| **b** Net unrelated business taxable income from Form 990-T, line 34  . . . . | **7b** | 0 |

**Revenue**

| | Prior Year | Current Year |
|---|---|---|
| **8** Contributions and grants (Part VIII, line 1h) . . . . . . . . . | 2,000,736 | 1,824,613 |
| **9** Program service revenue (Part VIII, line 2g) . . . . . . . . . | 224,253,237 | 240,099,269 |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . . | -16,017,598 | 15,375,473 |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 24,773,331 | -2,477,988 |
| **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) . . . . . . . . . | 235,009,706 | 254,821,367 |

**Expenses**

| | | |
|---|---|---|
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . . | 16,250 | 15,925 |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | 0 | 0 |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 70,134,526 | 74,736,374 |
| **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . | 0 | 0 |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ►0 | | |
| **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24f) . . . . | 132,201,946 | 133,967,056 |
| **18** Total expenses  Add lines 13–17 (must equal Part IX, column (A), line 25) . . . | 202,352,722 | 208,719,355 |
| **19** Revenue less expenses  Subtract line 18 from line 12 . . . . . . | 32,656,984 | 46,102,012 |

**Net Assets or Fund Balances**

| | Beginning of Current Year | End of Year |
|---|---|---|
| **20** Total assets (Part X, line 16) . . . . . . . . . . . | 250,785,059 | 290,767,514 |
| **21** Total liabilities (Part X, line 26) . . . . . . . . . . | 173,153,910 | 176,817,165 |
| **22** Net assets or fund balances  Subtract line 21 from line 20 . . . . | 77,631,149 | 113,950,349 |

### Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

**Sign Here**

| Signature of officer | 2011-05-11 |
|---|---|
| | Date |
| MARIE DROEGE PRESIDENT & COO | |
| Type or print name and title | |

**Paid Preparer's Use Only**

| Preparer's signature | | Date | | Check if self-employed ► ☐ | Preparer's identifying number (see instructions) |
|---|---|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP + 4 | PricewaterhouseCoopers LLP 2001 MARKET ST SUITE 1700 PHILADELPHIA, PA  19103 | | | EIN ► | |
| | | | | Phone no ► (267) 330-3000 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . .  ☑ Yes ☐ No

Form 990 (2009)

Page **9**

| **Part VIII** | **Statement of Revenue** | | | | | |
|---|---|---|---|---|---|---|

| | | | | **(A)** Total revenue | **(B)** Related or exempt function revenue | **(C)** Unrelated business revenue | **(D)** Revenue excluded from tax under sections 512, 513, or 514 |
|---|---|---|---|---|---|---|---|

**Contributions, gifts, grants and other similar amounts**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1a | Federated campaigns . . | 1a | 0 | | | | |
| b | Membership dues . . . . | 1b | 0 | | | | |
| c | Fundraising events . . . . | 1c | 0 | | | | |
| d | Related organizations . . . | 1d | 18,500 | | | | |
| e | Government grants (contributions) | 1e | 436,634 | | | | |
| f | All other contributions, gifts, grants, and similar amounts not included above | 1f | 1,369,479 | | | | |
| g | Noncash contributions included in lines 1a-1f $ 6,542 | | | | | | |
| h | **Total.** Add lines 1a-1f . . . . . . ▶ | | | 1,824,613 | | | |

**Program Service Revenue**

| | | Business Code | | | | | |
|---|---|---|---|---|---|---|---|
| 2a | NET PATIENT SERVICE REVENUE | 621,990 | 127,667,130 | 127,667,130 | | | |
| b | EDUCATIONAL SERVICES | 611,600 | 258,702 | 258,702 | | | |
| c | MEDICARE AND MEDICAID PAYMENTS | 621,990 | 112,173,437 | 112,173,437 | | | |
| d | | | | | | | |
| e | | | | | | | |
| f | All other program service revenue | | | | | | |
| g | **Total.** Add lines 2a–2f . . . . . . ▶ | | 240,099,269 | | | | |

**Other Revenue**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3 | Investment income (including dividends, interest and other similar amounts) . . . . . ▶ | | | 5,039,374 | | | 5,039,374 |
| 4 | Income from investment of tax-exempt bond proceeds . ▶ | | | 0 | | | |
| 5 | Royalties . . . . . . . . . ▶ | | | 0 | | | |

| | | (i) Real | (ii) Personal | | | | |
|---|---|---|---|---|---|---|---|
| 6a | Gross Rents | | | | | | |
| b | Less rental expenses | | | | | | |
| c | Rental income or (loss) | 0 | 0 | | | | |
| d | Net rental income or (loss) . . . . . ▶ | | | 0 | | | |

| | | (i) Securities | (ii) Other | | | | |
|---|---|---|---|---|---|---|---|
| 7a | Gross amount from sales of assets other than inventory | 153,650,489 | 34,610 | | | | |
| b | Less cost or other basis and sales expenses | 143,320,845 | 28,155 | | | | |
| c | Gain or (loss) | 10,329,644 | 6,455 | | | | |
| d | Net gain or (loss) . . . . . . . ▶ | | | 10,336,099 | | | 10,336,099 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8a | Gross income from fundraising events (not including $ 0 of contributions reported on line 1c) See Part IV, line 18 . . . a | | 0 | | | | |
| b | Less direct expenses . . . b | | 0 | | | | |
| c | Net income or (loss) from fundraising events . . ▶ | | | 0 | | | |
| 9a | Gross income from gaming activities See Part IV, line 19 . . . a | | 0 | | | | |
| b | Less direct expenses . . . b | | 0 | | | | |
| c | Net income or (loss) from gaming activities . . ▶ | | | 0 | | | |
| 10a | Gross sales of inventory, less returns and allowances . a | | | | | | |
| b | Less cost of goods sold . . b | | 0 | | | | |
| c | Net income or (loss) from sales of inventory . . ▶ | | | 0 | | | |

| | Miscellaneous Revenue | Business Code | | | | | |
|---|---|---|---|---|---|---|---|
| 11a | CHANGE IN DVIATIVE INSTRUMENT | 900,099 | -9,701,792 | | | -9,701,792 |
| b | ALL OTHER REVENUE | | 7,223,804 | 7,223,804 | | |
| c | | | | | | |
| d | All other revenue . . . . | | | | | |
| e | **Total.** Add lines 11a–11d . . . . . ▶ | | -2,477,988 | | | |
| 12 | **Total revenue.** See Instructions . . . ▶ | | 254,821,367 | 247,323,073 | 0 | 5,673,681 |

Form **990** (2009)

Doing business as

☐ Name change
☐ Initial return
☐ Final return/terminated
☐ Amended return
☐ Application pending

| Number and street (or P O box if mail is not delivered to street address) | Room/suite | E telephone number |
|---|---|---|
| ONE GUTHRIE SQUARE | | (570) 887-4625 |

City or town, state or province, country, and ZIP or foreign postal code
SAYRE, PA  18840

**G** Gross receipts $ 502,924,968

**F** Name and address of principal officer
MARIE DROEGE
GUTHRIE SQUARE
SAYRE,PA  18840

**H(a)** Is this a group return for subordinates?  ☐ Yes  ☑ No

**H(b)** Are all subordinates included?  ☐ Yes  ☐ No
If "No," attach a list  (see instructions)

**I** Tax-exempt status  ☑ 501(c)(3)  ☐ 501(c) ( ) ◄ (insert no )  ☐ 4947(a)(1) or  ☐ 527

**J** Website: ► WWW GUTHRIE ORG

**H(c)** Group exemption number ►

**K** Form of organization  ☑ Corporation  ☐ Trust  ☐ Association  ☐ Other ►

**L** Year of formation 1885  **M** State of legal domicile PA

## Part I  Summary

**Activities & Governance**

**1** Briefly describe the organization's mission or most significant activities
THE PROVISION OF CHARITABLE HEALTHCARE SERVICES TO RESIDENTS OF THE SURROUNDING COMMUNITY ON AN IN-PATIENT AND OUT-PATIENT BASIS

**2** Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) . . . . . . . | **3** | | 15 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . | **4** | | 10 |
| **5** Total number of individuals employed in calendar year 2015 (Part V, line 2a) . . . | **5** | | 2,074 |
| **6** Total number of volunteers (estimate if necessary) . . . . . . . . . . . | **6** | | 121 |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . | **7a** | | 0 |
| **b** Net unrelated business taxable income from Form 990-T, line 34 . . . . . . | **7b** | | 0 |

**Revenue**

| | | Prior Year | Current Year |
|---|---|---|---|
| **8** | Contributions and grants (Part VIII, line 1h) . . . . . . . . . | 80,604 | 657,886 |
| **9** | Program service revenue (Part VIII, line 2g) . . . . . . . . | 296,590,851 | 303,819,785 |
| **10** | Investment income (Part VIII, column (A), lines 3, 4, and 7d) . . . . | 16,979,589 | 17,847,420 |
| **11** | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 11,048,622 | 12,781,452 |
| **12** | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 324,699,666 | 335,106,543 |

**Expenses**

| | | | |
|---|---|---|---|
| **13** | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | 73,750 | 127,425 |
| **14** | Benefits paid to or for members (Part IX, column (A), line 4) . . . . | 0 | 0 |
| **15** | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 95,875,632 | 102,988,872 |
| **16a** | Professional fundraising fees (Part IX, column (A), line 11e) . . . . | 0 | 0 |
| **b** | Total fundraising expenses (Part IX, column (D), line 25) ►0 | | |
| **17** | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . | 167,470,814 | 183,006,450 |
| **18** | Total expenses  Add lines 13–17 (must equal Part IX, column (A), line 25) | 263,420,196 | 286,122,747 |
| **19** | Revenue less expenses  Subtract line 18 from line 12 . . . . . . | 61,279,470 | 48,983,796 |

**Net Assets or Fund Balances**

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| **20** | Total assets (Part X, line 16) . . . . . . . . . . . | 577,137,977 | 602,937,360 |
| **21** | Total liabilities (Part X, line 26) . . . . . . . . . . | 200,786,101 | 198,641,511 |
| **22** | Net assets or fund balances  Subtract line 21 from line 20 . . . . | 376,351,876 | 404,295,849 |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

**Sign Here**

| ► | Signature of officer | 2017-05-11 Date |
|---|---|---|
| ► | PAUL VERVALIN, COO Type or print name and title | |

**Paid Preparer Use Only**

| Print/Type preparer's name ANTONIO C RUSSO | Preparer's signature ANTONIO C RUSSO | Date | Check ☐ if self-employed | PTIN P00858539 |
|---|---|---|---|---|
| Firm's name ► PricewaterhouseCoopers LLP | | | Firm's EIN ► | |
| Firm's address ► 2001 MARKET ST SUITE 1800  PHILADELPHIA, PA  19103 | | | Phone no  (267) 330-3000 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . ☑ Yes  ☐ No

| | | | | | |
|---|---|---|---|---|---|
| **c** | Fundraising events | **1c** | | | |
| **d** | Related organizations | **1d** | 26,410 | | |
| **e** | Government grants (contributions) | **1e** | 344,809 | | |
| **f** | All other contributions, gifts, grants, and similar amounts not included above | **1f** | 286,667 | | |
| **g** | Noncash contributions included in lines 1a-1f $ | | | | |
| **h** | **Total.** Add lines 1a-1f . . . . . . . ▶ | | 657,886 | | |

| | | Business Code | | | |
|---|---|---|---|---|---|
| **2a** | NET PATIENT SERVICE REVENUES | 621990 | 156,602,488 | 156,602,488 | |
| **b** | EDUCATIONAL SERVICES | 611600 | 346,247 | 346,247 | |
| **c** | MEDICARE AND MEDICAID PAYMENTS | 621990 | 146,871,050 | 146,871,050 | |
| **d** | | | | | |
| **e** | | | | | |
| **f** | All other program service revenue | | | | |
| **g** | **Total.** Add lines 2a–2f . . . . . . . ▶ | | 303,819,785 | | |

| | | | | | |
|---|---|---|---|---|---|
| **3** | Investment income (including dividends, interest, and other similar amounts) . . . . . . ▶ | | 6,574,538 | | 6,574,537 |
| **4** | Income from investment of tax-exempt bond proceeds . ▶ | | 0 | | |
| **5** | Royalties . . . . . . . . . . . ▶ | | 0 | | |

| | | (i) Real | (ii) Personal | | |
|---|---|---|---|---|---|
| **6a** | Gross rents | 11,700 | | | |
| **b** | Less rental expenses | 9,999 | | | |
| **c** | Rental income or (loss) | 1,701 | 0 | | |
| **d** | Net rental income or (loss) . . . . . . ▶ | | | 1,701 | | 1,701 |

| | | (i) Securities | (ii) Other | | |
|---|---|---|---|---|---|
| **7a** | Gross amount from sales of assets other than inventory | 169,759,600 | 9,321,708 | | |
| **b** | Less cost or other basis and sales expenses | 167,630,149 | 178,277 | | |
| **c** | Gain or (loss) | 2,129,451 | 9,143,431 | | |
| **d** | Net gain or (loss) . . . . . . . . . ▶ | | | 11,272,882 | | 11,272,882 |

| | | | | | |
|---|---|---|---|---|---|
| **8a** | Gross income from fundraising events (not including $ _____ of contributions reported on line 1c) See Part IV, line 18 . . | **a** | | | |
| **b** | Less direct expenses . . . **b** | | | | |
| **c** | Net income or (loss) from fundraising events . . ▶ | | 0 | | |
| **9a** | Gross income from gaming activities See Part IV, line 19 . . . | **a** | | | |
| **b** | Less direct expenses . . . **b** | | | | |
| **c** | Net income or (loss) from gaming activities . . . ▶ | | 0 | | |
| **10a** | Gross sales of inventory, less returns and allowances . | **a** | | | |
| **b** | Less cost of goods sold . . **b** | | | | |
| **c** | Net income or (loss) from sales of inventory . . ▶ | | 0 | | |

| | Miscellaneous Revenue | Business Code | | | |
|---|---|---|---|---|---|
| **11a** | MEANINGFUL USE/MITIGATION/STABILITY | 900099 | 2,654,349 | 2,654,349 | |
| **b** | ALL OTHER REVENUE | 900099 | 10,125,402 | | 10,125,402 |
| **c** | | | | | |
| **d** | All other revenue . . . . | | | | |
| **e** | **Total.** Add lines 11a–11d . . . . . ▶ | | 12,779,751 | | |
| **12** | **Total revenue.** See Instructions . . . . ▶ | | 335,106,543 | 306,474,134 | 27,974,522 |

**EXHIBIT B** --  Guthrie Clinic Ltd. / Guthrie Medical Group, P.C.
Names, National Provider Identifiers (NPI) Numbers and
License Numbers For Physicians employed by
Guthrie Clinic/Guthrie Medical Group Through May,
2017. NPI numbers of referring/ordering and treating
physicians are included on all claim forms submitted
to Medicare and Medicaid by Robert Packer Hospital,
Corning Hospital and other GHS subsidiary-
providers, and all claims including any of the
physicians and/or NPI numbers in Exhibit B are
claims alleged to be false and fraudulent.

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| | **GUTHRIE CLINIC --** **Medicare Group Assign't #** | | GU039851 | GU039851 | GU039851 | | |
| 1982609061 | DICHTEL, WILLIAM | ENT | 013500C19 | | B60186 | MD443576 | |
| 1144295726 | SCOPELLITI, JOSEPH Clinic CEO GH CEO – (2012-present) CEO Clinic & GH Board | GI | 091556N9L | RA9267 | B35518 | MD024027E | 00840313 |
| 1336141241 | SCIORTINO, DAVID | Onc | 142282N82 | | | MD433462 | 03057605 |
| 1144213976 | CHAUDHARY, SUMBLINA | Radiology, DX | 057397QQE | RA0629* | H60469 | MD73109L NY-228559 | 02499347 |
| 1578551610 | FANELLI, ROBERT | Surgery | O y Massachusetts | O y Massachusetts | F34484 | O y Massachusetts | O y Massachusetts |
| 1881678399 | GOOSSENS, JAN | ER –PA Internal Med - NY | CG1637 082183N9Z | F83050* | | MD417706 222325-1** | |
| 1902889504 | NEDELCU, JOITA | Psychiatry + Neurology | 039186 "Pa-Unspecified" | | H10183 | MD066829L | |
| 1609846732 | ENDERS, GARY | ER | | Q70079 | B82779 | 146397 –New York o y | |

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1235101593 | MATTHEWS, JOSEPH | Pulmonary | 03468N9Y*** | | B98249 | MD070030L 216447-1 (NY) | 02046124 |
| 1356312151 | LEE, FERROL Clinic Board & Officer | Endocrinology | 070706N90 | 56418K | C28941 | | 00792810 |
| 1710951264 | LIM, REBECCA | Anesth | | | D12617 | MD034118L | 00686897 |
| 1285607143 | REES, RUSSELL | Ob-Gyn | 086557N8L | RA5572 | E38401 | MD425473 179186-1 (NY) | 02620097 |
| 1770556359 | ROJAS, RENATO | Radiology Dx | 026286N87 | RA5295 | B81497 | MD033041L 108465-1 (NY) | 00360187 |
| 1306819701 | MACAPI AC, ERIC | Inf Disease | NA | NA | H34686 | MD440824 | |
| 1457325318 | COHEN, ROBERT Clinic Board & Officer | Ortho | 066267N9S | 56418G | C28782 | MD14445E 156432-1 (NY) | 00365522 |
| 1013981059 | LEE, RACHEL | Derm | 098757N8T P00289349 (RR Medicare PA) | | D02247 | MD043612L 134322 (NY) | 00810628 |
| 1710950423 | BRADSTREET, RICHARD | Pathology | 712762N8W 220029295 (RR Medicare – PA) | | F18542 | MD043186L 19106-1 (NY) | 01297263 |

2

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1588631212 | HARJAI, KISHORE<br><br>Phys. Dir. Cardiac Cath Lab | Int Med Cardiology | 7021N8V<br><br>RR PA:<br>CC9269 | | G65750 | MD421879 | 02412059 |
| 1124093307 | DESHMUKH, NARAYAN | Vasc Surg | 124587N8S<br><br>RR-Medicare PA<br>770002509 | | 37342 | MD033868L<br><br>NY-<br>153224-1 | 00365191 |
| 1053385583 | SAMPSON, LAWRENCE | Vasc Surg | 784434N8S<br><br>RR Medicare PA<br>P00313956 | CC5999 | G08885 | MD056226L<br><br>NY: 205449-1 | 01575699 |
| 1134194632 | SRIVATANA, PANIT | Hematology | 0670074N82<br><br>RR Medicare PA | 830008718 | H78594 | MD068302L | 02370318 |
| 1396710893 | SRIVATANA, UKORN | GI | 055043N9L | RA8659 | H55891 | MD068303L<br><br>NY- 237737-1 | 02238397 |
| 1912972597 | SHARMA, RAM | Int Med | 005144N8Q<br><br>RR Medicare PA<br>110209244 | CC8751 | G63063 | MD053496L<br><br>NY- 224303-1 | 01805632 |

3

# EXHIBIT B

GUTHRIE CLINIC LTD.<br>PHYSICIANS' NPI<br>(National Provider Identifier)<br>LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1215903844 | VANDERMEER, THOMAS Clinic Board | Surgery | 014646N8S RR Medicare PA 020046847 | DD4772 | G80136 | MD066677L NY- 212422-1 | 01876677 |
| 1548235484 | DESHMUKH, PRAMOD | Int Med Cardiology | 508185N8V RR Medicare PA 060060323 | 51425W | A65013 | MD042000L NY  164983-1 | 01206711 |
| 1316912116 | FEDELE, CHARLES | Derm | 0006852070001 | DD4563 | B34606 | MD037378L Ny - 119115-1 | 00365155 |
| 1205801024 | FOSTER, RICHARD | Rad  Dx | 0011348310001 RR Medicare PA 110069224 | RA0437 RR Medicare – NY: P00198719 | C32818 | MD041395E NY - 174288-1 | 01094802 |
| 1962478842 | WILSON, THOMAS | Ophth | 776492N85 | | G05745 | MD049787L | 01736281 |
| 1841266491 | FRIEDENBERG, WILLIAM | Hem/Onc | 0017018890001 | | B52907 | MD065579L 211946-1 | 01860975 |

4

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1861468944 | DEVINE, SEA | Pulm | 090661 | | I28864 | MD073868 | |
| 1811966765 | KUCHELAN, DEEPA | Int Med | 093988N8Q<br><br>RR Medicare PA P00240756 | | I39368 | MD427160 | 02678779 |
| 1790753374 | HUDOCK, STEPHEN | Ophth | 197881N85<br><br>RR Medicare PA 150040317 | 52021E 01031570<br><br>RR NY - P00329050 | A61509 | MD027486E<br><br>NY - 169815-1 | |
| 1154399657 | HUSSAIN, SARWAT | Rad | 076887N87<br><br>RR PA - P00179469 | RA5752<br><br>RR NY- P00137705 | E85758 | MD423493<br><br>NY - 234501-1 | 02521988 |
| 1114986775 | ROHR, RICHARD | Int Med | 141768N8Q<br><br>RR PA - P00693898 | RB9183 | B98981 | NY  147737 | 02974596 |
| | | | | | | | |
| 1770549586 | HARTMAN, RICKY | Path | 174075 | J400048781 | E32905 | OS005557L | 03339273 |
| 1003864281 | TAMKIN, DONNA | Rad | 172110 | | | MD425617 | 03177777 |
| 1386699239 | SAMIMI, FAROKH | Surgery | 408245N8S<br><br>RR PA- P00337167 | | B41327 | MD038395L | |

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1598702375 | VAKIOS, JOHN | Radiation Onclogy | RR PA - P00635209 | 931431 | G60603 | NY  193492 | 01897236 |
| 1154353696 | NAJEEB, FAHAD | Int Med | None listed ( ) | | | Mass. O y listed | |
| 1710905070 | MURPHY, BARBARA | Int  Med | | | | MD044858L | |
| 1881707602 | EVANS, RICHARD | Int Med Hospitalist | | J400008270 | D74966 | MD438985  NY - 139403-1  NY Hospitalist - 139403 | |
| 1770689895 | DEREGIS, DAVID | Occ Med | All Kentucky | | H28346 | Kentuck 35991 | Curious entry on address – says contact "provider services Vicky Detrick" |
| 1245321249 | KALUSKI, EDO | Cardiology | None Listed ( ) | | | MD446568 | |
| 1235351222 | GRIPPO, ANTHONY | Occ Med | 106633N86 | RB5249 | | NJ  Listed: 25MA07931400 | 02897574 |
| 1275748386 | KASHMER, DAVID | Surgery | 194629PDN | | | MD437006 | 03262939 |

**EXHIBIT B**

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| 1326013525 | DEVINE, TERRENCE<br><br>Clinic Board & Officer (Chairman, Secretary)<br><br>GH Board & Officer (Chairman & Vice Chairman) | Ophthal | 420038N85<br><br>RR – Medicare PA - 180040307 | 52021B<br><br>RR – Medicare NY - P00258515 | B41500 | MD028357E<br><br>NY - 131307-1 | 00627770 |
| 1669676631 | SADIK, CRYSTAL | Urology | | | | MD450690 | |
| 1154514701 | PAMULA, JOHN | Int Med | 131887 | | | MD 435261 | 03129302 |
| 1710149489 | WEN, YUANYUAN | Fam Med | | | | MT192978<br><br>(Odd # - PA usually carries "MD" designation) | |
| 1154595049 | DEVARAKONDA, SRINIVAS | Int Med | | | | MT85512<br><br>(see above) | |
| 1104090125 | CHANDIRAMANI, VIJAY | Int Med | | | | MT186880<br><br>(See above) | |
| 1386894814 | JALALUDDIN, MUHAMMAD | Neuro-Surgery | 146104 | | | MD436256 | 03081674 |
| 1437399391 | KULKARNI, ABHISHEK | Int Med | | | | MD444938 | |
| 1487889796 | CARTER, SARAH | Surgery | | | | MT194783 | |

7

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| 1922332196 | NORMAN, HEATHER | Surgery | | | | MD451637<br><br>(PA --<br>HS000197L) ? | |
| 1477870368 | ALIPUI, DIDIER | Surgery | | | | MT196713 | |
| 1780998450 | LAPINID, MARICRIS | Fam Med | | | | MT197163 | |
| 1114293057 | BOSELLI, BRUCE<br>570-596-2125 | Hem-Onc<br>RETIRED | | | | MD007349E | |
| 1548260771 | TROSTLE, DOUGLAS<br><br>Clinic Board<br>GH Board | Surgery | 430640N8S<br><br>RR – PA -<br>P00393479 | | B41698 | MD022427-E | 02821649 |
| 1669469789 | MCFARLANE, MICHELLE | Rehab Med | | | H76643 | MD443057 | |
| 1043294499 | SHAH, JAY | Psych | 068211 | | H80314 | MD417917 | |
| 1003120338 | KONDAREDDY, Sreekanth | Int Med | | | | MT196348 | |
| 1558679993 | GOLI, HIMAN | Hospitalist | | | | MD449018 | |
| 1144596271 | ZEYKAN, VIOLETA | Int Med | | | | MD446261 | |
| 1508849175 | ELLIS, GEORGE<br><br>Chairman, RPH ER<br>1000 Admisions Initiative | ER | 165661 | | D71352 | MD024250E | |

8

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1962485532 | RAFTIS, JAMES | ER | 892906 | | G43140 | OS008954L | |
| 1992785497 | GRANET, PAUL | Surgery | 107282 | | I42591 | MD428351 | 03064642 |
| 1669678892 | BEDI, UPDESH | Cardiology Interventional | | | | MD448423 | |
| 1881685584 | GIST, CHRISTOPHER | Urology | | | I34071 | MD450397 | |
| 1598939340 | BLACK, MARK | Surgery | | | | MT191019 (see above) | |
| 1871766147 | DALAL, GUNJAN | Int Med | | | | MT185423 (see above) | |
| 1225291222 | SINGHAL, VIKAS | Surgery | | | | MT193502 (see above) | |
| 1003174384 | OBAFEMI, OLUYOMI | Surgery | | | | MT202124 (see above) | |
| 1821071499 | SHEPHERD, WILLIAM | ER | CG1637 051826 | RB3566 | H49974 | MD073489<br><br>NY - 222459 | 02353446 |
| 1881908747 | LAI, JIUN-AN | Fam Med | | | | MT196573 (see above) | |
| 1720061393 | OAKLEY, ESTHER | Fam Med ER | 022822N86 RR PA - 08016002 | CC8683 | G85444 | MD066348L<br><br>NY - 215766-1 | 01915920 |
| 1609848696 | MCDONALD, THOMAS<br><br>Clinic Board & Officer | GI | 081131N9L<br><br>RR PA | CC2037<br><br>RR NY P00315704 | C29248 | MD032268E<br><br>NY 179149-1 | 01131704 |
| 1861475444 | HARRIS, MARC | ER | 021018 CG1637 | | G82126 | OS009121L | |

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1396729265 | WARD, WILLIAM | Ortho | | | E51670 | MD447695 | |
| 1275504615 | MCDONALD, LESTER | Ophth | 132989N85<br><br>RR PA - 180040319 | CC2114<br><br>RR NY - P00173981 | E78403 | MD050522L<br><br>NY - 164439-1 | 01170983 |
| 1477573707 | LARSON, ROBERT | Rad Dx | 048909 | | | MD060970L | |
| 1881707602 | EVANS, RICHARD | Int Med Crit Care Hospitalist | | J400008270 40014B | D74966 | MD438985<br><br>139403-1 | |
| 1629040845 | MASHAS, WAYNE | Surgery Criical Care | 048338PDN | | F10108 | MD072744L | 02157748 |
| 1467426999 | CHIVATE, VANDANA | Anesth | 054134N8Z<br><br>RR PA - 050085020 | DD2005<br><br>RR NY - P00323959 | H54057 | MD417856<br><br>NY - 221801-1 | 02188172 |
| 1891932331 | BOYIADZIS, HARRIS | Cardiology | 169511N93 | | | MD436108 | |
| 1578768495 | RUDZINSKI, WOJCIECH | Cardiology | | | | MD448233 | |
| 1871568923 | SPORN, DANIEL<br><br>Clinic Board | Cardiology Interventional | 486554N8V<br><br>RR PA - 060060371 | CC2045 | B42256 | MD040312L<br><br>NY - 202340 | 01264768 |
| 1629043831 | STAPLETON, DWIGHT<br><br>Phys Manager / Chief of Cardiology | Cardiology | 053658N8V<br><br>RR PA - 060066509 | DD0248<br><br>RR NY - P00327245 | F09189 | MD417062<br><br>NY - 222968-1 | 02189504 |

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1356317648 | VENKATESH, GOVINDAR AJAN | cardiology | 067661N8V<br><br>RR PA - 06007114 | | H79198 | MD419669 | 02379248 |
| 1306811989 | SHAH, ASHOKKUMAR | Cardiology | 063473N8V<br><br>RR PA - 060069861 | | B79969 | MD419932<br><br>NY - 139003-1 | 02355168 |
| 1467632661 | DANG, HANG | Surgery | | | | OS015111 | |
| 1134195381 | GILLOTT, ANTHONY<br><br>Clinic Board | Surgery Trauma | 158866N8S<br><br>RR PA - 020046837 | CC2111<br><br>RR NY - P00199376 | B40242 | MD027818E<br><br>NY - 153726 | 01032791 tan |
| 1578539730 | BANNISTER, KYRA<br><br>GH BOARD | Anesth | 147516N8Z<br><br>RR PA 05007574 | 55681E<br><br>RR NY P00693905 | A61177 | MD044464E<br><br>NY 162645-1 | 01070084 |
| 1568451896 | BOUSHRA, NADER | Anesth | 081918H12 | | | MD423454<br><br>NY 255970 | 03155608 |
| 1427022839 | BROWN, DANIEL<br><br>Clinic Board | Anesth | 461933N8Z<br><br>RR PA 050075749 | CC5959 | E30225 | MD037935E<br><br>NY 184500 | 01139739 |
| 1740225234 | GIFEISMAN, MARK | Anesth | 178103 | | H88320 | MD439852 | 03206888 |
| 1548239395 | JOHNSON, GLEN | Anesth | 196170N8Z | | C33287 | MD039684L | 01040784 |

11

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1811960560 | LOCKARD, JOHN | Anesth | 132825N8Z<br><br>RR PA<br>050075790 | | F41903 | MD045440L<br><br>NY 199264-1 | 01354594 |
| 1154564995 | MADABHUSHI, PRANEETH | Anesth | | | | MD448842 | |
| 1114985520 | MALIK, JAVAID | Anesth | | | H76615 | MD423112 | |
| 1477576627 | MANCUSO, CHARLES | Anesth | | | F20971 | MD425606 | |
| 1194798819 | PORTER, BURDETT<br><br>Clinic Board | Anesth | 026208N8Z<br><br>RR PA<br>050075753 | | G11417 | MD042659L<br><br>NY 217587-1 | 01950201 |
| 1598993636 | SINGH, SUKHDIP | Anesth | | | | MD447605 | |
| 1013248632 | SIVASANKAR, CHITRA | Anesth | 191434 | | | MD439141 | 03252155 |
| 1245206861 | UDDOH, EMMANUEL | Anesth | 040616N8Z<br><br>RR PA<br>050076233 | RA2120<br><br>RR NY<br>P00316313 | H23008 | MD066184L<br><br>NY 230264-1 | 02095870 |
| 1982816427 | ALLEY, JOSHUA | Surgery - Bariatric | | | | MD442484 | |
| 1265409577 | HERLAN, DAVID ("Kim") | Card Surgery | 477919N8N<br><br>RR PA<br>330005916 | DD4479<br><br>RR NY<br>P00213069 | F34042 | MD033834E<br><br>NY 227077-1 | 02332850 |

12

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1952374704 | REITKNECHT, FELICE<br><br>Clinic Board | Cardiac Surgery | 544066N8N<br><br>RR PA<br>060060324 | CC2120 | E13008 | MD042691E<br><br>NY 168780-1 | 01117702 |
| 1194763409 | SAMY, SANJAY | Cardiac Surgery | | | | MD435072 | |
| 1467426031 | CAGIR, BURT | | 903550N8S<br><br>RR PA<br>P00324435 | CC6292<br><br>RR NY<br>020049520 | G48028 | MD058502L<br><br>NY 192712-1 | 02152014 |
| 1881846897 | EVERTSEN, NICHOLAS | Plastic Surgery | 190336 | J400038405 | | OS013911 | 03248437 |
| 1700857257 | MARTINES, RICHARD | Derm | 175405N8T<br><br>RR PA<br>110069222 | 51397U<br><br>RR NY<br>P00196063 | A63871 | OS004256L<br><br>NY 166095-1 | 01088137 |
| 1821022344 | TAMESIS, MARION EUNICE | Derm | BT9343625<br>** "DEA" #?? | | I34274<br>(Colorado) | MD437262 | 02667729 |
| 1740255405 | BERTSCH, DAVID | Surgery | 144697<br><br>608524<br><br>(Two??) | | E55588 | MD037939E | |
| 1215905898 | HOMAN, MAL | Endocrin | 026269N90<br><br>RR PA<br>460003312 | 51323H | C27840 | MD036464E<br><br>NY 192882-1 | 01228591 |

13

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1114999703 | ANDRES, CHRISTOPHER | FP | 857591N89 | | G25062 | MD056625L | |
| 1376792671 | ATTIA, MAXIMOS | FP | | | | MD446582 | |
| 1215909742 | BELARDI, FRANCIS<br><br>Clinic EVP Medical Dir<br>Clinic CEO | FP | 037972N86 | CC5733 | A75730 | MD071136L<br><br>NY 191831-1 | 01408084 |
| 1972577385 | BROWN, DERYCK | FP | 017261N8J<br>017261N93<br>(two?)<br><br>RR PA<br>080176502 | | G82686 | MD066159L | 01860782 |
| 1992017271 | CARSKADDEN, ERBA | FP | | | | OS015913 | |
| 1164496733 | CAREY, KEVIN<br><br>Clinic CEO<br>Guthrie Health – Co-CEO | GI | 026459N9L<br><br>RR PA<br>100014269 | RA9221 | C27852 | MD020642E<br><br>NY 143022-1 | 00365068 |
| 1023082351 | CAVANAUGH, MICHELLE | FP | 021295N8H<br><br>RR PA<br>080176504 | | G82649 | MD069473L | 02083732 |
| 1760456370 | CETTON, GREGORY | FP | 021296N9X<br><br>RR PA<br>080176503 | | G82648 | MD069307L<br><br>NY 227026 | 02081001 |

14

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1164497004 | DOTY, JOHN | FP | 039320N8H<br><br>RR PA<br>080176505 | | A49480 | MD070820L<br><br>NY 218108-1 | 02090417 |
| 1699742387 | HARPST, LISA<br><br>(Listed as "Lynnelle" on GH Web site)<br><br><br>Dr. Harpst's data appears to be mixed up. I believe her NY Medicare # is DD5573, and her UPIN is G88098. The registry calls the former her "NY Medicare UPIN" and the latter her UPIN. | FP | 024731N9X<br><br>RR PA<br>080160287<br><br>I then believe they inserted her NY Medicaid # in the NY Medicare column. | 01923326<br><br><br>DD5573 | DD5573<br>G88098<br>(two?) | MD064476L<br><br>NY 220136<br><br><br>What I believe are the true values are in yellow. | 01923326 |
| 1043444573 | HOOVER, DERRICK | FP | | | | MD444711 | |
| 1669440707 | INGERICK, BRENT | FP | 102904N86<br><br>RR PA<br>P00337166 | RA3030<br><br>RR NY<br>P00173974 | I13561 | OS012494<br><br>NY 232476-1 | 02581455 |
| 1356310106 | JONES, EDWARD<br><br>Clinic Board-Officer<br>GH Board-Officer<br>GHS Board | FP | 135851N8Y<br><br>RR PA<br>080159964 | | E70567 | MD011609E<br><br>NY 115759-1 | 00793980 |

15

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| 1174752257 | KOHN, DANIEL | FP | | | | OS015998 | |
| 1558410191 | LEESON, THOMAS | FP | All NH/VT/ME | Same | Same | OS016477 | same |
| 1841446473 | MANEK, MEGHA | | 221411 | | | MD443149 | 03356223 |
| 1568433043 | MCCLELLAND, ROBERT | FP | 081582N86 | | I12573 | MD424650 NY 232905-1 | 02577897 |
| 1306986021 | MEIKLE, ROBERT | FP | All Connecticutt | Same | Same | MD034073E | same |
| 1194797100 | MEYERS, LEE | | 081666N8H RR PA P00150597 | | I13111 | MD423039 | |
| 1245467224 | PAMULA, ANNE | FP | | | | MD444939 | |
| 1760456826 | PAVLOU, BILL | FP | 619899N8F | | D47478 | MD045093L NY 161227-1 | 00901524 |
| 1417920398 | PFISTERER, DAVID Clinic Board – Regional Office Leader GH Board | FP | 888606N86 RR PA 080089180 | | G32781 | MD058686L NY 205525-1 | 01665145 |

16

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1295709970 | PHYKITT, DONALD | FP | 743011N86<br><br>RR PA<br>080159956 | RA6749 | F557744 | OS007979L<br><br>NY 205144-1 | 01488893 |
| 1437125507 | WEIS, JOHN | FP | 073866N8X<br><br>RR PA<br>080176490 | | C29041 | OS00372L | 00552727 |
| 1093843906 | WOOD, KARI | FP | 113587N93<br><br>RR PA<br>P00424202 | | | MD429558 | 02897556 |
| 1598731549 | YAEGER, THOMAS<br><br>Clinic Board | FP | 760796N86<br><br>RR PA<br>080160029 | 51425Z<br><br>RR NY<br>P00405508 | A48253 | MD052144L<br><br>NY 196641-1 | 01464740 |
| 1689640823 | GEORGETSON, MICHAEL | GI | 486557N9L<br><br>RR PA<br>100014270 | 56418H<br><br>RR NY<br>P00379066 | B42258 | MD036907E<br><br>NY 174652-1 | |
| 1396710893 | SRIVATANA, UKORN | GI | 055043N9L | RA8659<br>RR NY<br>P00318222 | H55891 | MD068303L<br><br>NY 237737-1 | 02238397 |
| 1851366082 | TALENTI, DAVID<br><br>Clinic Board | GI | 617292N9L<br><br>RR PA<br>100014272 | CC2042 | E55863 | MD042285L<br><br>NY 194300 | 01411687 |

17

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1073787271 | COOROS, JAMES | Surgery | | | | NY 244771 | |
| 1801069356 | LASH, BRADLEY | Hematology | | | | MD435307 | |
| 1518949080 | LOWRY, PHILIP Chief – Hem /Onc | Hem-Onc | 151453KNC | | C85234 | MD071964 | |
| 1790726255 | LYNCH, CYNTHIA | Hem-Onc | 203004 | J400040885 | | MD441610 | |
| 1134194632 | SRIVATANA, PANIT | Hem-Onc | 067074N82 | | H78594 | MD068302L | 02370318 |
| 1023166832 | KETSELA, GIZATCHEW | Infectious Med | | | I25621 | MD445869 NY 230027 | |
| 1306819701 | MACAPI AC, ERIC | Infectious Med | | | H34686 | MD440824 | |
| | | | | | | | |
| 1710946686 | GOOD, VANCE Clinic Board | Int Med | 033377N93 RR PA 110209499 | | 28217 | MD018594E NY 151601-1 | 00364961 |
| 1053559427 | PATEL, PALAKKUMAR | Int Med | 160266 | | | MD437785 | 03133479 |
| 1750354718 | PRABHU, SHEELA | Int Med | 081258N8Q | | I11491 | MD422496 NY 235670-1 | 02574243 |
| 1790914265 | RESURRECCION, I AM | Int Med | | | | MD447626 | |

18

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1912971276 | RYAN, DEBRA | Int Med | 169224N8Q | | C32667 | MD031741E NY 178361-1 | 00960605 |
| 1053593962 | SAYLOR, KAREN | Int Med | 121308N80 | | | Calif o y | |
| 1912972597 | SHARMA, RAM | Int Med | 005144N8Q RR PA 110209244 | CC8751 RR NY P00313959 | G63063 | MD053496L NY 224303-1 | 01805632 |
| 1225004302 | WEBB, PAUL | Int Med | 103114N8E RR PA 110209179 | | C30062 | MD035684E NY 162315-1 | 00960641 |
| 1144596271 | ZEYKAN, VIOLETA | Int Med | | | | MD446261 | |
| 1790825040 | OTENG-BEDIAKO, EVELYN | Anesh- Pain Mgt | | J400001247 | | MD431870 | |
| 1447221189 | LEE, SALLY | Nephrlogy | 083194N92 RR PA P00173973 | | H99772 | MD424986 NY 219997-1 | 02411636 |
| 1871775122 | NOVAK, MATTHEW | Nephrolgy | 128197N92 | | | MD427764 | 02985266 |
| 1720057326 | KOH, HAN | Neurology | 054174N8U RR PA | | H54123 | MD063640L | 02195884 |
| 1740322544 | DAYOUB, HAYAN | Neurosurg | | | | | |

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1902872955 | GREGORIE, ERIK | Neurosurg | 021037N83<br><br>RR PA<br>GU039843 | CC6168<br><br>RR NY<br>P00202184 | G27036 | MD067109L<br><br>NY 213376 | 01894182 |
| 1386894814 | JALALUDDIN, Muhammad | Neurosurg | 146104 | | | MD436256 | 03081674 |
| 1821065137 | HERBST, LEE | ObGyn | 014996N8L<br><br>RR PA<br>160049894 | | G78621 | MD065622L<br><br>NY 201510 | 01861105 |
| 1366413916 | LUBELL, RICHARD | ObGyn | 088436N8L<br><br>RR PA<br>P00277810 | RR NY<br>P00379064 | B83779 | MD425710<br><br>NY 147836-1 | 02633232 |
| 1275540411 | MCCULLOUGH, LARRY | ObGyn | Iowa | Iowa | F62906 | MD-057040-L | Iowa |
| 1255304838 | ROUSE, STEVEN BRYAN | ObGyn | 427181N8L<br><br>RR PA<br>160049844 | | D71437 | MD039279L<br><br>NY 154877-1 | 00761519 |
| 1083841274 | ANSARI, AIYSHA | Occ Med | | | | MD447023 | L |
| 1770689895 | DEREGIS, DAVID | Occ Med | KY | KY | H28346 | KY | KY |
| 1235351222 | GRIPPO, ANTHONY | Occ Med | 106633N86 | RB5249 | | NJ | 02897574 |

20

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1497720270 | THEM, THEODORE<br><br>Chief – Occ Med | Occ Med | 677572N8Q<br><br>RR PA 250011739 | | E90427 | MD044017L<br><br>NY 187118-1 | 01245418 |
| 1790753374 | HUDOCK, STEPHEN | Ophth | 197881N85<br><br>RR PA 150040317 | 52021E 01031570 (two?)<br><br>RR NY P00329050 | A61509 | MD027486E<br><br>NY 169815-1 | |
| 1275501157 | HUDOCK, MICHAEL | Ophth | 474365N85<br><br>RR PA 180040318 | 52021D 00908829 (two?) | B82647 | MD027583E<br><br>NY 162180-1 | |
| 1912974643 | APPLETON, ABRAHAM | Ortho | 071470TB8 | | A60316 | MD424966 | |
| 1457526022 | CHOI, JOSEPH | Ortho | | | | MD436357 | |
| 1487627139 | REYNOLDS, DERMOT | Ortho | 076949N9S<br><br>07649N8P (two?)<br><br>RR PA P00120718 | | I02025 | MD422314 | 0251846 |

21

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| 1275797060 | STILWELL, MASON | ORTHO | | | | MD441473 | J400054840 |
| 1649245861 | SUAREZ, PAUL | Ortho | 887898N9S RR PA 200039043 | | E28042 | MD059283L NY 152761 | 01662977 |
| 1396729265 | WARD, WILLIAM | Ortho | | | E51670 | MD447695 | |
| 1750324307 | LINDEMANN, TIMOTHY | ENT | | | I52208 | MD422865 | |
| | PELLIERI, PHILLIP | ENT | | | | | |
| 1669447447 | TOLHURST, KIRK | ENT | 138260N91 RR PA 040015212 | 56418R RR NY P00387771 | B38868 | MD023068E NY 162219-1 | 00725966 |
| 1275502064 | KING, JOSEPH | PATH | 084769N8W RR PA 220029212 | | C29351 | MD019481E NY 148619-1 | 00793999 |
| | SARKER, ASHIT | PATH | | | | | |
| 1629358742 | BISTA, SUKIRTI | PEDS | | | | MD446053 | |
| 1407113178 | DAS, SUJATA | PEDS | | | | MD449940 | |
| 1598730376 | TERWILLIGER, JERRY | PEDS | 055387N86 | | B34516 | MD028322E NY 144861-1 | 00702667 |
| 1144437120 | SADIK, KARIM | PLASIC | | | | MD448672 | |

22

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| | | SURGERY | | | | | |
| 1952373920 | NORVILLE, KIM | PULM | 099201N9Y RR PA P00284119 | | H79248 | MD428166 NY 002506-1 | 02724087 |
| 1790751089 | WALSH, JAMES | PULM | 724727N9Y | CC2041 | F31422 | MD046747L NY 188971-1 | 01326856 |
| 1366478364 | CHIN, SHING | RAD ONC | | RA9853 RA9854 (two?) | I50346 | NY 2369731 | 02740178 |
| 1417929480 | ANTOS, JOHN | RAD | 055539N87 RR NY 300125078 | CC2115 RR NY P00207601 | B96862 | MD024966E NY 139819-1 | 00785204 |
| 1295798502 | CHANNIN, DAVID | RAD | | | G59220 | MD057141L | |
| 1144213976 | CHAUDHARY, SUMBLINA | RAD | 057397N87 057397QQE (two?) RR PA P00393474 | RA0629 | H60469 | MD073109L NY 228559 | 02499347 |
| 1760694285 | CHEN, MICHAEL | RAD | | | | MD445769 | |
| 1205829181 | GUNZENHAUSER, JEFFREY | RAD | 115846N87 | DD0801 | G04082 | MD065879L NY 184898 | 01673234 |
| | | | | | | | |

23

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1255300208 | JOY, CHRISTOPHER | RAD | 787561QQE | CC2052 <br><br> RR NY P0060168 | E43039 | MD053953L <br><br> NY 204967-1 | 01574116 |
| 1073582557 | KOSTICK, RICHARD | RAD | 088502QQE 088502N87 (two?) <br><br> RR PA P00199377 | RA1096 <br><br> RR NY P00098797 | F60472 | OS013100 <br><br> NY 213740-1 | 01990954 |
| 1447225008 | SKEIST, BARRY | RAD | 081641N87 <br><br> RR PA 30114154 | RA0217 <br><br> RR NY P00196082 | B35215 | MD014591E <br><br> NY 135965-1 | 00905679 |
| 1851596936 | SLAUGHTER, AUBREY | RAD | | | | MD448997 | |
| 1508065632 | YANG, MING | RAD | | | | Ohio | |
| 1881793537 | ZWIRKO, RICHARD | RAD | | | | MD071402L <br><br> NY 262724 | |
| 1588861496 | CLOWES, JACKIE | RHEUM | | | | Minn | |
| | | | | | | | |
| 1295709970 | PHYKITT, DONALD | SPORTS MEDICINE | 743011N86 <br><br> RR PA 080159956 | RA6749 | F557744 | OS007979L <br><br> NY 205144-1 | 01488893 |
| 1609849959 | CASOS, STEVEN | TRAUMA | | | H77248 | MD450143 | |

**EXHIBIT B**

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| | | SURG | | | | | |
| 1053563072 | SHAH, NIRAL | TRAUMA SURG | | | | MD444490 | |
| 1700861358 | FAWZY, AHMED | UROLGY | | | E41259 | MD438980 | |
| | MARICA, SILVIU | VASCULAR SURG | NO RECORD | NR | NR | NR | NR |
| 1215135496 | WANG, KIE-JIE | VASCULAR SURG | 116668N9S<br><br>RR PA P00424200 | | | MD432218 | 02910089 |
| 1386699239 | SAMIMI, FAROKH | WOUND CARE HYPER-BARIC MEDICINE | 408245N8S<br><br>RR PA P00337167 | | B41327 | MD038395L | |
| 1073654919 | ARGILA, CHARLES | SURGERY VASCULAR SURGERY | | | C52767 | MD435916 | |
| 1821022344 | TAMESIS, MARION | PEDS | | | I34274 | MD437262 | 02667729 |
| 1144475401 | BALLARD, GENEVA | RAD | | | | MD447249<br><br>NY  267509 | |
| 1316158892 | BALLARD, LUKE | RAD | | | | MD447259<br><br>NY 267584 | |
| 1770511495 | BENNETT, CHRISTOPHER | RAD | 222581 | | | MD443364 | 03356576 |

25

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1144513763 | ACHARYA, LOPAMUDRA | Hospitalist | 221886N8Q | | | MD443185 | 03355300 |
| 1558679993 | GOLI, HIMAN | Hospitalist | | | | MD449018 | |
| 1790098655 | JOSHI, ABHASH | | | | L | MD449189 | |
| | MANDHADI, ASWINI | Hospitalist | No Record | NR | NR | NR | NR |
| | MWISIGE, JOSEPH | Hospitalist | NO RECORD | NR | NR | NR | NR |
| 1235247511 | RAZA, QASIM | Hospitalist | | | H20328 | MD448719 | |
| 1689807216 | THAPA, RUPAK | Hospitalist | | | | MT191950 | |
| | | | | | | | |

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| 1760496855 | ANDERSON, ELDRIDGE | Ortho | | 55136B | C58722 | NY - 173533 | 01060993 |
| 1205938263 | LA DELIA, VINCENT | Cardiology | | | A62656 | NY - 157419-1 | 01027590 |
| 1376645838 | REHMAN, NAJEEB | Cardiology | | | F94720 | NY - 197463-1 | 01591139 |
| 1386755478 | WAHEED, ABDUL | Cardiology | | J400069741 | B27390 | NY - 119700-1 | 01447929 |
| 1912979576 | OLMSTEAD, JOHN | Surgery | | RA0080  RR NY - P00090504 | H70392 | NY - 230070-1 | 02471814 |
| 1770557209 | SANDIDGE, DONNA | Allergy | | CC4845  RR NY - 030004925 | G23784 | NY - 220140-1 | 02154516 |
| 1205808656 | ADANIEL, TANGUILE | Anesth | | CC9291  RR NY - 050083073 | D01935 | NY - 132102-1 | 00373148 |
| 1518939594 | ANWAR, SAEED | Anesth | 082734N8Z  RR PA - P00150585 | | I07231 | MD424157  NY 237566 | 02582429 |
| 1962625483 | JIAO, KUIRAN | Anesth | | | | | |

27

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1093786733 | LEE, MARVIN | Anesth | | CC8114  RR NY 050083222 | D01950 | NY 113108-1 | 00373139 |
| 1710072574 | WENTZEL, CHRIS | Anesth | | RB9308 | | MD422956  NY 249628-1 | 02992712  02009983 |
| 1659347615 | ZALA, JASVANTSINH | Anesth | | CC2040  RR NY 050081887 | C33549 | NY 140240+1 | 02009983 |
| 1942272653 | ALEXANDER, JAMES | FP | | DD6544  RR P0049022 | H90800 | NY 229015-1 | 02438833 |
| 1689835431 | ASGHER, SHOAIB | FP | | J400054119 | | NY 262545 | 03368650 |
| 1558335174 | CHAPMAN, ALLA | FP | 1011726930001  RR PA P00413975 | RA4047  RR NY P00199107 | I14422 | MD424877  NY 233177-1 | 02581464 |
| 1629042585 | COREY, MARK | FP | 025644N86  RR PA P00402922 | CC2108  RR NY 080173598 | G89356 | MD066447L  NY 216573-1 | 01927182 |

28

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| 1063484020 | NARAYANAN, SURYA<br><br>Clinic Board | Path | 696320N8W<br><br>RR PA 220029213 | CC2036<br><br>RR NY P00212674 | E45134 | MD045255L<br><br>NY 149594-1 | 01274717 |
| 1508947540 | FUCITO, CHRISTOPHER | FP | | RB5202 | | NY 244514 | 02905860 |
| 1265408090 | GALYANOVA, VALENTINA | FP | | CC2068<br><br>RR NY P00070152 | H03696 | NY 214680-1 | 01961504 |
| 1720055528 | GUSTAFSON, THOMAS | FP | | 51425J<br><br>RR NY 080173355 | E89748 | MD042588L<br><br>NY 186217-1 | 01255774 |
| 1942270970 | HODDER, HEIDI | FP | | J400000867<br><br>RR NY P00693903 | | NY 250626-1 | 03035334 |
| 1467421305 | KUNTZ, BRUCE | FP | | DD1084<br><br>RR NY 080182608 | G89041 | NY 208587-1 | 02223403 |
| 1720059298 | MAUER, MARK<br><br>Board | FP | | CC2104<br><br>NY RR 080173404 | E52487 | MD039478E<br><br>NY 172789-1 | 01200595 |
| 1285605766 | MCCLINTIC, WILLIAM<br><br>Board | FP | | 39821V<br><br>RR NY 080173354 | B36461 | OS003393L<br><br>NY 184734-1 | 0365224 |

29

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| | | | | | | | |
| 1356313753 | MENESES, ROBERT | FP | | CC2080 RR NY 080174238 | A06627 | NY 197892-1 | 01532865 |
| 1003136052 | PERALTA, EDELWEISS | FP | | | | NY 273095 | |
| 1508885971 | PERLE, KRISTINE | FP | | J400003345 | G44286 | MD061954L NY 252305 | 03104267 |
| 1639142391 | PHILLIPS, ERIC | FP | | 51397P RR NY 080174242 | F39014 | NY 192934-1 | 01431630 |
| 1710951249 | SAMODAL, RODRIGO | FP | 109118N86 RR PA P00405510 | RA4046 RR NY P00179402 | I14421 | MD424079 NY 233438-1 | 02581473 |
| 1861621955 | SICILIANO, MICHAEL | FP | | | | NY 266364 | |
| 1851366686 | SUTTON, MALA | | | 50210F RR NY 080174240 | D78460 | NY 142060 | 00467616 |
| 1306179833 | YIA, MARY CHRISTINE | FP | | J400075320 | | NY 004079 | 03472002 |

30

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1548363559 | HATHWAR, JAGADEESH | GI | | 02163000<br><br>CC6577 (Two?) | H42575 | NY 211024 | |
| 1639385479 | KIM, KAREN | GI | | | | NY 260998 | |
| 1306968417 | SINGH, MARVIN | GI | | | | NY 265559 | |
| 1003880683 | REPPERT, MATTHEW | Surgery | | 39822P<br><br>RR NY 020049791 | F64037 | MD044340E<br><br>NY 192911-1 | 01431621 |
| 1710204573 | AGHELI, AREF | Hematology | | J400024385 | | NY 257893 | 03246191 |
| 1285646125 | CONJALKA, MICHAEL | Hematology | | J400014443 | B20221 | NY 134887 | 00783404 |
| 1336116037 | CASSETTA, BRIAN | Int Med | | 39821F<br><br>RR NY B58844 | B58844 | MD028026E<br><br>NY 153836-1 | 01028899 |
| 1003880055 | CHOI, SUSAN | Int Med | | 51323C<br><br>RR NY 110224587 | E67074 | MD042209E<br><br>NY 181337-1 | 01222040 |
| 1639394323 | COCH, REILLY | Int Med | | RB5858 | | NY 245671 | 02908116 |
| 1306810270 | CREPET, RUTH | Int Med | | 50606E<br><br>RR NY 110078649 | B37628 | NY 181204-1 | 01173335 |

31

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| | | | | | | | |
| 1063487296 | ELSISI, AMR | Int Med | | DD2894 RR NY 110244494 | H72750 | NY 225142-1 | 02351022 |
| 1487629622 | ESTILL, MATTHEW | Int Med | 848237N8Q | 50606Z RR NY 110209191 | G05241 | MD058404L NY 202366-1 | 01636502 |
| 1326039058 | HALLINAN, JAMES | Int Med | | | | NY C0030251 | |
| 1912974619 | HO, ELIZABETH | Int Med | | 39822K RR NY 110225125 | E97198 | MD044235L NY 185920 | 01255632 |
| 1851362594 | LEWIS, PAULETTE | Int Med | | DD4564 | H55583 | NY 207068-1 | 01761302 |
| 1225009095 | MALAVET, ANGEL | Int Med | | 5021P RR NY 110224589 | G06222 | NY 200024-1 | 01575011 |
| 1174595136 | MOHYUDDIN, ALIASGHAR | Int Med | 032439N9K | CC2071 RR NY 110209182 | G23527 | MD068766L NY 215037-1 | 01980905 |
| 1154396752 | SHARMA, HARI Clinic Board | Int Med | | 50210G RR NY 110224584 | B82777 | NY 110375-1 | 00395033 |

32

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1700851375 | SKEZAS, JACOB | Int Med | | 50606C <br><br> RR NY 110079070 | B42305 | MD038449E <br><br> NY 176831-1 | 01088191 |
| 1396711479 | WEINER, JAMIE | Int Med | | RA7036 | B79093 | MD058229L <br><br> NY 141180-1 | |
| 1417923434 | WOGLOM, RUSSELL <br><br> Clinic Manager – 1000 Admissions | Int Med | | 50210U <br><br> RR NY 110224586 | B82780 | NY 170146-1 | 01030271 |
| 1508859125 | KRAUSE, NORMAN | Ortho surg Pain Mgt | | IA0794 <br><br> J400084825 (two?) | C29290 | NY 138531 | 02162958 |
| 1306091400 | HAREWOOD, PETER | Ob-Gyn | | | | NY 270729 | |
| 1801861489 | SCALZONE, JOHN <br><br> Clinic Board | ObGyn | | CC2078 | G29171 | MD058299L <br><br> NY 210773-1 | 01864855 |
| 1861450298 | SCHAEFER, GREGORY | ObGyn | | RB5535 | C21602 | NY 244641 | 02898584 |
| 1215166707 | SCOTT, JAMES | ObGyn | | | | 258271 | |
| 1265694608 | MAINOLFI, MARIA | Occ Med | | | | NY 266134 | |

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1841264215 | REED, ROBERT | Occ Med | | 50606S | E89472 | MD063534L 193063-1 | 01461701 |
| 1184691065 | CHAUDHRI, KAMRAN | Ophth | All Mass. | All Mass. | H46450 | NY 219404 | All Mass. |
| 1376547273 | CRISP, ANGELA | Ophth | All Tenn. | All Tenn. | F-32731 | NY 271510 | All Tenn. |
| 1174796890 | GIGANTI, MONICA | Ophth | | | | NY 248784 | |
| 1669440137 | HOGREFE, KENNETH | Ophth | | 51397G RR NY 180042769 | B81001 | MD53407L NY 144719-1 | 00779846 |
| 1013178052 | APEL, PETER | Ortho | | | | NY 271489 | |
| 1275506503 | AUSTIN, DAVID | Ortho | 707040N9S | 55973F RR NY 200039044 | G28093 | NY 192792-1 | 01653823 |
| 1679587760 | GREENE, BRUCE | Ortho | | 55136C | D19060 | NY 153402 | 01507464 |
| 1194914812 | MCCLURG, JOEL | Ortho | NC o y | NC o y | 2016290 | NY 264649 | NC o y |
| 1467414920 | SOMMER, JOHN | Urology | 153565N88 | RR – NY P00304946 | C32093 | MD023415E | 02732070 |
| 1194790923 | SUSSMAN, HAL Clinic Board | ENT | | 55973C RR NY 040016277 | E12342 | OS009427L NY 202336 | 01635083 |

34

**EXHIBIT B**

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| | | | | | | | |
| 1053380725 | KAHN, ROWSHANUL | PEDS | 0018454770001 | CC6681 RR NY 370019082 | G17698 | NY 221066-1 | 02161439 |
| | MALAVET, JANETE | PEDS | NO RECORD | NR | NR | NR | NR |
| 1306851035 | NAIK, DHRUTI | PEDS | | | | NY 231827 | 02752761 |
| 1679787154 | ODIFE, AMECHI | PEDS | | | | NY 254821 | |
| | QADIR, ABDUL | PEDS | | 56349E | C50490 | NY 142784-1 | 00689318 |
| | | | | | | | |
| 1588639314 | TAO, SUEHONG | PEDS | | DD5798 | H85059 | MD073327L NY 222009 | 02407312 |
| 1134379902 | GRAHAM, DAVID | PLASTIC SURGERY | | | | NY 269255 | |
| | DUBOIS, LOUIS | PULM | | 39822L RR NY 290013918 | F01332 | NY 186516-1 | 01258882 |
| 1477549285 | COLLIER, CHARLES | RAD ONC | | RA9947 | B82381 | NY 157804 | 00837930 |
| 1932192051 | AYYUB, MOHAMMAD | RAD | | | | NY 134475 | |
| 1497720213 | DOUENIAS, ROBERT | UROLOGY | 901192N88 RR NY 340018205 | 51397O | F41670 | MD059201L NY178316-1 | 01350774 |

35

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1376536474 | ASGHER, ZAHID | PATH | | RA5878 | F59524 56190D (two?) | NY 184389 | 01719575 |
| | HAMEED, SHAHID | RAD ONC | NO RECORD | NR | NR | NR | NR |
| 1578536876 | BIFANO, JOSEPH Board | RAD | 064891QQE 064891N87 (two) RR PA 300138269 | RA0210 RR NY P00196036 | H48270 | MD072317L NY 192746-1 | 02370583 |
| 1790791804 | CAMARENA, JACINO | RAD | | J400050960 | | NY 262132 | |
| 1053498147 | HORWICH, PERRY | RAD | 225046 | J400047626 | I11070 | NY 216852-1 | 03349075 |
| 1104862986 | FREEMAN, JAMES | RHEUM | 123373N8Q | 34935K | C58971 | NY 170165 | 01031736 |
| 1922266634 | ARAZI, TEOFILO | Hospitalist | | | | NY 262066 | |
| 1598731150 | GARCIA, CARLOS | Hospitalist Int Med | 115342N8Q | RA1178 RR NY P00098794 | G57531 | NY 208328-1 | 01880732 |
| 1992077051 | KHAN, MADEEHA | Hospitalist | | J400079942 | | NY 266532 | |
| | MOWLA, MOHAMMED | Hospitalist | NO RECORD | NR | NR | NR | NR |
| 1992020069 | OE, YUKIKO | Hospitalist | | J400019394 | | NY 003502 | 03230031 |
| 1396719985 | PARKEN, PETER | Hospitalist | | 50210T | B82782 | NY 151614-1 | 01028913 |

36

# EXHIBIT B

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| | | | | RR NY 110224583 | | | |
| 1316967623 | PERLE, JAMES | Hospitalist | 006595 | | G66129 | MD063893L | |
| 1982677829 | POKORNY, GEORGE<br><br>Clinic Board | Orthopedic | No Longer Listed | | B81330 | 156399-1 | 00965637 |
| 1841452919 | JACOBSON, JEFFREY | Psychiatry | | | | | |
| 1619980224 | RAMADAN, SHEREEF | Radiology | | | | 01057081A | |
| 1225033772 | DENNEN, TIMOTHY | Family Med | 080754 | | B72130 | MD035289E | |
| 1326264383 | CERAOLO, LISA | Primary Care | 229046Y0L | | | MD431154 | |
| 1932540218 | AGRAWAL, VINEET | Urology | 421625N88 | | | MD454350 | 04191984 |
| 1295998672 | ELHUSEIN, SARA | OG-GYN | | | | OS017773 280508 | |
| 1174841084 | NEUBERT, LEE | Anesth | | | | OS017404 280042 | |
| 1568774784 | ZAKIR, ZEBO | Anesth | | | | MD455794 | |
| 1659500452 | SINGH, MANINDER | Int. Med | | | | MD447338 | |
| 1992038251 | THAKAR, KEYUR | Hem/Onc | | | | MD454683 | |

37

**EXHIBIT B**

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| 1811966765 | KUCHELAN, DEEPA | Pulm | | | | MD427160 | |
| | SHARAF-ELDEEN, EHSAN | | | | | | |
| 1497042832 | HADDAD, HOUSAM | Hem/Onc | | | | MD443319 | |
| 1497047369 | SINH, PREETIKA | GI | | | | | |
| 1821229584 | CHOI, YOON JAE | Psychiatry | | | | MD45385 | |
| 1235296591 | RICKERT, KIM | Neurosurgery | | | | MD455464 | |
| 1225262900 | GOLDEN, DANIEL | Trauma Surg | | | | MT194839 | |
| 1528334794 | LINKENHEIL, ELIZABETH | ER | | | | OS017508 | |
| 1023346483 | FRIESS, ZACHARY | Radiology | | | | OS017625 279942 | |
| 1275698243 | MINGOS, MARK | Radiology | | | | MD439162 279343 | |
| 1811200777 | PAL, RAKHI | Anesth | | | | MD454774 279561 | |
| 1003857590 | JOSWICK, DAVID | Anesth | | | I23818 | 259903 | |
| 1255434619 | NANDA, MICHELLE | Fam Med | | | H67511 | 279683 | |
| 1134486145 | JASTI, VENKATA | Hospitalist | | | | MD455191 | |
| | JEAN-MARIE, NANCY | | | | | | |

38

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| | LOBO, DAVID | | | | | | |
| 1942266259 | RORABAUGH, JAMES | Gen Surgery | 081745 | | G15081 | MD051863L | |
| 1205053113 | BEHESHTI, JAVAD | Pathology | 402325N8W | J400199653 | | MD453997 268155-1 | |
| 1861464323 | TSANG, ALEXANDER | Ophthalmology | | | | | |
| 1346464849 | RAMA, SREEDHAR | Int Med / Hospitalist | | | I72088 | MD430486 | |
| 1386956563 | AUERBACH, BRETT | Orthopedic | | | | OS017298 264595 | 04561235 |
| 1992023071 | TAYAG, DANIEL | Orthopedic | | | | | |
| 1972955565 | KRISHNAMOORTHY, RAJBABU | Urology | | | | MD45768 | |
| | | | | | | | |
| 1538325394 | MCPHAIL, PHILIP | Trauma Surg | | | | MD457109 | |
| 1578903258 | MARSHALL, CORINA | Fam Med | | | | MD459027 | |
| 1104263169 | BARROWS, STEVEN | Fam Med | 529875N9X | | | MD457049 | 04542292 |
| 1891135851 | GANDHI, FORAM | Peds | | | | 285211 | |
| 1235572876 | KHAN, AMBER | Hospitalist | | | | MD459088 | |

39

**EXHIBIT B**

GUTHRIE CLINIC LTD.
PHYSICIANS' NPI
(National Provider Identifier)
LOG

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| | | | | | | | |
| 1619287596 | MCCLINTIC, ELYSA | Ophthalmology | 530070N85 | J40032671 | | MD457228 283897 | 04506832 |
| 1689977720 | MCCLINTIC, JEDEDIAH | Ophthalmology | | | | MD457707 | |
| 1518933498 | MEYER, MICHAEL ANDRES | Neurology | | | G07820 | MD459621 219413 | |
| 1588845028 | MCELHANEY, NATHANIEL | Card Surg | | | | MD458611 | |
| 1710327796 | TAUFLIK, MIREILLE | Fam Med | | | | | |
| 1790908069 | BAU, JENNIFER | Radiology | | | | MD436395 | |
| 1043617830 | LAL, DARSHAN | Hospitalist | | | | MD45814 | |
| 1184856478 | RAVI, ANANTH | Radiology | | | | | |
| 1649321977 | MOIS-KOWALCZEWSKI, BARBARA | Endocrinology | | J400000962 | | 194168 | 01460159 |
| | | | | | | | |
| 1952546038 | MWESIGE, JOSEPH | Int Med | 159630 | | | MD437681 | 03123544 |
| 1659746394 | RAND, JEFFREY | Derm | | | | 169158 | 04413681 |
| | SUBRAYAPPA, NAVIN KUMAR | Cardiology | | | | | |
| 1407866205 | ZIAUDDIN, M. FIRDOS | Breast Surg | | | | | |

40

**EXHIBIT B**

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|-----|------|-----------|-------------------|-------------------|---------------|---------------|-------------|
| | | | | | | | |
| 1912140724 | BANERJEE, SIMA | Radiology | | | | MD458555 285409 | |
| 1730161621 | HAYES, JAMES | ENT | | | | 168453 | |
| 1780725051 | JARVIS, WINGROVE | Orthopedic | | | | MD448347 | |
| 1346210879 | RONSIVALLE, JOSEPH | Radiology | | | H04825 | | |
| 1467435115 | SCHACKOW, T. ERIC | Fam Med | 488175N86 | J400011473 | G66238 | MD456820 209615 | 01805614 |
| 1205839933 | CANNARIATO, CATHERINE | Fam Med | | BB8986 | F26662 | 182559 | 01417770 |
| 1083619530 | CHALABI, SAMIM | Gen Surg | | | H24616 | MD071978L | 02154007 |
| 1841435401 | BUTLER, SHEILA | Occ Med | | | | 192608 | |
| 1588764484 | CHOI, MIKE | Fam Med | | | | 228972 | |
| 1861628612 | DYER, PATRICK | Radiology | | | | MD456763 | |
| 1194746974 | KAMENSKI, ROBERT SCOTT | Radiology | | | | MD428423 | |
| 1114922663 | PAULISH, JOHN | Hospitalist | 648567YGDB | | E12462 | OS005887L | |

41

**EXHIBIT B**

**GUTHRIE CLINIC LTD.**
**PHYSICIANS' NPI**
**(National Provider Identifier)**
**LOG**

| NPI | Name | Specialty | Medicare PIN - PA | Medicare PIN - NY | Medicare UPIN | PA/NY License | Medicaid NY |
|---|---|---|---|---|---|---|---|
| 1689991697 | WORLEY, ANDREA | Peds | | | | 280903 | |
| 1255309944 | GERGEL, THOMAS | Radiology / Radiation Oncology | | | H89521 | MD421616 | |
| 1023062353 | DIFILIPPO, WILLIAM | Nephrology | | | F43638 | MD430288 219785-1 | 02107899 |
| 1386614253 | MEVORACH, DAVID | Anesth /Pain Mgt | | | E41533 | MD456736 170758 | 01218386 |

42